**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DC GAMBLING RECOVERY LLC, | Case No. 1:25-cv-1023 (CJN) |
| *Plaintiff*, | **DEFENDANTS AMERICAN WAGERING, INC. DBA CAESARS SPORTSBOOK, BETFAIR INTERACTIVE US LLC DBA FANDUEL, AND FBG ENTERPRISES OPCO, LLC DBA FANATICS BETTING AND GAMING'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |
| v. | |
| AMERICAN WAGERING, INC. dba CAESARS SPORTSBOOK, BETFAIR INTERACTIVE US LLC dba FANDUEL, BETMGM, LLC, CROWN DC GAMING LLC dba DRAFTKINGS, FBG ENTERPRISES OPCO, LLC dba FANATICS | |
| *Defendants*. | **ORAL HEARING REQUESTED** |

Robert A. Fumerton (*pro hac vice*)
Judith A. Flumenbaum (*pro hac vice*)
Sarah E. Danehy (*pro hac vice*)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
(212) 735-3000
robert.fumerton@skadden.com
judy.flumenbaum@skadden.com
sarah.danehy@skadden.com

Shay Dvoretzky (DC Bar No. 498527)
 *Counsel of Record*
Parker Rider-Longmaid (DC Bar No. 1552207)
Sylvia O. Tsakos (DC Bar No. 888273394)
Hanaa Khan (DC Bar No. 173586)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
1440 New York Ave., N.W.
Washington, DC 20005
(202) 371-7000
shay.dvoretzky@skadden.com
parker.rider-longmaid@skadden.com
sylvia.tsakos@skadden.com
hanaa.khan@skadden.com

*Attorneys for Defendants American Wagering, Inc. dba Caesars Sportsbook, Betfair Interactive US LLC dba FanDuel, and FBG Enterprises Opco, LLC dba Fanatics Betting & Gaming*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 5

    A.    Legal background ................................................................................................. 5

          1.    Since the early 1800s, the District's Statute of Anne has permitted those who lost money gambling and other persons to recover gambling losses from winners. ................................................................. 5

          2.    Congress enacts PASPA in the 1990s to impose a nationwide ban on sports betting, subject to a handful of grandfathered exceptions. ........... 8

          3.    In its 2018 decision in *Murphy*, the Supreme Court finds PASPA's core provisions unconstitutional and finds the remaining provisions not severable. ............................................................................................ 10

          4.    In the wake of *Murphy*, the District passes the Sports Wagering Act, authorizing the creation of a heavily regulated sports betting industry. ......................................................................................... 12

    B.    Factual background .......................................................................................... 15

          1.    Sportsbook offerings ............................................................................... 16

          2.    Parties ..................................................................................................... 16

    C.    Procedural background ..................................................................................... 17

REQUEST FOR ORAL HEARING .................................................................................. 18

LEGAL STANDARD ....................................................................................................... 18

ARGUMENT ................................................................................................................... 19

I.    DC Gambling Recovery's claim fails as a matter of law because the District's Statute of Anne does not apply to sports wagering or corporate entities ........................ 19

    A.    The Statute of Anne's prohibition on betting on "cards, dice or any other game" does not encompass sportsbook offerings. ................................................ 19

**TABLE OF CONTENTS**
**(continued)**

Page

    1.    The Statute of Anne's specification of "cards" and "dice" qualifies the type of "any other game" the statute reaches to include only other traditional table games of chance. ....................................................19

    2.    Sportsbook offerings do not qualify as "any other game" under the Statute of Anne because they are not, and are not like, traditional table games of chance. ...............................................................21

B.    The Statute of Anne applies only to natural persons, so corporate entities cannot sue or be sued under it..................................................................23

II.    DC Gambling Recovery's claim fails as a matter of law because the Sports Wagering Act authorizes Defendants' licensed sports wagering operations and overrides any application of the Statute of Anne to authorized sports wagering. .............24

A.    The Sports Wagering Act repealed the Statute of Anne as to authorized sports wagering. ..................................................................................24

    1.    A later act overrides and repeals an earlier one when the acts conflict, or when the later act displaces the earlier act's application to certain subject matters. ..........................................................24

    2.    The Sports Wagering Act overrode and repealed the Statute of Anne as to licensed sports wagering, even assuming the Statute of Anne ever applied to sports wagering and corporate entities. ..................25

    3.    Trying to harmonize the Sports Wagering Act and the Statute of Anne would raise serious due process concerns about the government's inviting conduct only to penalize it.....................................28

B.    DC Gambling Recovery's contentions fail. ...........................................29

III.    PASPA has no force or effect in DC, as *Murphy* makes clear, so it does not bar the Sports Wagering Act. ...............................................................................31

A.    PASPA has no force and effect in DC because *Murphy* held that Congress would not have enacted any provision of PASPA if it knew of the unconstitutionality..................................................................................31

B.    Even if *Murphy* did not hold that Congress would not have enacted any provision of PASPA if it knew of the unconstitutionality, no provision of PASPA is still in force in the District. ...................................................31

C.    PASPA does not bar the Sports Wagering Act, which authorizes Defendants' sports betting operations....................................................33

**TABLE OF CONTENTS**
**(continued)**

**Page**

IV.    Even if DC's Statute of Anne applies to licensed sports wagering like Defendants' offerings, DC Gambling Recovery fails to state a claim. ....................................................34

    A.    DC Gambling Recovery fails to identify any unsuccessful bettors, any bets worth at least $25, or when any particular loss occurred.......................................34

    B.    DC Gambling Recovery's attempt to plead bets, unsuccessful bettors, and timeliness "upon information and belief" fails. ....................................................36

CONCLUSION....................................................................................................................37

CERTIFICATE OF SERVICE ............................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

C**ASES**

*Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*,
  59 F.4th 948 (8th Cir. 2023) .............................................................................. 36

*Ali v. Federal Bureau of Prisons*,
  552 U.S. 214 (2008).......................................................................................... 19

*Ardis v. Ward*,
  467 S.E.2d 742 (S.C. 1996) ............................................................................... 36

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................... 18, 35

*Bank of Augusta v. Earle*,
  38 U.S. (13 Pet.) 519 (1839) ............................................................................. 23

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................... 15

*Bliley v. Kelly*,
  23 F.3d 507 (D.C. Cir. 1994) ............................................................................ 33

*\*Carragher v. District of Columbia*,
  240 A.3d 321 (D.C. 2020) ....................................................................... 9, 10, 12,
  ........................................................................................................... 13, 24, 31, 34

*Carter v. State Farm Mutual Automobile Insurance Co.*,
  808 A.2d 466 (D.C. 2002) ................................................................................. 29

*Circuit City Stores, Inc. v. Adams*,
  532 U.S. 105 (2001)..................................................................................... 19, 20

*Crowell v. Benson*,
  285 U.S. 22 (1932)....................................................................................... 28, 29

*Department of Homeland Security v. MacLean*,
  574 U.S. 383 (2015)........................................................................................... 21

*Department of Homeland Security v. Regents of the University of California*,
  591 U.S. 1 (2020)............................................................................................... 29

*Federal Communications Commission v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)........................................................................................... 28

*Gordon v. New York Stock Exchange, Inc.*,
  422 U.S. 659 (1975)................................................................................ 24, 25, 26

*Hall St. Associates, LLC v. Mattel, Inc.*,
  552 U.S. 576 (2008)..................................................................................... 19, 20

*Humphrey v. Viacom, Inc.*,
  No. 06-2768, 2007 WL 1797648 (D.N.J. June 20, 2007).................... 6, 20, 22, 23, 35

**TABLE OF AUTHORITIES**
(continued)

PAGE(S)

*Langone v. Kaiser*,
No. 12-cv-2073, 2013 WL 5567587 (N.D. Ill. Oct. 9, 2013) ............................................ 20, 35

*Loughrin v. United States*,
573 U.S. 351 (2014) ................................................................................................................ 21

*Mama Cares Foundation v. Nutriset Société Par Actions Cimplifié*,
825 F. Supp. 2d 178 (D.D.C. 2011) ........................................................................................ 20

*McCurry v. Keith*,
481 S.E.2d 166 (S.C. Ct. App. 1997) ................................................................................ 35, 36

*Minneapolis & St. Louis Railway Co. v. Beckwith*,
129 U.S. 26 (1889) .................................................................................................................. 23

*\*Murphy v. National Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) .................................................................................... 1, 2, 4, 5, 8, 9,
................................................................................................. 10, 11, 12, 17, 18,
................................................................................................. 24, 26, 31, 32, 33, 34

*National Labor Relations Board v. SW General, Inc.*,
580 U.S. 288 (2017) ................................................................................................................ 21

*Noble v. Union River Logging Railroad Co.*,
147 U.S. 165 (1893) ................................................................................................................ 23

*Patriots for Legal Equality, LLC v. DraftKings, Inc.*,
No. SUCV 2015-3364-D, 2016 WL 11972483
(Mass. Super. Ct. Feb. 23, 2016) ............................................................................................ 35

*\*Pearsall v. Alexander*,
572 A.2d 113 (D.C. 1990) ......................................................................... 3, 5, 6, 8, 23, 24

*PHH Corp. v. Consumer Financial Protection Bureau*,
839 F.3d 1 (D.C. Cir. 2016), *reinstated in pertinent
part on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018) ........................................................ 4, 28

*Raley v. Ohio*,
360 U.S. 423 (1959) ................................................................................................................ 28

*Redmon v. YMCA of Metropolitan Washington*,
417 F. Supp. 3d 99 (D.D.C. 2019) .......................................................................................... 18

*Texas Industries, Inc. v. Radcliff Materials, Inc.*,
451 U.S. 630 (1981) .......................................................................................................... 7, 8, 26

*Trudeau v. Federal Trade Commission*,
456 F.3d 178 (D.C. Cir. 2006) ................................................................................................ 18

*Trustees of Dartmouth College v. Woodward*,
17 U.S. (4 Wheat.) 518 (1819) ................................................................................................ 23

**TABLE OF AUTHORITIES**
(continued)

PAGE(S)

*United States v. Booker,*
543 U.S. 220 (2005) ........................................................................................ 32

*United States v. Brown,*
309 A.2d 256 (D.C. 1973) ...................................................................... 3, 19, 20

*United States v. Kaluza,*
780 F.3d 647 (5th Cir. 2015) ........................................................................... 20

*United States Parole Commission v. Noble,*
693 A.2d 1084 (D.C. 1997) ....................................................................... 24, 25

*Ward v. District of Columbia,*
494 A.2d 666 (D.C. 1985) ............................................................................... 23

*Wirt v. Stubblefield,*
17 App. D.C. 283 (1900) ...................................................................... 6, 8, 23,
.............................................................................................. 25, 26, 27, 28

*York Blouse Corp. v. Kaplowitz Bros.,*
97 A.2d 465 (D.C. 1953) ............................................................................. 7, 26

**CONSTITUTIUON AND STATUTES**

U.S. Const. art. I, § 10, cl. 1 .......................................................................... 23

U.S. Const. art. IV, § 2, cl. 1 .......................................................................... 23

U.S. Const. amend. V ................................................................................ 23, 28

U.S. Const. amend. X .............................................................................. 5, 10, 31

U.S. Const. amend. XIV .................................................................................. 23

28 U.S.C. § 1331 ............................................................................................. 18

28 U.S.C. § 1332 ............................................................................................. 18

*Professional and Amateur Sports Protection Act,
28 U.S.C. § 3701 *et seq.* .................................................................. 2, 4, 5, 8, 9,
............................................................................................. 10, 11, 12, 17,
............................................................................................. 18, 31, 32, 33, 34

28 U.S.C. § 3701(5) ........................................................................... 5, 9, 32, 33

28 U.S.C. § 3702(1) ............................................................................... 9, 32, 33

28 U.S.C. § 3702(2) ...................................................................................... 9, 11

28 U.S.C. § 3704(a) ......................................................................................... 9

28 U.S.C. § 3704(a)(3) ..................................................................................... 9

District of Columbia Self-Government & Governmental Reorganization Act,
42 U.S.C. § 14401 *et seq.* ............................................................................. 33

**TABLE OF AUTHORITIES**
(continued)

PAGE(S)

D.C. Code § 1-206.02(c)(1) ................................................................ 33

D.C. Code § 12-301(a)(5) ................................................................. 36

D.C. Code § 12-301(a)(8) ................................................................. 36

*D.C. Statute of Anne,
    D.C. Code § 16-1701 *et seq.* .............................................. 1, 2, 3, 4, 5,
    ......................................................................... 6, 7, 8, 17, 19,
    ...................................................................... 21, 22, 23, 24, 25,
    ................................................................. 26, 27, 28, 29, 30, 34, 35

    D.C. Code § 16-1701 .......................................................... 21

    D.C. Code § 16-1701(a) ........................................................ 6

    D.C. Code § 16-1702 ........................................................ 1, 2, 3, 4,
    ......................................................................... 6, 7, 8, 17, 19, 20,
    .................................................................... 21, 23, 24, 27, 34, 35, 36

    D.C. Code § 16-702 (1961) ................................................ 7, 21

    D.C. Code § 16-1702 (1963) ............................................... 7, 21

    D.C. Code § 16-1703 .......................................................... 8

An Act to Establish a Code of Law for the District of Columbia,
    ch. 854, § 869, 31 Stat. 1189, 1331 (1901) ........................... 8, 26

    D.C. Code § 22-1708 ..................................................... 12, 15, 22, 30

*Sports Wagering Lottery Amendment Act of 2018, D.C. Law 22-312,
66 D.C. Reg. 1402 (Jan. 23, 2019),
    D.C. Code § 22-1716 *et seq.* ...................................... 1, 2, 3, 4, 12,
    ......................................................................... 13, 14, 15, 17,
    ...................................................................... 18, 24, 25, 26, 27,
    ................................................................. 28, 29, 30, 31, 33, 34

    D.C. Code § 22-1716 ..................................................... 12, 15, 30

    D.C. Code § 22-1717 ..................................................... 14, 15, 30

    D.C. Code § 36-601.01 ........................................................ 14

    D.C. Code § 36-601.01(c)(13) .......................................... 13, 14, 27

    D.C. Code § 36-601.01(c)(17) ............................................ 13, 27

    D.C. Code § 36-601.01(c)(20) ........................................ 13, 14, 25, 27

    D.C. Code § 36-621.01 .................................................. 3, 12, 14, 25

    D.C. Code § 36-621.02 ........................................................ 14

    D.C. Code § 36-621.02(a) ............................................... 14, 15, 27

# TABLE OF AUTHORITIES
## (continued)

PAGE(S)

D.C. Code § 36-621.02(a)(2) ................................................................. 3, 15, 29

D.C. Code § 36-621.02(a)(14) .......................................................................... 15

D.C. Code § 36-621.02(c) ...................................................................... 14, 25, 27

D.C. Code § 36-621.04 ..................................................................................... 27

D.C. Code § 36-621.04(a) ................................................................................. 14

D.C. Code § 36-621.04(b)(1) ............................................................................ 14

D.C. Code § 36-621.04(b)(2) ............................................................................ 14

D.C. Code § 36-621.04(c) ................................................................................. 14

D.C. Code § 36-621.05 .............................................................................. 14, 25

D.C. Code § 36-621.06 ................................................................. 13, 14, 25, 27

D.C. Code § 36-621.06(b)(1) ............................................................................ 14

D.C. Code § 36-621.06(b)(3)(A) ....................................................................... 14

D.C. Code § 36-621.06(c) ................................................................................. 14

D.C. Code § 36-621.06(c)(4)(A) ....................................................................... 14

D.C. Code § 36-621.06(c-1) ............................................................................. 14

D.C. Code § 36-621.11(a) ................................................................................ 13

D.C. Code § 36-621.15 ..................................................................................... 27

D.C. Code § 36-621.15(a)(2) ............................................................................ 14

D.C. Code § 36-621.15(d) ................................................................................ 12

An Act Against Deceitful, Disorderly, and Excessive Gaming (Statute of Charles),
16 Car. 2 c. 7 (Eng. & Wales) ................................................................... 27, 28

Gaming Act 1710 (Statute of Anne),
9 Anne c. 19 (Gr. Brit.) ................................................................... 1, 3, 5, 6, 7,
.............................................................................................. 21, 23, 27, 28

9 Anne c. 19 § I ......................................................................................... 6, 21

9 Anne c. 19 § II ...................................................................... 6, 7, 8, 21, 23

REGULATIONS AND RULE

D.C. Mun. Regs. Title 30, §§ 2000-2604 ......................................................... 15

D.C. Mun. Regs. Title 30, § 2023.4 ............................................... 15, 25, 26, 29

D.C. Mun. Regs. Title 30, § 2027.14 ............................................................... 15

D.C. Mun. Regs. Title 30, § 2118.2 ................................................... 15, 26, 29

**TABLE OF AUTHORITIES**
(continued)

PAGE(S)

D.C. Mun. Regs. Title 30, § 2118.3 ..................................................................... 15, 26

Local Civil Rule 7(f) ........................................................................................... 18

**OTHER AUTHORITIES**

138 Cong. Rec. 12,972 (1992) ..................................................................... 9, 10, 32

138 Cong. Rec. 32,439 (1992) ..................................................................... 10, 32

*B22-0944 - Sports Wagering Lottery Amendment Act of 2018*,
   Council of the District of Columbia, https://lims.dccouncil.gov/
   Legislation/B22-0944 (last visited May 5, 2025) ........................................ 33

27 Tracy Bateman et al., *Federal Procedure, Lawyer's Edition* (Mar. 2025 update) ................. 36

Council of the District of Columbia, Committee on Finance & Revenue,
   *Report on Bill 22-944, the "Sports Wagering Lottery Amendment
   Act of 2018"* (2018) ................................................................................. 12, 13

Marc Edelman, *A Short Treatise on Fantasy Sports and the Law:
   How America Regulates Its New National Pastime*,
   3 Harv. J. Sports & Ent. L. 1 (2012) .................................................................. 7

Councilmember Evans, *Amendment to Bill 22-944,
   the "Sports Wagering Lottery Amendment Act of 2018"* (Dec. 18, 2018) ........................ 12, 13

1A Noah J. Gordon et al., *American Jurisprudence 2d Pleading*
   (Jan. 2025 update) ...................................................................................... 36

Philip Grant, *The Poor of the Parish: Social care in Kingsbury
   in the Early Nineteenth Century*, Brent Council (Oct. 2010),
   https://tinyurl.com/3s3fsynk .......................................................................... 6

Councilmember McDuffie et al., *Amendment to Bill 22-944,
   the "Sports Wagering Lottery Amendment Act of 2018"* (Dec. 18, 2018) ........................ 12, 13

Note, *The History and Development of Qui Tam*,
   1972 Wash. U. L.Q. 81 (1972) .......................................................................... 8

Office of Lottery and Gaming, *Approved Licenses*, District of Columbia Government,
   https://dclottery.com/olg/approved-licenses (last visited May 5, 2025) ................................ 16

*Prohibiting State-Sanctioned Sports Gambling, Hearing Before the
   Subcommittee on Patents, Copyrights, and Trademarks of the
   S. Comm. of the Judiciary*, 102nd Cong. (1991) .................................................. 9, 10

*Public Hearing on B22-0944, Hearings Before the Committee on
   Finance & Revenue* (D.C. Oct. 17, 2018) .......................................................... 12, 26

Eric Ramsey, *US Sports Betting Revenue & Handle*, Legal Sports Report
   (April 30, 2025), legalsportsreport.com/sports-betting/revenue .................................... 33

**TABLE OF AUTHORITIES**
(continued)

PAGE(S)

Antonin Scalia & Brian A. Garner, *Reading Law* (2012) ................................................. 19, 24, 25

2A N. Singer, *Sutherland on Statutes and Statutory Construction* (1991) .................................... 19

S. Rep. No. 102-248 (1991) ........................................................................................... 8, 9, 10, 32

5 Charles A. Wright & Arthur R. Miller,
    *Federal Practice and Procedure* (4th ed. Apr. 2025 update) .................................................. 36

## PRELIMINARY STATEMENT

This suit is an attempt by Plaintiff DC Gambling Recovery LLC to go after Defendants, five licensed sports wagering operators, for millions of dollars in damages under an archaic, inapplicable District of Columbia statute, simply for Defendants' engaging in lawful activity that the District expressly authorized, licensed, encouraged, and closely regulates. This case begins and ends with the District's Sports Wagering Lottery Amendment Act of 2018, D.C. Law 22-312, 66 D.C. Reg. 1402 (Jan. 23, 2019) (Sports Wagering Act). The District enacted the Sports Wagering Act in 2019 after the Supreme Court's decision in *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 481, 486 (2018), removed federal prohibitions on sports wagering. The Sports Wagering Act creates a comprehensive and uniform statutory and regulatory scheme to govern sports wagering activities in the District, including by imposing significant taxes on sports wagering operations and subjecting them to the District's Office of Lottery and Gaming's (OLG) oversight. The D.C. Council expected that the Act would generate significant revenue for the District and recognized that the District was competing with other jurisdictions to welcome the sports wagering industry in the wake of *Murphy*.

DC Gambling Recovery now seeks to recover treble damages for the very activity unambiguously authorized by the Sports Wagering Act. DC Gambling Recovery alleges one claim, on behalf of thousands of unidentified unsuccessful bettors (making unidentified bets), under the Statute of Anne, D.C. Code § 16-1702, a D.C. statute based on a 1710 English law. The statute allows treble recovery of gambling losses of $25 or more, with half the funds going to the plaintiff and half to the District.

Statutory text, context, and history make clear that the original English statute did not apply to sports wagering and the District's never has, either. But even if the Statute of Anne ever applied to sports wagering, the Sports Wagering Act makes clear that the Statute of Anne does not apply

to sportsbook wagering today. DC Gambling Recovery's notion that *District-licensed* sports wagering is somehow subject to treble damages under an outmoded law is baseless as a matter of statutory construction, absurd as a matter of common sense, and concerning as a matter of constitutional first principles. The government cannot both encourage conduct it authorizes and licenses and also impose punitive treble damages (with half going to the government) on that same conduct. Of course, D.C. law does not do that, despite DC Gambling Recovery's wishful contentions.

Recognizing the problem with its theory, DC Gambling Recovery claims that a federal statute, the Professional and Amateur Sports Protection Act (PASPA), 28 U.S.C. § 3701 *et seq.*, bars the Sports Wagering Act because it prohibits the District from authorizing sports gambling. Indeed, as DC Gambling Recovery all but concedes, to prevail it must win on a key federal question by showing that PASPA applies in the District and that it bars the Sports Wagering Act. But PASPA has no force and effect in the District or anywhere else. In *Murphy*, the Supreme Court held that PASPA's core provisions were unconstitutional because they commandeered state legislatures. 584 U.S. at 481, 486. DC Gambling Recovery claims that because the District is not a state, it has no defense to congressional commandeering. But that contention misses *Murphy*'s severability holding, where the Court concluded that Congress would not have enacted *any* provision of PASPA without the core unconstitutional provisions. Put differently, the Court concluded that Congress would not have enacted PASPA *at all* if it could not have enacted the core provisions that the Court found unconstitutional, and so the rest of PASPA fell along with those unconstitutional provisions.

In sum, DC Gambling Recovery's claim fails as a matter of law for four reasons:

**1.**	By its terms, the Statute of Anne, D.C. Code § 16-1702, does not apply to DC Gambling Recovery's sports wagering claim. Section 16-1702 punishes "persons" for betting on "cards,

dice or any other game." Under the *ejusdem generis* canon, which D.C. courts have used in construing gambling statutes, *see United States v. Brown*, 309 A.2d 256, 258 (D.C. 1973), "any other game" must refer to games similar to cards and dice—*i.e.*, traditional table games of chance. Those games do not include Defendants' sportsbook offerings. DC Gambling Recovery's claim also fails because the Statute of Anne authorizes suits only by and against natural persons—not corporate entities like DC Gambling Recovery and Defendants—based on the usage of the term "persons" at the time the original Statute of Anne was enacted and the District adopted its version.

2.    Even assuming the Statute of Anne applies to sports wagering, DC Gambling Recovery's claim fails because the Sports Wagering Act overrides the Statute of Anne as to licensed sports wagering. As the D.C. Court of Appeals has recognized, although the Statute of Anne is still on the books, it does not apply "where it is inconsistent with or repealed by subsequent law." *Pearsall v. Alexander*, 572 A.2d 113, 115 n.1 (D.C. 1990). If the Statute of Anne applied to licensed sports wagering activities, the Sports Wagering Act would override it as to those activities, because the laws would subject regulated parties, like Defendants, to conflicting standards. Indeed, the Sports Wagering Act covers the entire subject of licensed sports wagering, authorizing the very activity that the Statute of Anne seeks to punish and nullifying any effect the Statute of Anne could have on the matter.

In particular, under DC Gambling Recovery's theory, the Statute of Anne restricts all bets worth at least $25—by subjecting winners to a penalty of treble damages for those bets. The Sports Wagering Act, in contrast, makes licensed sports wagers "lawful," D.C. Code § 36-621.01, with OLG charged with setting the maximum amounts, *see id.* § 36-621.02(a)(2). And the regulations, in turn, permit wagers well above $25. The District also passed the Sports Wagering Act to increase revenue, imposing substantial taxes on sports wagering operations. But a regime subjecting

3

sportsbook operators to treble damages for bets worth at least $25 would undermine that goal by *deterring* sports wagering and making financially unsustainable the sports wagering industry that the D.C. Council hoped would be robust and financially profitable.

What's more, the Sports Wagering Act governs "the entire matter" of licensed sports wagering—from taxation to licensing to enforcement—thus nullifying any application the Statute of Anne could have to those licensed sportsbook operations. The Sports Wagering Act also makes clear that licensed sports wagering is not criminal—and the only way it can do that is if the law applies to all licensed sports wagering no matter the amount. On DC Gambling Recovery's theory, a $25.01 wager would expose a winner not just to treble damages, but also to criminal prosecution. The Sports Wagering Act forecloses both that possibility and DC Gambling Recovery's claim.

Worse still, trying to harmonize the Sports Wagering Act with § 16-1702 raises serious due process concerns. Due process prohibits the government from authorizing parties to engage in conduct and then imposing liability on them for that same conduct. *See PHH Corp. v. Consumer Financial Protection Bureau*, 839 F.3d 1, 46-49 (D.C. Cir. 2016) (Kavanaugh, J.), *reinstated in pertinent part on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018). But trying to harmonize the Sports Wagering Act with § 16-1702 would produce just that result, because the Sports Wagering Act makes lawful and encourages licensed sports betting—no matter the amount—and the Statute of Anne imposes debilitating treble damages on the winners of bets worth at least $25. Inviting conduct and then punishing it is the essence of arbitrary government action and failure to provide fair notice.

**3.** DC Gambling Recovery contends that a federal statute, PASPA, bars the Sports Wagering Act. DC Gambling Recovery acknowledges that the Supreme Court found PASPA unconstitutional in *Murphy*, but claims that *Murphy*'s holding applies only to the states, not the

District. That argument is meritless. *Murphy* "doom[ed]" PASPA in its entirety, holding that PASPA's provisions prohibiting states from authorizing and licensing sports gambling violated the Tenth Amendment, and that "no provision of PASPA is severable," because Congress would not have enacted any of PASPA's other provisions had it known about the unconstitutionality. 584 U.S. at 480-86. PASPA is thus no longer the law *anywhere* after *Murphy. See* 28 U.S.C. § 3701(5). And even assuming *Murphy* did not address PASPA's applicability to the District, the Court's analysis compels the same conclusion: nothing is left of PASPA. Congress sought to implement a "coherent federal policy" of prohibiting sports wagering nationwide, *Murphy*, 584 U.S. at 484, and would not have enacted PASPA to apply only in the District and territories.

     **4.**     Even assuming the Statute of Anne applies to licensed sportsbook operations (and it does not), DC Gambling Recovery still fails to state a claim. DC Gambling Recovery does not identify any unsuccessful bettors or any particular bet. Nor does it identify the value of any particular bet. And because it fails to identify when any loss occurred, or when any participant made a payment on the bet, it also fails to allege that any unsuccessful bettor failed to sue to recover their losses within three months. DC Gambling Recovery cannot allege all these elements "upon information and belief" because none of those facts are solely within Defendants' knowledge.

     The Court should dismiss DC Gambling Recovery's complaint with prejudice for the reasons explained here and for the reasons, which Defendants adopt by reference, set forth in the motion to dismiss filed by Defendants BetMGM, LLC, and Crown DC Gaming LLC.

## BACKGROUND

**A.**    **Legal background**

     **1.**     **Since the early 1800s, the District's Statute of Anne has permitted those who lost money gambling and other persons to recover gambling losses from winners.**

Enacted in England in 1710, the Statute of Anne—named after the then-reigning English

monarch—"outlawed certain forms of wagering, permitted unsuccessful bettors to recover their gambling losses, and denied winners the use of judicial process to collect from recalcitrant losers." *Pearsall*, 572 A.2d at 115 n.1. Section I made unenforceable certain contracts based on consideration derived from proceeds won from playing "Cards, Dice, Tables, Tennis, Bowls, or other Game or Games whatsoever." Gaming Act 1710, 9 Anne c. 19 § I (Gr. Brit.). Section II, in turn, allowed unsuccessful bettors and other individuals to sue to recover treble damages from those who won money at a narrower subset of activities—playing "Cards, Dice, Tables or other Game or Games whatsoever," "or by betting on the Sides or Hands of such as do play at any of the Games aforesaid." *Id.* § II. Half of the losses recovered were to be returned to the parish where the gambling took place "for the use of the Poor of the Parish." *Id.*; *see* Philip Grant, *The Poor of the Parish: Social care in Kingsbury in the Early Nineteenth Century*, Brent Council (Oct. 2010), https://tinyurl.com/3s3fsynk.

Eventually, U.S. states began adopting similar laws, likewise "directed at deterring traditional gambling." *Humphrey v. Viacom, Inc.*, No. 06-2768, 2007 WL 1797648, at \*4 (D.N.J. June 20, 2007). Maryland was one of those states. *Wirt v. Stubblefield*, 17 App. D.C. 283, 286 (1900). And when Maryland ceded land that became the District of Columbia in 1801, the Statute of Anne became law in DC as well. *Id.*

The District later codified its version of the Statute of Anne. Tracking the original English statute, the District's statute declared certain contracts involving winnings from "any game whatsoever" void. D.C. Code § 16-1701(a). And like the English version, the District's statute provided a narrower cause of action, covering a more limited set of games, against the "winner" of bets worth at least $25: "A person who, at any time or sitting, by playing at cards, dice or any other game, or by betting on the sides or hands of persons who play, loses to a person so playing or

betting, a sum of money, or other valuable thing, amounting to" at least $25, can sue "the winner thereof" to recover the amount lost. *Id.* § 16-1702. The unsuccessful bettor must sue the winner "within three months" of "pay[ing] or deliver[ing]" the money or item to the winner. *Id.* Notably, the District did not incorporate the terms "Tennis" or "Bowls" from the 1710 Statute of Anne into its own Code provision granting a private cause of action against a winner in 1961, *see* D.C. Code § 16-702 (1961), and it further narrowed the provision's reach in 1963 by eliminating the terms "tables" and "Games whatsoever," *see* D.C. Code § 16-1702 (1963).

The statute also allows another person to sue the winner if the unsuccessful bettor fails to do so within three months. Specifically, if the unsuccessful bettor "does not, within three months actually and bona fide, and without collusion, sue," then "any person may sue" the winner "and recover treble the value of the money" or item lost, with half the recovery going to the plaintiff and half to the District. *Id.* But the statute provides no procedure for the District to bring its own enforcement action or to intervene in an existing enforcement action brought by a private party. *See id.* Because the District cannot enforce the statute itself, the cause of action allowing "any person" to sue the winner effects a complete assignment of the District's interest in the statute's enforcement to the person suing, who brings an action in his or her own name to vindicate the interest the District has assigned to that plaintiff. *See York Blouse Corp. v. Kaplowitz Bros.*, 97 A.2d 465, 468 (D.C. 1953).

The Statute of Anne framework generally was meant "to prevent gambling losers from becoming wards of the state due to their risky financial behavior," Marc Edelman, *A Short Treatise on Fantasy Sports and the Law: How America Regulates Its New National Pastime*, 3 Harv. J. Sports & Ent. L. 1, 46 (2012), as the original statute's dedication of half the recovery to "the Poor of the Parish" shows, *see supra* p. 6. Treble damages—which are, by nature, punitive—served to

discourage betters from committing the "Offence." 9 Anne c. 19 § II; *see* D.C. Code § 16-1702; *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981). Beyond that, the Statute supplemented the general criminal prohibition on gambling and lotteries, which separately expressly included "mak[ing] books or pools on the result of any athletic contest." *See* An Act to Establish a Code of Law for the District of Columbia, ch. 854, § 869, 31 Stat. 1189, 1331 (1901) (codified as amended at D.C. Code § 22-1708). To that end, the Statute of Anne's private enforcement mechanism served "as a useful and perhaps necessary supplement" to the broader gambling prohibition at a time when local governments' regulatory and enforcement capabilities were less robust than they are today. Note, *The History and Development of Qui Tam*, 1972 Wash. U. L.Q. 81, 101 (1972). Confirming its punitive nature, the Statute of Anne further provides that gambling winners who return their profits under § 16-1702 will not incur "further or other punishment" for "playing for, or winning, the money." D.C. Code § 16-1703.

The District and Maryland were not the only jurisdictions restricting gambling. "By the end of the 19th century, gambling was largely banned throughout the country." *Murphy*, 584 U.S. at 458. But starting in the 1920s and 1930s, legislatures throughout the country began relaxing gambling laws. *Id.* Indeed, as early as 1900, courts recognized that Congress had begun chipping away at the Statute of Anne. *See Wirt*, 17 App. D.C. at 290-91. And throughout the next century, the District authorized and began to heavily regulate lotteries and other forms of gambling. *See Pearsall*, 572 A.3d at 116-17. The Statute of Anne still applies in the District, but not "where it is inconsistent with or repealed by subsequent law." *Id.* at 115 n.1; *infra* pp. 24-25.

### 2. Congress enacts PASPA in the 1990s to impose a nationwide ban on sports betting, subject to a handful of grandfathered exceptions.

Fast forward to the 1990s, when "there were signs that the trend" of legalizing "many other forms of gambling might extend to sports gambling." *Murphy*, 584 U.S. at 460. In response,

Congress enacted PASPA, 28 U.S.C. § 3701 *et seq.*, in an effort to "keep sports gambling from spreading," S. Rep. No. 102-248, at 4-6 (1991).

PASPA had two key prohibitions that "were meant to be deployed in tandem to stop … state legalization of sports gambling." *Murphy*, 584 U.S. at 484. The first applied to the "States," which PASPA defined as "the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, Palau, or any territory or possession of the United States," 28 U.S.C. § 3701(5). PASPA prohibited the States from "sponsor[ing], operat[ing], advertis[ing], promot[ing], licens[ing], or authoriz[ing] by law or compact" sports gambling schemes. *Id.* § 3702(1). The second prohibition applied to private parties, forbidding them from "sponsor[ing], operat[ing], advertis[ing], or promot[ing], pursuant to the law or compact of a governmental entity," sports gambling schemes. *Id.* § 3702(2).

PASPA also included a narrow grandfathering provision that allowed a few state-authorized sports gambling schemes to continue operating. *See id.* § 3704(a); *Carragher v. District of Columbia*, 240 A.3d 321, 322 (D.C. 2020). Specifically, Nevada could continue allowing sports gambling in casinos, and state-run sports gambling lotteries or sports pools could continue operating in three other states as well. *Murphy*, 584 U.S. at 462. New Jersey also was allowed to legalize sports gambling in Atlantic City as long as it did so within one year of PASPA's effective date. *Id.* (citing 28 U.S.C. § 3704(a)(3)).

Congress enacted PASPA to address concerns about the cumulative effects of widespread legalized sports gambling. When the Senate was considering PASPA, 32 states and the District already were running state-sponsored lotteries and had considered or were considering adding sports-themed lotteries. *E.g.*, 138 Cong. Rec. 12,972 (1992) (statement of Sen. DeConcini). But Congress sought to "stop th[e] trend toward sports gambling before it spread[]" to those

9

jurisdictions that were "considering sports lotteries." *Prohibiting State-Sanctioned Sports Gambling, Hearing Before the Subcommittee on Patents, Copyrights, and Trademarks of the S. Comm. of the Judiciary*, 102nd Cong., 11 (1991) (statement of Sen. Bradley). In some Congressmembers' view, "[o]ne State conducting sports gambling may not change the image of sports, but many will." *Id.* at 2 (statement of Sen. DeConcini). Senators thus sought to design PASPA to address "the cumulative effect that State sponsored sports betting could have on sports." 138 Cong. Rec. 12,972 (statement of Sen. DeConcini); *see* S. Rep. No. 102-248, at 5 (discussing effects of "[w]idespread legalization of sports gambling"). Members of the House likewise were concerned with addressing "coast-to-coast" sports betting. 138 Cong. Rec. 32,439 (statement of Congressman Fish).

### 3.    In its 2018 decision in *Murphy*, the Supreme Court finds PASPA's core provisions unconstitutional and finds the remaining provisions not severable.

In 2018, the Supreme Court held in *Murphy* that PASPA's core provisions are unconstitutional, 584 U.S. at 474, and no provision remains, thus "upend[ing]" the entire statute, *Carragher*, 240 A.3d at 322. *First*, the Court held that PASPA's prohibition on states' authorization of sports gambling violates the Tenth Amendment because it commandeers the states by "unequivocally dictat[ing] what a state legislature may and may not do." *Murphy*, 584 U.S. at 474. Likewise, the prohibition on states' licensing of sports gambling operations was unconstitutional because "[i]t issues a direct order to the state legislature." *Id.* at 481.

*Second*, having concluded that the provisions prohibiting states from authorizing and licensing sports gambling operations were unconstitutional, the Court held "that no provision of PASPA is severable" from the invalid ones, so no part of the law survived. *Id.* at 486. The Court's severability analysis asked what Congress would have done if it had known that PASPA's key provisions were unconstitutional. *Id.* at 481. The Court began by reasoning that Congress likely would not have enacted the prohibitions on States' operating, sponsoring, or promoting sports

gambling independently of the unconstitutional prohibitions on States' authorizing and licensing sports gambling schemes, because PASPA would not have remained "fully operative" without the unconstitutional provisions. *Id.* at 481-83. "The line between authorization, licensing, and operation, on the one hand, and sponsorship or promotion, on the other, is too uncertain." *Id.* at 483. And it was "unlikely," the Court reasoned, "that Congress would have wanted to prohibit such an ill-defined category of state conduct." *Id.*

The "PASPA provisions that prohibit a private actor from 'sponsor[ing],' 'operat[ing],' or 'promot[ing]' sports gambling schemes 'pursuant to' state law," were not severable either, the Court explained, so they likewise did not survive. *Id.* The provisions were "meant to work together" with the prohibitions on States, the Court explained. *Id.* And if "Congress lacks the authority to prohibit a State from legalizing sports gambling, the prohibition of private conduct under § 3702(2) ceases to implement any coherent federal policy." *Id.* at 484.

That left the provisions prohibiting the advertising of sports gambling. The Court held that those were not severable, either. *Id.* at 485-86. Congress would not have enacted those provisions without the unconstitutional provision, the Court reasoned, because then "federal law would forbid the advertising of an activity that is legal under both federal and state law." *Id.* at 485. The Court did not think Congress would have wanted such an anomalous result. *Id.* at 485-86.

Having examined each of PASPA's remaining provisions, the Court concluded that Congress would not have enacted any of them—that is, that it would not have enacted PASPA at all— if Congress had known of the constitutional infirmity of PASPA's core provisions. *Id.* at 486. The Court thus concluded that "the remainder of PASPA" was "doom[ed]." *Id.* at 480, 486; *see id.* at 481-85. As the dissenters observed, the Court's conclusion that no provision was severable from the unconstitutional provisions was "a wrecking ball destroying [PASPA] in its entirety." *Id.* at

493 (Ginsburg, J., dissenting).

    **4.**    **In the wake of *Murphy*, the District passes the Sports Wagering Act, authorizing the creation of a heavily regulated sports betting industry.**

When *Murphy* was decided, the District prohibited betting on "athletic contest[s]." D.C. Code § 22-1708. But "[w]ith *Murphy* in the books, many jurisdictions—including the District—raced to launch sports gambling platforms." *Carragher*, 240 A.3d at 322. Recognizing that "new sports gambling markets [would] emerge around the country" after *Murphy*, *Public Hearing on B22-0944, Hearings Before the Committee on Finance & Revenue* at 14:35-15:05 (D.C. Oct. 17, 2018) (statement of Councilmember White); *see id.* at 03:00-05:30 (statement of Chairman Evans), the D.C. Council sought to "establish a first-to-market advantage over neighboring jurisdictions," *Carragher*, 240 A.3d at 322-23, which the D.C. Council anticipated would soon authorize sports wagering, Council of the District of Columbia, Committee on Finance & Revenue, *Report on Bill 22-944, the "Sports Wagering Lottery Amendment Act of 2018"* at 5 (2018).

The District's "first step" was enacting the Sports Wagering Act, *Carragher*, 240 A.3d at 323, which made "[t]he operation of sports wagering and related activities" "lawful" in DC. D.C. Code § 36-621.01; *see id.* § 22-1716. The D.C. Council designed the Act to facilitate the growth of the sports wagering industry so that it would, in turn, "provide revenue to the District" and benefit its citizens. *Id.* § 22-1716. Councilmembers designed the Act to create a robust sports gambling market that would "return the maximum amount of revenue possible to the District while also ensuring strong consumer protections." *Public Hearing on B22-0944* at 02:50-03:00 (statement of Chairman Evans). The Council decided that sports wagering revenue would fund early childhood and violence prevention programs, including the District's Child Trust Fund. Council of the District of Columbia, Committee on Finance & Revenue, *Report on Bill 22-944, the "Sports Wagering Lottery Amendment Act of 2018"* at 3-4; D.C. Code § 36-621.15(d). In addition, the

Council aimed to "create middle-class jobs," Councilmember Evans, *Amendment to Bill 22-944, the "Sports Wagering Lottery Amendment Act of 2018"* at 2 (Dec. 18, 2018), and provide "opportunities for local business owners to participate" in the industry, Councilmember McDuffie et al., *Amendment to Bill 22-944, the "Sports Wagering Lottery Amendment Act of 2018"* at 7 (Dec. 18, 2018); *accord* Council of the District of Columbia, Committee on Finance & Revenue, *Report on Bill 22-944, the "Sports Wagering Lottery Amendment Act of 2018"* at 2-4.

The Sports Wagering Act created a comprehensive statutory scheme and contemplated detailed regulations to govern lawful sports wagering activities in the District. The D.C. Code defines "sports wagering" as:

> accepting wagers on sporting events, or a portion of a sporting event, or on the individual performance statistics of an athlete in a sporting event or combination of sporting events, including single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange wagering, in-game wagering, in-play bets, proposition bets, straight bets, or other means by a system or method of wagering, including in-person or over the internet through websites or on mobile devices.

D.C. Code § 36-601.01(c)(17). But the Code carves out from that definition certain "fantasy or simulated game[s] or contest[s] such as fantasy sports." *Id.* The Act's detailed provisions govern subjects like licensing requirements for sports wagering activities, enforcement of statutorily defined violations, taxation of sports wagering operations, and the promulgation of rules and regulations governing sports wagering conduct.

**Operator licenses.** Under the Sports Wagering Act, the District can operate its own mobile and online sports wagering platform. *Carragher*, 240 A.3d at 323 (citing D.C. Code § 36-621.11(a)). The District also can license third parties to operate in-person sports wagering facilities and offer mobile or digital sports wagering products. D.C. Code § 36-601.01(c)(20). In particular, the Act created three classes of "operators"—Class A, Class B, and Class C—who can run sports betting operations if they have an operators' license issued by OLG. *Id.* §§ 36-601.01(c)(13), 36-

13

621.06. Class A operators can operate a sports wagering facility in one of a few designated locations in the District: Capital One Arena, Audi Field, Nationals Park, or St. Elizabeths East Entertainment and Sports Arena. *Id.* § 36-621.06(b)(1). Class B operators can operate a sports wagering facility outside a certain radius of the designated Class A facilities. *Id.* § 36-621.06(c). And Class C operators can offer mobile and online sports wagering products within the District, but not within a certain radius of a designated facility. *Id.* § 36-621.06(c-1). Under the Act, OLG is responsible for licensing sports wagering operators and approving sports wagering facilities. *Id.* §§ 36-601.01(c)(20), 36-621.02(c); *see id.* § 36-621.05-06.

**Violations and enforcement.** The Act makes it unlawful for operators to misuse or fail to protect the personal information of those making sports wagers, and permits the D.C. Attorney General to bring a civil action in D.C. Superior Court to enjoin or recover penalties for any violations. *Id.* § 36-621.04(a), (c). In addition, the Act makes it unlawful for operators to make false or misleading statements about a person's chances of winning a sports wager. *Id.* § 36-621.04(b)(1). An aggrieved person can sue for damages or equitable relief, *id.* § 36-621.04(b)(2), or the D.C. Attorney General can seek an injunction or penalties in D.C. Superior Court, *id.* § 36-621.04(c).

**Taxation and fees.** The Act imposes steep taxes on sports wagering operators. *See id.* § 36-621.15(a)(2). Class A operators must pay 20% of their "gross sports wagering revenue" to the District each month; Class B operators pay 10%; and Class C operators pay 30%. *Id.* Operators also must pay the District non-refundable licensing fees, which range from $100,000 to $1 million. *See id.* § 36-621.06(b)(3)(A), (c)(4)(A).

**Regulations.** The Act subjected sports wagering activities to heavy regulation, primarily by OLG. *See, e.g.*, *id.* §§ 22-1717, 36-601.01, 36-621.01, 36-621.02. "To ensure fair and honest play in sports wagering and to protect the economic welfare and interests of the District and

participants of sports wagering," the Sports Wagering Act required the District to adopt regulations "governing the conduct of sports wagering" and covering seventeen topics. *Id.* § 36-621.02(a). The topics include, among other things, "[m]aximum wagers that may be accepted by an operator from any one individual or on a sports event," *id.* § 36-621.02(a)(2), and "[p]rotections for an individual placing a wager," *id.* § 36-621.02(a)(14).

OLG promulgated detailed regulations to implement the Sports Wagering Act, just as the Act directed. *See* D.C. Mun. Regs. Title 30, §§ 2000-2604. With respect to wager amounts, the regulations contemplate bets well over $25. For example, the provisions that regulate sports wagering kiosks provide that "[t]he maximum wager amount for a single wager shall be one thousand dollars" and "[a]ll winning tickets over six hundred dollars … must be claimed at a location specified by a Designated Sports Wagering Operator." *Id.* §§ 2023.4, 2027.14. In addition, sports betting service providers must obtain and record information regarding "any wager in excess of ten thousand dollars" or any "payout in excess of $10,000 on a winning wager." *Id.* § 2118.2-2118.3.

**Decriminalization.** The Sports Wagering Act also decriminalized sports wagering within its scope. Before the Sports Wagering Act, D.C. criminal law made it "unlawful for any person … to make or place a bet or wager, accept a bet or wager, gamble or make books or pools on the result of any athletic contest," without monetary limitation. D.C. Code § 22-1708. But the Sports Wagering Act was enacted "to legalize … sports wagering," *id.* § 22-1716, and it expressly states that "[n]othing in subchapter I of this chapter"—those criminal provisions—"shall be construed to prohibit the operation of or participation in … sports wagering regulated, licensed, or operated by the Office of Lottery and Gaming," *id.* § 22-1717.

### B.    Factual background

The following factual background reflects the allegations in DC Gambling Recovery's complaint. *See, e.g.*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### 1. Sportsbook offerings

This case concerns sports wagering using "sportsbooks," which assess and assign probabilities to the occurrence of sporting-related events and create bets for gamblers to wager on. Compl. ¶¶ 20, 22. The bets may range from which team will win a given match to how an individual player will perform on a given night. *See id.* ¶ 20. Sportsbooks typically use proprietary software and statistical analyses to "set their odds." *Id.* ¶ 22. Once a gambler has placed a bet, sportsbooks typically cannot change the bet's terms. *Id.* But sportsbooks sometimes "modify their offerings dynamically over time based on national and global betting trends." *Id.* If, for example, a particular bet was gaining popularity, "the sportsbook would lower the payout for future bettors." *Id.* That, in turn, would encourage bettors to put their money on different outcomes, thus decreasing the risk to the sportsbook. *Id.*

Sportsbooks allow users to place different types of bets. Sometimes sportsbooks offer "money lines," which offer a higher or lower payout based on how risky a bet is. *Id.* ¶ 21. Sportsbooks also may offer "parlays," which allow a user to create a single, riskier bet by linking together several bets, thus allowing for a higher payout if the gambler wins them all. *Id.*

### 2. Parties

Defendants are licensed sports wagering operators offering in-person or online sports wagering services to residents of and visitors to the District. *Id.* ¶ 17; *see* Office of Lottery and Gaming, *Approved Licenses*, District of Columbia Government, https://dclottery.com/olg/approved-licenses (last visited May 5, 2025) (listing Defendants' OLG-approved licenses).

Caesars Sportsbook and FanDuel are authorized by OLG as Class A operators. Compl. ¶¶ 9-10. Caesars Sportsbook runs a brick-and-mortar sports wagering operation at Capitol One Arena, in addition to offering a betting website and mobile app that may be used within the District. *Id.* ¶¶ 9, 35. DC Gambling Recovery alleges that FanDuel runs a sports wagering facility at Audi

Field and offers a betting website and mobile app that may be used within the District. *Id.* ¶¶ 10, 35.

FBG is authorized as a Class C operator. *Id.* ¶ 13. Although it does not operate a physical sports wagering facility in the District, it operates a betting website and mobile app that may be used within the District. *Id.*

BetMGM is a Class A operator operating a physical sports wagering facility at Nationals Park, and Crown DC Gaming is a Class C operator. *Id.* ¶¶ 11-12. Both offer sports wagering websites and mobile apps that can be used in the District. *Id.*

Plaintiff DC Gambling Recovery LLC was formed "to enforce the District's gaming laws." *Id.* ¶ 8. It has not "suffered gambling losses" itself, and instead allegedly seeks to remedy harms associated with problem gambling. *Id.* ¶¶ 8, 38.

### C.    Procedural background

1.    DC Gambling Recovery sued Defendants in D.C. Superior Court, raising a single claim under the Statute of Anne, D.C. Code § 16-1702, seeking to recover gambling losses of $25 or more incurred by thousands of unidentified "D.C.-based gamblers," Compl. ¶¶ 7, 39. DC Gambling Recovery claims that it is "authorized to sue for the recovery [of] losses at gaming" under the Statute of Anne and that Defendants are "gambling 'winner[s]' within the meaning of D.C. Code § 16-1702." *Id.* ¶¶ 41-42. According to DC Gambling Recovery, in January 2025, Defendants collectively made close to $10 million in gross gaming revenue in DC. *Id.* ¶ 17. DC Gambling Recovery seeks declaratory relief, treble damages, cost and attorneys' fees, interest, and any other relief the Court deems proper. *Id.* at 15 (Prayer for Relief).

2.    Defendants removed the case to this Court on April 4, 2025, based on federal question jurisdiction and diversity jurisdiction. *See* Notice of Removal, ECF No. 1. As Defendants explained, a key premise of DC Gambling Recovery's claim is that the Sports Wagering Act does

not authorize Defendants' operations because PASPA survived in the District, despite *Murphy*, and PASPA thus invalidates the Sports Wagering Act, Compl. ¶ 5. As Defendants explained, DC Gambling Recovery must show that PASPA survived in the District for its complaint to go forward, meaning that its claim necessarily turns on a substantial, disputed question of federal law. Notice of Removal ¶ 5. There is thus federal question jurisdiction under § 1331. *Id.* Defendants also explained that the Court has diversity jurisdiction, *see* 28 U.S.C. § 1332, because the parties are completely diverse and the amount in controversy is greater than $75,000 based on DC Gambling Recovery's allegations in the complaint, Notice of Removal ¶¶ 7-16.

    **3.**     Defendants moved to extend their time to respond to the Complaint, and this Court granted Defendants' motion in part, setting Defendants' deadline to respond to the Complaint for May 5, 2025. Minute Order, April 10, 2025.

## REQUEST FOR ORAL HEARING

    This motion concerns important issues of federal and District law arising from Plaintiff's attempt to recover treble damages for Defendants' lawful, licensed sports wagering operations. Defendants respectfully submit that oral argument would help the Court decide this motion. *See* Local Civil Rule 7(f).

## LEGAL STANDARD

    A complaint cannot "survive a motion to dismiss" unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim'" for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And the Court may resolve "the existence of [an] element" of a cause of action "on a motion to dismiss." *Trudeau v. Federal Trade Commission*, 456 F.3d 178, 191 (D.C. Cir. 2006). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *Redmon v. YMCA of Metropolitan Washington*, 417 F. Supp. 3d 99, 101, 105 (D.D.C. 2019) (Nichols, J.).

18

## ARGUMENT

**I.    DC Gambling Recovery's claim fails as a matter of law because the District's Statute of Anne does not apply to sports wagering or corporate entities.**

DC Gambling Recovery's claim fails because the Statute of Anne, which is a penal statute and thus must be strictly construed, does not apply to (a) sports wagering or (b) corporate entities as plaintiffs or defendants.

**A.    The Statute of Anne's prohibition on betting on "cards, dice or any other game" does not encompass sportsbook offerings.**

**1.    The Statute of Anne's specification of "cards" and "dice" qualifies the type of "any other game" the statute reaches to include only other traditional table games of chance.**

The Statute of Anne applies to "[a] person who" loses money "by playing at cards, dice or any other game, or by betting on the sides or hands of persons who play." D.C. Code § 16-1702. It makes no mention of sports wagering. Nor is sports wagering lurking in the phrase "any other game." "Any other game" means, at most, traditional table games of chance, as basic principles of statutory construction and statutory history make clear.

Under the *ejusdem generis* canon, which D.C. courts have applied to gambling statutes, *see Brown*, 309 A.2d at 258, "any other game" means traditional table games of chance. "Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (quoting 2A N. Singer, *Sutherland on Statutes and Statutory Construction* § 47.17 (1991)); *accord* Antonin Scalia & Brian A. Garner, *Reading Law* 199-213 (2012) [hereinafter *Reading Law*]. Courts first identify the "common attribute" connecting the specific words, *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 224-26 (2008), and the general phrase is then "confined to covering subjects comparable to the specifics it follows," *Hall St. Associates, LLC v. Mattel, Inc.*, 552 U.S. 576, 586 (2008). Two specific terms

plus a residual phrase will often trigger the canon.

In *Circuit City Stores*, for example, the Supreme Court applied the *ejusdem generis* canon to find that the term "any other class of workers" in the phrase "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" was limited to transportation workers. 532 U.S. at 113-15, 118-19. And the D.C. Court of Appeals has applied the canon in the gambling context, affirming the dismissal of an indictment because the phrase "the confidence game or swindle known as three-card monte, or of any such game, play, or practice, or any other confidence game, play, or practice," "must be limited in application to gambling activity similar to 'three-card monte.'" *Brown*, 309 A.2d at 258. Indeed, applying the *ejusdem generis* canon is particularly critical for interpreting statutes that are penal in nature, because courts must construe such statutes narrowly. *See Humphrey*, 2007 WL 1797648, at *4; *Langone v. Kaiser*, No. 12-cv-2073, 2013 WL 5567587, at *3-4 (N.D. Ill. Oct. 9, 2013) (strictly construing penal loss recovery law not to apply to money allegedly won playing online fantasy sports games); *Mama Cares Foundation v. Nutriset Société Par Actions Cimplifiée*, 825 F. Supp. 2d 178, 187 (D.D.C. 2011) (false patent marking statute). *Cf. United States v. Kaluza*, 780 F.3d 647, 661 (5th Cir. 2015) ("*[E]jusdem generis* has particular force with respect to criminal statutes, which courts are compelled to construe rigorously.").

Here, the common attribute connecting cards and dice is that they are traditional table games of chance. Thus, the phrase "any other game" in § 16-1702 must be understood as "confined to" the "subjects comparable" to "cards" and "dice"—namely, traditional table games of chance. *Mattel*, 552 U.S. at 586. And because § 16-1702's imposition of treble damages makes the provision penal, *infra* p. 26, the Court must construe the provision strictly: "any other game" means only traditional table games of chance, like cards and dice, and nothing more.

20

Statutory history confirms that "any other game" means traditional table games of chance, like cards and dice, and that the phrase should be construed narrowly. Section I of the original 1710 Statute of Anne, which is now codified as adopted and amended at D.C. Code § 16-1701, applied to "Cards, Dice, Tables, Tennis, Bowls or other Game or Games whatsoever." 9 Anne c. 19 § I. And section II, which is now codified as adopted and amended at D.C. Code § 16-1702, applied to "Cards, Dice, Tables or other Game or Games whatsoever." *Id.* § II. For one thing, section II thus did not sweep as broadly as section I, and did not reach Tennis, Bowls, or similar games. And when a legislature "'includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—[courts] 'presume[]' that [the legislature] intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014). Indeed, when a legislature includes terms in one provision but not another, the presumption is that the legislature "meant to exclude" the terms from the provision omitting them. *Department of Homeland Security v. MacLean*, 574 U.S. 383, 391 (2015). The provisions' different language suggests that section I, but not section II, reached sporting events like Tennis or Bowls.

What's more, when the District adopted the Statute of Anne, it did not incorporate the terms "Tennis" or "Bowls" into any section, *see* D.C. Code § 16-702 (1961), and it further narrowed the Statute's reach in 1963 by eliminating the terms "tables" and "Games whatsoever," *see* D.C. Code § 16-1702 (1963). By expressly mentioning "cards, dice or any other game," and omitting "Tables, Tennis, Bowls" "or Games whatsoever," the District made clear that the Statute of Anne reaches only a limited category of traditional table games of chance. *See National Labor Relations Board v. SW General, Inc.*, 580 U.S. 288, 302 (2017).

> **2.    Sportsbook offerings do not qualify as "any other game" under the Statute of Anne because they are not, and are not like, traditional table games of chance.**

Neither sportsbook offerings nor athletic contests are "any other game," D.C. Code § 16-

1702, because they are not and are not like traditional table games of chance, like cards and dice. As noted, the District plainly intended that the Statute of Anne *not* reach athletic contests. The first section—addressing contracts but not treble damages—originally applied to Tennis but the treble damages provision did not, and the District removed "Tennis" even from that first section. *See supra* pp. 6-7.

That makes sense considering the words surrounding "any other game," which show that "any other game" refers to traditional games of chance. In fact, the D.C. Code elsewhere defines "athletic contest" in a way that makes clear it is a category unto its own, and has nothing to do with "cards" and "dice." Under D.C. Code § 22-1708, which makes certain gambling activities unlawful, "athletic contest" means "a football, baseball, softball, basketball, hockey, or polo game, or a tennis, golf, or wrestling match, or a tennis or golf tournament, or a prize fight or boxing match, or a trotting or running race of horses, or a running race of dogs, or any other athletic or sporting event or contest." None of those activities is a traditional table game of chance, like cards and dice. The District would not have codified a detailed definition of "athletic contest" if it thought a reference to "any other game" would do the trick. And given the penal nature of the Statute of Anne's treble damages provision, *see infra* p. 26, the Court should construe the Statute of Anne strictly, rather than expanding the Statute's scope by reading "any other game" to include sportsbook offerings or athletic contests. *See Humphrey*, 2007 WL 1797648, at *4-5.

Beyond athletic events, "any other game" does not encompass sports wagering more generally, either. Cards and dice are traditional table games of chance where individuals can bet on the outcome of a roll or a hand. But those "games" are unlike the sports-related occurrences—who wins or loses a sports match; how many points someone scores; what match-related events occur—that individuals bet on when they engage in sports wagering. The *ejusdem generis* canon and the

penal context make clear that "cards, dice or any other game" reaches traditional table games of chance, but it does not encompass the separate category of sports wagering.

**B.      The Statute of Anne applies only to natural persons, so corporate entities cannot sue or be sued under it.**

DC Gambling Recovery's claim also fails as a matter of law because the Statute of Anne does not authorize suits by or against corporate entities. Section 16-1702 provides that, if "[a] person" loses a bet to another "person," and the unsuccessful bettor does not sue to recover gambling losses within three months, "any person may sue for, and recover treble [damages] … by a civil action against the winner." That language traces back to the original English Statute of Anne, which allowed suits by and against "any Person or Persons." 9 Anne c. 19 § II. And when the District's Statute of Anne became law in the early 1800s, a "person" was understood to refer to a natural person. For example, it was not until the mid– to late 1800s that the Supreme Court began wrestling with whether corporate entities had any cognizable constitutional rights. *See Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819) (Contracts Clause applied to Dartmouth College); *Bank of Augusta v. Earle*, 38 U.S. (13 Pet.) 519 (1839) (Privileges and Immunities Clause did not apply to bank); *Minneapolis & St. Louis Railway Co. v. Beckwith*, 129 U.S. 26, 28 (1889) ("corporations are persons" under the Fourteenth Amendment); *Noble v. Union River Logging Railroad Co.*, 147 U.S. 165 (1893) (Fifth Amendment Due Process Clause protects corporate property). Given the penal nature of § 16-1702, the Court should construe the term "person" narrowly, *see Humphrey*, 2007 WL 1797648, at *4, and hold that it applies only to natural persons, just as the drafters of the Statute likely intended. Indeed, Defendants are unaware of any cases involving the DC Statute of Anne where a corporate entity is the named plaintiff. *E.g.*, *Pearsall*, 572 A.2d at 114; *Wirt*, 17 App. D.C. at 285; *Ward v. District of Columbia*, 494 A.2d 666, 666-67 (D.C. 1985); *see also Humphrey*, 2007 WL 1797648, at *1-2. Consequently, DC Gambling

Recovery's claim fails because it is an LLC, Compl. ¶ 8, and because Defendants are also LLCs and corporations, *id.* ¶¶ 9-13, rather than natural persons, as required under § 16-1702.

## II.    DC Gambling Recovery's claim fails as a matter of law because the Sports Wagering Act authorizes Defendants' licensed sports wagering operations and overrides any application of the Statute of Anne to authorized sports wagering.

DC Gambling Recovery's claim fails for another reason. Even assuming the Statute of Anne ever reached sports-related betting (*but see supra* pp. 19-23), the Sports Wagering Act controls, and it authorizes Defendants' sports-wagering operations and overrides and repeals any application of the Statute of Anne as to licensed sports wagering activities.

### A.    The Sports Wagering Act repealed the Statute of Anne as to authorized sports wagering.

As the D.C. Court of Appeals has recognized, the District enacted the Sports Wagering Act, which, in the wake of *Murphy*, "authorized the District to establish its own online sports gambling platform 'through contract with a limited number of partners' who would operate the underlying systems on behalf of the Office of Lottery and Gaming." *Carragher*, 240 A.3d at 323. And although the District's Statute of Anne is still on the books, it does not apply "where it is inconsistent with or repealed by subsequent law," *Pearsall*, 572 A.2d at 115 n.1—*i.e.*, to the extent a later act overrides and thus repealed it. The Sports Wagering Act did just that with respect to licensed sports-betting activities in the District, even assuming that the Statute of Anne covered sports wagering and corporate entities in the first place.

### 1.    A later act overrides and repeals an earlier one when the acts conflict, or when the later act displaces the earlier act's application to certain subject matters.

A later-enacted statute repeals an earlier one to the extent the two are incompatible and cannot coexist. That can occur when the statutes cannot be harmonized. *See United States Parole Commission v. Noble*, 693 A.2d 1084, 1087 (D.C. 1997). For example, the later-enacted statute

nullifies the earlier statute if the laws subject regulated parties "to conflicting standards." *Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659, 689 (1975); *see Reading Law* 328-29. So too if the acts address a common subject matter, and the later act "was intended to cover [that] whole subject." *Wirt*, 17 App. D.C. at 290. A court analyzing whether a statute nullifies an earlier law evaluates not only the statutory text, but also "the policy and object" of the later act "as compared with the effect and operation" of the earlier one. *Id.* at 287. Legislative history is also relevant. *Noble*, 693 A.2d at 1088.

> **2.** **The Sports Wagering Act overrode and repealed the Statute of Anne as to licensed sports wagering, even assuming the Statute of Anne ever applied to sports wagering and corporate entities.**

The Sports Wagering Act overrode the Statute of Anne as to licensed sports wagering because the laws cannot be harmonized. The Sports Wagering Act made licensed sports wagering lawful, and it occupies the entire subject matter of licensed sports wagering. That means the Statute of Anne cannot subject those same authorized wagers to treble damages.

> **a.** The Sports Wagering Act overrides the Statute of Anne because the laws subject parties, like Defendants, to conflicting standards. The Sports Wagering Act changed course in the District by making "[t]he operation of sports wagering" "lawful," D.C. Code § 36-621.01, no matter the amount wagered. The Act permits a "license[d]" "individual, group of individuals, or entity" to operate physical sports wagering facilities and online sports wagering platforms, *id.* § 36-621.06, subject to OLG's license and approval processes, *id.* §§ 36-601.01(c)(20), 36-621.02(c); *see id.* § 36-621.05-06. The Act also contemplates bets well over the Statute of Anne's $25 threshold by expressly authorizing the District to promulgate regulations to set "[m]aximum wagers that may be accepted by an operator from any one individual or on a sports event." *Id.* § 36-621.02(a)(2). And the regulations, in turn, provide that the "maximum wager amount for a single wager" placed at a sports wagering kiosk "shall be one thousand dollars." D.C. Mun. Regs. Title

30, § 2023.4. Other regulations require sports wagering operators to obtain and record information regarding "any wager in excess of ten thousand dollars" or any "payout in excess of $10,000 on a winning wager" no matter the physical or online location of the bet. *Id.* §§ 2118.2-2118.3.

The Sports Wagering Act conflicts with the Statute of Anne, which punishes those who win bets worth at least $25 by subjecting them to treble damages. Treble damages "reveal[] an intent to punish past, and to deter future, unlawful conduct," *Texas Industries*, 451 U.S. at 639, making clear that the Statute of Anne was adopted to prohibit gambles worth at least $25. And the Statute created a private enforcement mechanism to achieve that goal, *see York Blouse*, 97 A.2d at 468, which supplemented the general prohibitions on gambling, *see* § 869, 31 Stat. 1331. As the Supreme Court recognized in *Murphy*, "state 'authorization' makes sense only against a backdrop of prohibition." 584 U.S. at 468. By authorizing sports wagering and making it lawful, the District lifted any preexisting prohibition on, and punishment and liability for, sports wagering.

Not only do the two regimes subject regulated parties "to conflicting standards," *Gordon*, 422 U.S. at 689—authorization versus prohibition and punishment—but the "effect and operation" of the Statute of Anne on sports wagering contravenes "the policy and object" of the Sports Wagering Act. *Wirt*, 17 App. D.C. at 287. The District passed the Sports Wagering Act to increase revenue, imposing substantial taxes on sports wagering operations. *See supra* pp. 12, 14. That design conflicts with the Statute of Anne's imposition of treble damages for the very same conduct for bets worth at least $25. The threat of such damages would deter wagers worth at least $25—even though the Sports Wagering Act is designed to encourage sports wagering to "make the most money for the District," *Public Hearing on B22-0944* at 33:03-33:12. And it would make operating sports wagering businesses economically infeasible, despite the Act's seeking to facilitate a burgeoning sports wagering industry. On DC Gambling Recovery's theory, the Statute of Anne would

eviscerate the newly-minted sports wagering industry that the Sports Wagering Act was designed to facilitate.

    **b.**    The Sports Wagering Act also overrides the Statute of Anne because it governs "the entire scope" of licensed sports wagering in the District. *See Wirt*, 17 App. D.C. at 290. The Act applies broadly to wagers on in-person and online "sporting events" or on "individual performance statistics of an athlete in a sporting event or combination of sporting events." D.C. Code § 36-601.01(c)(17). It broadly authorizes sports wagering while subjecting it to a detailed licensing and approval process, *see id.* §§ 36-601.01(c)(13), (c)(20), 36.621.02(c), 36.621.06, plus regulations covering at least seventeen topics about "the conduct of sports wagering," *id.* § 36-621.02(a). The Act also creates an enforcement scheme, allowing aggrieved persons or the D.C. Attorney General to bring civil actions in D.C. Superior Court to enjoin or recover penalties from certain violations, *id.* § 36-621.04, thus displacing the Statute of Anne's separate private citizen enforcement scheme. And the Sports Wagering Act taxes sports gambling, leaving no room for the Statute of Anne's monetary penalties. *Id.* § 36-621.15.

    *Wirt* is instructive. In *Wirt*, the District's high court held that a federal statute governing negotiable instruments repealed the Statute of Anne and the Statute of Charles insofar as they rendered certain negotiable instruments unenforceable. 17 App. D.C. at 286-88. Congress designed the negotiable instrument act "to cover the whole subject of negotiable instruments" by "establish[ing] a uniform system of law" to govern them. *Id.* at 287, 290. In passing that act, Congress also sought to remove "impediments and hindrances to the circulation of negotiable instruments." *Id.* at 290. But the negotiable instrument act, the court held, "could not be effected" so long as the statutes of Anne and Charles "declared … null and void … bills or notes" resting on gambling proceeds as consideration. *Id.* at 287-90. The court thus concluded that the later statute

"repealed" the statutes of Anne and Charles "by implication," insofar as those earlier acts "af-fect[ed] negotiable instruments." *Id.* at 287, 289-91. Likewise, here, the D.C. Council enacted the Sports Wagering Act to make lawful licensed sports wagering through a uniform and comprehensive statutory and regulatory regime, thus "cover[ing] the whole subject" and displacing the Statute of Anne insofar as it otherwise applied to and impeded licensed sports wagering in the District.

> **3.    Trying to harmonize the Sports Wagering Act and the Statute of Anne would raise serious due process concerns about the government's inviting conduct only to penalize it.**

Trying to harmonize the Sports Wagering Act and the Statute of Anne, despite their incompatibility, would also raise serious constitutional concerns. If the Sports Wagering Act authorizes sports wagers while the Statute of Anne at the same time requires "winners" to pay treble the amount of a person's losses on those wagers, the statutes would create an unconstitutional bait and switch—or at the very least raise "serious doubt" about the Statute's constitutionality under the Fifth Amendment Due Process Clause, *see Crowell v. Benson*, 285 U.S. 22, 62 (1932). The due process guarantee requires "that regulated parties should know what is required of them so they may act accordingly." *Federal Communications Commission v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). That guarantee prohibits the government from authorizing parties to engage in conduct and then penalizing or imposing liability on them for that very conduct. *See PHH Corp.*, 839 F.3d at 46-49 (Kavanaugh, J.) (citing cases, including *Raley v. Ohio*, 360 U.S. 423, 438-39 (1959)). As then–Judge Kavanaugh put it, "[n]o one would seriously contend" that a police officer acts "in a manner consistent with basic due process" if she "tells a pedestrian that the pedestrian can lawfully cross the street at a certain place," the pedestrian follows those directions, and "the officer hands the pedestrian a $1,000 jaywalking ticket" after the pedestrian arrives at the other side. *Id.* at 49.

Interpreting the Statute of Anne to subject sportsbook operators to treble damages for the

very conduct that the Sports Wagering Act authorizes would create just such an unconstitutional bait and switch. On that view, the District lured sportsbook operators into reasonably relying on the Sports Wagering Act's authorization and licensing of sports wagering, including licensed wagering over $25, only to then impose penal treble damages on the operators' winnings under the Statute of Anne. Meanwhile, half the money would go to the District itself, which had *authorized* the operations and already recouped significant tax revenue and licensing fees ranging from $100,000 to $1 million from those operations. Just as regulated parties "must turn square corners when they deal with the Government," "the Government should turn square corners in dealing with the people." *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 24 (2020). The Court should reject DC Gambling Recovery's construction and the serious due process concerns it raises. *See Crowell*, 285 U.S. at 62.

**B.      DC Gambling Recovery's contentions fail.**

DC Gambling Recovery claims that the Sports Wagering Act did not repeal the Statute of Anne but instead "legalized only *small-stakes betting*—claims that fall below the Statute of Anne's $25 threshold." Compl. ¶ 6; *see id.* ¶ 34. That contention fails.

For starters, nothing in the Sports Wagering Act's plain text limits licensed sports-wagering to bets under $25, and the Court should not "read into an unambiguous statute language that is clearly not there." *Carter v. State Farm Mutual Automobile Insurance Co.*, 808 A.2d 466, 472 (D.C. 2002). As explained, the Sports Wagering Act nullifies the Statute of Anne as to licensed sports wagering because the two statutes cannot be harmonized. *Supra* pp. 24-29. For example, the Sports Wagering Act expressly authorizes the District to set "[m]aximum wagers" by regulation. D.C. Code § 36-621.02(a)(2). And the regulations allow wagers well over $25—in some instances limiting bets to $1,000, D.C. Mun. Regs. Title 30, § 2023.4, and contemplating wagers greater than $10,000, *id.* § 2118.2. *Supra* pp. 15, 25-26. But the Statute of Anne restricts bets worth

at least $25 by punishing those who win them.

DC Gambling Recovery's construction of the provisions also defeats the purpose of the Sports Wagering Act to authorize sports wagering and facilitate the growth of an industry that would "provide revenue to the District." D.C. Code § 22-1716; *supra* pp. 12-13. Had the Sports Wagering Act authorized only bets worth less than $25, while simultaneously creating a comprehensive administrative licensing and oversight scheme through OLG and imposing substantial taxes on sports wagering operations, the District would be unable to generate—much less maximize—significant revenue from sports wagering.

What's more, reading the Sports Wagering Act to apply only to bets below $25 would conflict with the law's express statement that it decriminalizes sports wagering where the Act applies. D.C. criminal law makes it "unlawful for any person … to make or place a bet or wager, accept a bet or wager, gamble or make books or pools on the result of any athletic contest," without monetary limitation. D.C. Code § 22-1708. The Sports Wagering Act, in turn, was enacted "to legalize … sports wagering," *id.* § 22-1716, and the Sports Wagering Act expressly states that "[n]othing in subchapter I of this chapter"—those criminal provisions—"shall be construed to prohibit the operation of or participation in … sports wagering regulated, licensed, or operated by the Office of Lottery and Gaming," *id.* § 22-1717. If DC Gambling Recovery were right, and the Sports Wagering Act did not authorize sports bets over $25, placing a $25.01 bet would not only trigger the Statute of Anne, but it would also trip § 22-1708's criminal prohibition and the threat of imprisonment. That is because any sports wagering that is not authorized by the Sports Wagering Act is still criminally prohibited in the District under § 22-1708 and § 22-1717. But DC Gambling Recovery is wrong, because nothing in the Sports Wagering Act places a cap on the amount of covered bets, just as nothing in the criminal prohibition turns on the amount, either.

**III.    PASPA has no force or effect in DC, as *Murphy* makes clear, so it does not bar the Sports Wagering Act.**

DC Gambling Recovery claims that "PASPA's prohibition" on authorizing sports gambling "remains in full force in the District" because *Murphy* held that the prohibition violated the Tenth Amendment, which "does not apply to the District." Compl. ¶ 5; *see id.* ¶ 32. That contention fails. PASPA has no effect in the District, as *Murphy* makes clear, so PASPA does not bar the Sports Wagering Act.

**A.    PASPA has no force and effect in DC because *Murphy* held that Congress would not have enacted any provision of PASPA if it knew of the unconstitutionality.**

As the D.C. Court of Appeals recognized, *Murphy* "upended" PASPA. *Carragher*, 240 A.3d at 322. *Murphy* held that PASPA's prohibitions on states' authorizing and licensing sports gambling operations unconstitutionally commandeered the states, in violation of the Tenth Amendment. 584 U.S. at 486. The Court then concluded that, had Congress known those provisions were unconstitutional, it would not have enacted any other provision of PASPA. *See id.* at 481-86. The Court reasoned that, without the unconstitutional provisions, PASPA would not have remained "fully operative" or implemented any "coherent federal policy." *Id.* at 481-82, 484; *see id.* at 481-83. Thus, the Court declared that "no provision of PASPA" survived, because none was severable from the unconstitutional provisions. *Id.* at 486. Indeed, *Murphy* made clear that all of PASPA was "doom[ed]," *id.* at 480, and, as the dissent recognized, the decision "destroy[ed] [PASPA] in its entirety," *id.* at 493 (Ginsburg, J., dissenting). Indeed, Defendants are unaware of any decisions even purporting to apply PASPA after *Murphy*.

**B.    Even if *Murphy* did not hold that Congress would not have enacted any provision of PASPA if it knew of the unconstitutionality, no provision of PASPA is still in force in the District.**

*Murphy* held that "no provision of PASPA is severable," and thus declared all of PASPA

void. *Id.* at 486. But even if the Supreme Court's holding did not address whether PASPA still applies in the District, the test the Court applied makes clear that PASPA has no force and effect in the District. Congress would not have banned sports gambling in only the District and the territories, because PASPA's purpose was to uniformly prohibit sports wagering across the country outside of a few grandfathered exceptions.

When a court concludes that some provisions of a statute are invalid, the remaining provisions are not severable—and thus do not survive—unless Congress would "'still have passed' the valid sections 'had it known' about the constitutional invalidity of the other provisions." *United States v. Booker*, 543 U.S. 220, 246 (2005); *accord Murphy*, 584 U.S. at 481. In conducting that inquiry, courts ask "whether the law remains 'fully operative' without the invalid provisions." *Murphy*, 584 U.S. at 481-82.

Congress would not have banned only the District and the territories, *see* 28 U.S.C. § 3701(5), from authorizing sports gambling. PASPA's provisions thus fell in their entirety, including as applied to the District and the territories, with the holding that PASPA's core commandeering provisions were unconstitutional. Congress designed PASPA to ban sports gambling nationwide in an effort to address "the cumulative effect that State sponsored sports betting could have on sports." 138 Cong. Rec. 12,972 (statement of Sen. DeConcini); *see supra* pp. 8-10. Indeed, Congress sought to "keep sports gambling from spreading," S. Rep. No. 102-248, at 4-6, and quash sports gambling "coast-to-coast," 138 Cong. Rec. 32,439 (statement of Congressman Fish). That's why PASPA defined "States" as "the several States, the District of Columbia," and the territories, 28 U.S.C. § 3701(5), and directed its prohibitions to them collectively, *see id.* § 3702(1).

Given Congress's goal of creating a nearly uniform nationwide prohibition on sports gambling with narrow exceptions in a few states, *see supra* p. 8-10, Congress would not have banned

sports betting in only the District and the territories while every other jurisdiction across the country is free to authorize sports betting. Congress designed PASPA to have the opposite effect. Put differently, Congress's policy was to implement a uniform nationwide ban. And it could not achieve that objective through PASPA's remaining provisions given the core provisions' unconstitutional commandeering, or by retaining PASPA's provisions solely as to the District and the territories. Indeed, it would not have made any sense for Congress to have targeted the District in an effort to implement a nationwide ban, given that the District accounts for just a small fraction of the now $500 billion sports wagering industry. *See* Eric Ramsey, *US Sports Betting Revenue & Handle*, Legal Sports Report (April 30, 2025), legalsportsreport.com/sports-betting/revenue. Put simply, PASPA does not "remain[] 'fully operative'" as a coast-to-coast ban if its sports betting prohibitions apply to only the District and the territories. *Murphy*, 584 U.S. at 481-82. In fact, Congress even had the opportunity to veto the Sports Wagering Act on PASPA grounds under DC's Home Rule Act, but it chose not to. D.C. Code § 1-206.02(c)(1); *see Bliley v. Kelly*, 23 F.3d 507, 508 (D.C. Cir. 1994); *B22-0944 - Sports Wagering Lottery Amendment Act of 2018*, Council of the District of Columbia, https://lims.dccouncil.gov/Legislation/B22-0944 (last visited May 5, 2025).

### C.    PASPA does not bar the Sports Wagering Act, which authorizes Defendants' sports betting operations.

Before *Murphy*, PASPA purported to bar the District, along with the states and territories, from "sponsor[ing], operat[ing], advertis[ing], promot[ing], licens[ing], or authoriz[ing]" sports wagering operations. 28 U.S.C. § 3702(1); *see id.* § 3701(5). But PASPA has no force and effect in the District because *Murphy* held that Congress would not have enacted any of PASPA's provisions if it knew about the unconstitutionality. *Supra* pp. 10-12, 31. And even if *Murphy* did not address PASPA's applicability to the District, PASPA's sports betting prohibitions that applied to

the District are not severable from the prohibitions that applied to the states. *Supra* pp. 31-33. PASPA thus does not bar the Sports Wagering Act. In fact, as the D.C. Court of Appeals and the District itself have recognized, *Murphy* paved the way for the District to pass the Sports Wagering Act. *See Carragher*, 240 A.3d at 322-23; DC's Mot. for a Remand to Dismiss at 5, *Carragher*, 240 A.3d 321 (D.C. 2020) (Nos. 19-cv-1100, 19-cv-1221) (*Murphy* "struck down" PASPA and "[t]he following January, the [D.C.] Council enacted the Sports Wagering [Act]").

 As the complaint makes clear, the District authorized Defendants' sports betting operations under the Sports Wagering Act. Compl. ¶¶ 9-13. And because PASPA does not bar the Sports Wagering Act (which repeals the Statute of Anne, *supra* pp. 24-30), DC Gambling Recovery's claim fails.

## IV. Even if DC's Statute of Anne applies to licensed sports wagering like Defendants' offerings, DC Gambling Recovery fails to state a claim.

 DC Gambling Recovery fails to state a claim under the Statute of Anne, D.C. Code § 16-1702, even assuming the Statute of Anne could apply to licensed sports wagering in the District, because DC Gambling Recovery's allegations are generalized and vague. DC Gambling Recovery does not identify any unsuccessful bettor who lost at least $25. Nor does it allege when any particular loss occurred, meaning it does not allege that any particular unsuccessful bettor failed to sue a winner within three months. DC Gambling Recovery's attempt to plead these essential elements "upon information and belief" cannot salvage its inadequate pleading, because none of this information is solely within Defendants' knowledge. The unsuccessful bettors themselves know they lost, how much they lost, and whether they sued the winner.

### A. DC Gambling Recovery fails to identify any unsuccessful bettors, any bets worth at least $25, or when any particular loss occurred.

 To plausibly plead a claim under DC's Statute of Anne, a plaintiff who was not the unsuccessful bettor must allege that "[a] person" lost a bet worth at least $25 against "the winner," and

that "the person who loses the money" did not sue the winner to recover the losses "within three months" of paying the winner. *Id.* § 16-1702. That language requires actually identifying a person who suffered "a specific loss," alleging that the specific loss was worth "$25 or more," and that the unsuccessful bettor did not sue to recover their losses from "the winner" within three months. *E.g.*, *Humphrey*, 2007 WL 1797648, at *5-7; *Patriots for Legal Equality, LLC v. DraftKings, Inc.*, No. SUCV 2015-3364-D, 2016 WL 11972483, at *5 (Mass. Super. Ct. Feb. 23, 2016). Plaintiffs must "allege specific facts demonstrating that their claims are within the narrow confines of the" Statute of Anne. *Id.* at *4; *accord, e.g.*, *Langone*, 2013 WL 5567587, at *6-7 & n.5 (dismissing claims where a non-betting plaintiff failed to allege "the winner, the amount lost to that winner, and the date of the loss").

DC Gambling Recovery makes conclusory and vague allegations that fail to state a claim. DC Gambling Recovery alleges, for example:

> Upon information and belief … thousands of individuals within the District of Columbia have lost—and continue to lose—more than $25 at any single time by playing at games of chance (i.e., gambling) with Defendants, and have not sued to recover those losses within three months of payments to Defendants … [T]he identity and precise number of such gamblers … is within the unique possession of Defendants.

Compl. ¶ 40. But DC Gambling Recovery has not identified any particular "person who has lost money," how much money they lost, or any information regarding the timing of the bet. And DC Gambling Recovery's failure to identify any particular unsuccessful bettor means it also fails to plausibly allege that it has not "collu[ded]" with any such bettor. D.C. Code § 16-1702. DC Gambling Recovery's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *Iqbal*, 556 U.S. at 678.

Nor does DC Gambling Recovery allege that any person suffered a net loss of at least $25 "at any time or sitting," D.C. Code § 16-1702; *see McCurry v. Keith*, 481 S.E.2d 166, 168 (S.C.

Ct. App. 1997). To explain: if a bettor places three bets simultaneously for $50 each, and wins two, but loses one, she has lost more than $25 on a single bet, but has net a $50 gain for that "time or sitting," so her loss is not eligible for recovery under § 16-1702. And DC Gambling Recovery's failure to identify any person who supposedly suffered a net loss of at least $25 at any particular time or sitting also means it has not alleged facts showing that its claim is timely, whether under the District's one-year statute of limitations for any "action" "for a statutory penalty or forfeiture," D.C. Code § 12-301(a)(5); *see Ardis v. Ward*, 467 S.E.2d 742, 744 (S.C. 1996), or the general three-year statute of limitations, D.C. Code § 12-301(a)(8).

**B.    DC Gambling Recovery's attempt to plead bets, unsuccessful bettors, and timeliness "upon information and belief" fails.**

A plaintiff may allege facts "upon information and belief" when the necessary proof "is in the sole possession and control of the defendants." *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 952, 957 (8th Cir. 2023); *accord* 1A Noah J. Gordon et al., *American Jurisprudence 2d Pleading* § 113 (Jan. 2025 update). But a plaintiff may not allege facts upon information and belief as an end-run around the requirement to plead enough facts to state a plausible claim. 27 Tracy Bateman et al., *Federal Procedure, Lawyer's Edition* § 62:18 (Mar. 2025 update). A plaintiff thus may not "assert something on the basis of information and belief" unless it has a "right to claim a lack of information" under the circumstances. 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1224 (4th ed. Apr. 2025 update). Just so here. DC Gambling Recovery cannot salvage its conclusory allegations by making generalized assertions, "upon information and belief," *see* Compl. ¶ 40, about unsuccessful bettors, the value of the bets, and the timing of the bets. Critically, none of this information is "peculiarly within" Defendants' knowledge. *See American Jurisprudence*, *supra*, § 113. At a minimum, the unsuccessful bettors themselves know which bets they lost, how much money they lost, and when they lost it. DC

Gambling Recovery cannot circumvent plausibility pleading by asserting that, statistically speaking, it is likely that there are some unsuccessful bettors who lost more than $25 who did not sue to recover their losses in the last three months. *See* Compl. ¶¶ 7, 17, 40.

## CONCLUSION

The Court should dismiss DC Gambling Recovery's complaint with prejudice.

DATED: May 5, 2025                     Respectfully submitted,

                                        */s/ Shay Dvoretzky*
                                       Shay Dvoretzky (DC Bar No. 498527)
                                         *Counsel of Record*
                                       Parker Rider-Longmaid (DC Bar No. 1552207)
Robert A. Fumerton (*pro hac vice*)    Sylvia O. Tsakos (DC Bar No. 888273394)
Judith A. Flumenbaum (*pro hac vice*)  Hanaa Khan (DC Bar No. 173586)
Sarah E. Danehy (*pro hac vice*)       SKADDEN, ARPS, SLATE,
SKADDEN, ARPS, SLATE,                    MEAGHER & FLOM LLP
  MEAGHER & FLOM LLP                   1440 New York Ave., N.W.
One Manhattan West                     Washington, DC 20005
New York, NY 10001                     (202) 371-7000
(212) 735-3000                         shay.dvoretzky@skadden.com
robert.fumerton@skadden.com            parker.rider-longmaid@skadden.com
judy.flumenbaum@skadden.com            sylvia.tsakos@skadden.com
sarah.danehy@skadden.com               hanaa.khan@skadden.com

*Attorneys for Defendants American Wagering, Inc. dba Caesars Sportsbook, Betfair Interactive US LLC dba FanDuel, and FBG Enterprises Opco, LLC dba Fanatics Betting & Gaming*

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2025, I electronically filed the foregoing memorandum of points and authorities with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

DATED: May 5, 2025                    Respectfully Submitted,

By:  */s/ Shay Dvoretzky*
Shay Dvoretzky (DC Bar No. 498527)
  *Counsel of Record*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Ave., N.W.
Washington, DC 20005
(202) 371-7000
shay.dvoretzky@skadden.com

*Attorney for Defendants American Wagering, Inc. dba Caesars Sportsbook, Betfair Interactive US LLC dba FanDuel, and FBG Enterprises Opco, LLC dba Fanatics Betting & Gaming*