**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DISTRICT OF COLUMBIA**

| | |
|---|---|
| DC GAMBLING RECOVERY LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>AMERICAN WAGERING, INC. dba CAESARS SPORTSBOOK, BETFAIR INTERACTIVE US LLC dba FANDUEL, BETMGM, LLC, CROWN DC GAMING LLC dba DRAFTKINGS, FBG ENTERPRISES OPCO, LLC dba FANATICS,<br><br>*Defendants*. | Case No. 1:25-cv-1023 (CJN)<br>Judge Carl J. Nichols<br><br>**Oral Argument Requested** |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS BETMGM, LLC AND CROWN DC GAMING LLC'S MOTION TO DISMISS


Christopher Chorba *(pro hac vice* pending*)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
(213) 229-7000
CChorba@gibsondunn.com

Wesley Sze *(pro hac vice* pending*)*
GIBSON, DUNN & CRUTCHER LLP
310 University Avenue
Palo Alto, California 94301-1744
(650) 849-5300
WSze@gibsondunn.com

*Attorneys for Defendant BetMGM, LLC*

Orin S. Snyder *(pro hac vice* pending*)*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
(212) 351-4000
OSnyder@gibsondunn.com

Jacob T. Spencer (D.C. Bar No. 1023550)
Zachary B. Copeland (D.C. Bar No. 1724592)
Brandon Wolf (D.C. Bar No. 90024604)
GIBSON, DUNN & CRUTCHER LLP
1700 M St., N.W.
Washington, DC 20036
(202) 887-3792
JSpencer@gibsondunn.com
ZCopeland@gibsondunn.com
BWolf@gibsondunn.com

*Attorneys for Defendant Crown DC Gaming LLC*

# TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

BACKGROUND ..... 2

A. The District Legalizes and Regulates Sports Betting ..... 2

B. Defendants' Lawful Operations and Regulatory Compliance ..... 4

C. This Litigation ..... 5

LEGAL STANDARD ..... 6

ARGUMENT ..... 7

I. Applying Section 16-1702 To Sports Betting Is Irreconcilable With The Sports Wagering Act ..... 7

A. Section 16-1702 Cannot Be Reconciled With The Sports Wagering Act As Applied To Legalized Sports Betting ..... 8

B. Section 16-1702 Cannot Be Reconciled With The Sports Wagering Act As Applied To Bets Under $25 ..... 11

C. The Sports Wagering Act Is Not Void Under PASPA ..... 14

II. Section 16-1702 Does Not Apply To Sports-Betting Operators Like Defendants ..... 16

III. Plaintiff Has Not Alleged Multiple Essential Elements of Its Section 16-1702 Claim ..... 20

IV. Penalizing Defendants' Lawful Operations Under Section 16-1702 Would Be Unconstitutionally Arbitrary and Excessive ..... 23

A. Due Process Forbids Arbitrary and Disproportionate Punishments For Lawful Conduct ..... 23

B. The Excessive Fines Clause Independently Bars The Penalty Sought ..... 25

C. At a Minimum, Section 16-1702 Should Be Narrowly Construed To Avoid Constitutional Infirmity ..... 26

V. Plaintiff's Claim Should Be Limited To Losses Incurred Within The Last Year ..... 27

CONCLUSION ..... 30

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Am. Min. Cong. v. EPA*,
824 F.2d 1177 (D.C. Cir. 1987) ....18

*Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*,
406 F. Supp. 3d 72 (D.D.C. 2019) ....7

*Anderson v. Naperville Rotary Charities Inc.*,
2019 WL 1368551 (Ill. App. Ct. Mar. 22, 2019) ....18

*Ardis v. Ward*,
467 S.E.2d 742 (S.C. 1996) ....28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....6, 22

*Austin v. United States*,
509 U.S. 602 (1993) ....25

*Bartlett v. Bowen*,
816 F.2d 695 (D.C. Cir. 1987) ....15

*Beals v. Thurlow*,
63 Me. 9 (1874) ....28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....6

*Bliley v. Kelly*,
23 F.3d 507 (D.C. Cir. 1994) ....16

*Blue v. Fremont Inv. & Loan*,
562 F. Supp. 2d 33 (D.D.C. 2008) ....29

*BMW of N. Am., Inc. v. Gore*,
517 U.S. 559 (1996) ....24, 25

*Bolz v. District of Columbia*,
149 A.3d 1130 (D.C. 2016) ....18

*Bressler v. Averbuck*,
322 Mass. 139 (1947) ....21

*Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*,
492 U.S. 257 (1989) ....23

*Carter v. State Farm Mut. Auto. Ins. Co.*,
808 A.2d 466 (D.C. 2002) ....11

*Cheeks v. Fort Myer Constr. Corp.*,
216 F. Supp. 3d 146 (D.D.C. 2016) ....................22

*Chemalali v. District of Columbia*,
655 A.2d 1226 (D.C. 1995) ....................17

*Colbert v. Dist. of Columbia*,
5 F. Supp. 3d 44 (D.D.C. 2013) ....................24

*Cole v. Applebury*,
136 Mass. 525 (1884) ....................8

*Cole v. Groves*,
134 Mass. 471 (1883) ....................28

*Collins v. Yellen*,
594 U.S 220 (2021) ....................15

*Dew-Becker v. Wu*,
178 N.E.3d 1034 (Ill. 2020) ....................19

*Dist. Council 20 v. District of Columbia*,
1997 WL 446254 (D.D.C. July 29, 1997) ....................14

*Elias v. Gill*,
18 S.W. 454 (Ky. Ct. App. 1892) ....................21

*Everson v. Cong. Black Caucus Found., Inc.*,
2020 WL 6118440 (D.D.C. Oct. 16, 2020) ....................27

*Fay v. Noia*,
372 U.S. 391 (1963) ....................15

*FEC v. Christian Coal.*,
965 F. Supp. 66 (D.D.C. 1997) ....................27

*Grant v. Zorn*,
107 F.4th 782 (8th Cir. 2024) ....................25

*Green v. Brennan*,
578 U.S. 547 (2016) ....................28

*Hargrove v. D.C.*,
5 A.3d 632 (D.C. 2010) ....................14

*Harris v. D.C. Water & Sewer Auth.*,
791 F.3d 65 (D.C. Cir. 2015) ....................22

*Hobson v. Wilson*,
737 F.2d 1 (D.C. Cir. 1984) ....................29

*Hogle v. Connell*,
134 Mass. 150 (1883) ....................21

*Howard v. Ill. Cent. R.R. Co.*,
207 U.S. 463 (1908) .....16

*Humphrey v. Viacom, Inc.*,
2007 WL 1797648 (D. N.J. June 20, 2007) .....17, 18, 21, 26, 28

*Johns v. Newsmax Media, Inc.*,
887 F. Supp. 2d 90 (D.D.C. 2012) .....22

*Johnson v. Beatty*,
126 N.E.2d 816 (Ohio Ct. App. 1954) .....28

*Justice v. The Pantry*,
335 S.C. 572 (1999) .....17

*Kaempe v. Myers*,
367 F.3d 958 (D.C. Cir. 2004) .....4

*Leonard v. District of Columbia*,
794 A.2d 618 (D.C. 2002) .....8, 14

*Ludwig & Robinson, PLLC v. BiotechPharma, LLC*,
186 A.3d 105 (D.C. 2018) .....21

*Mazanderan v. D.C. Dep't of Pub. Works*,
94 A.3d 770 (D.C. 2014) .....8

*McCurry v. Keith*,
481 S.E.2d 166 (S.C. Ct. App. 1997) .....21

*McMillian v. Wetzel*,
2017 WL 887221 (W.D. Pa. Feb. 10, 2017) .....29

*Mittleman v. United States*,
997 F. Supp. 1 (D.D.C. 1998) .....27

*Murphy v. NCAA*,
584 U.S. 453 (2018) .....3, 15

*Norinsberg v. U.S. Dep't of Agric.*,
162 F.3d 1194 (D.C. Cir. 1998) .....12

*Patriots for Legal Equality, LLC v. DraftKings, Inc.*,
2016 WL 11972483 (Mass. Super. Ct. Feb. 23, 2016) .....20, 22

*Patzy v. Hochberg*,
266 F. Supp. 3d 221 (D.D.C. 2017) .....22

*Pearsall v. Alexander*,
572 A.2d 113 (D.C. 1990) .....10

*Peoples Drug Stores, Inc. v. District of Columbia*,
470 A.2d 751 (D.C. 1983) .....14

*Peterson v. Dist. of Columbia Lottery & Charitable Games Control Bd.*,
1994 WL 413357 (D.D.C. July 28, 1994)....................10, 26

*Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Human Servs.*,
43 F. Supp. 3d 28 (D.D.C. 2014)....................4

*Proctor v. Whitlark & Whitlark, Inc.*,
778 S.E.2d 888 (S.C. 2015)....................21

*Razolli v. Fed. Bureau of Prisons*,
230 F.3d 371 (D.C. Cir. 2000)....................20

*Richards v. Duke Univ.*,
480 F. Supp. 2d 222 (D.D.C. 2007)....................22

*Rochin v. California*,
342 U.S. 165 (1952)....................24

*Salamon v. Taft Broad. Co.*,
475 N.E.2d 1292 (Ohio Ct. App. 1984)....................8

*Sloan v. Lemon*,
413 U.S. 825 (1973)....................16

*Sonnenberg v. Amaya Group Holdings (IOM) Ltd.*,
810 F.3d 509 (7th Cir. 2016)....................18

*Sonnenberg v. Oldford Grp., Ltd.*,
2015 WL 1379505 (S.D. Ill. Mar. 24, 2015)....................21

*Speyer v. Barry*,
588 A.2d 1147 (D.C. 1991)....................11

*St. Louis, I.M. & S. Ry. Co. v. Williams*,
251 U.S. 63 (1919)....................24

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003)....................23, 24, 25

*Matter of T.L.J.*,
413 A.2d 154 (D.C. 1980)....................12

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
451 U.S. 630 (1981)....................25

*Tuten v. United States*,
440 A.2d 1008 (D.C. 1982)....................12

*United States v. Aleff*,
772 F.3d 508 (8th Cir. 2014)....................25

*United States v. Bajakajian*,
524 U.S. 321 (1998)....................26

*United States v. Brown*,
309 A.2d 256 (D.C. 1973) ....................18

*United States v. Halper*,
490 U.S. 435 (1989)....................25

*United States v. Hohri*,
482 U.S. 64 (1987)....................12

*United States v. Mackby*,
261 F.3d 821 (9th Cir. 2001) ....................25

*United States v. Niarchos*,
125 F. Supp. 214 (D.D.C. 1954)....................19

*Vinson v. Casino Queen, Inc.*,
123 F.3d 655 (7th Cir. 1997) ....................8

*Wall v. Babers*,
82 A.3d 794 (D.C. 2014) ....................13

*Ward v. District of Columbia*,
494 A.2d 666 (D.C. 1985) ....................28

*Washington v. Dist. of Columbia Dep't of Public Works*,
954 A.2d 945 (D.C. 2008) ....................17, 19

*Weaver v. U.S. Info. Agency*,
87 F.3d 1429 (D.C. Cir. 1996)....................26

*Wirt v. Stubblefield*,
17 App. D.C. 283 (1900) ....................8, 10, 11, 14

*Yates v. Pinellas Hematology & Oncology, P.A.*,
21 F.4th 1288 (11th Cir. 2021) ....................26

**STATUTES**

28 U.S.C. § 3701....................2

D.C. Code § 1-206.02 ....................16

D.C. Code § 1-233 ....................16

D.C. Code § 12-301 ....................29

D.C. Code § 16-1701 ....................10

D.C. Code § 16-1702 .................... *passim*

D.C. Code § 16-1703 ....................10, 27

D.C. Code § 22-1708 ....................19

D.C. Code § 22-1716 ....... 9

D.C. Code § 36-621.01 ....... 3, 9

D.C. Code § 36-621.02 ....... 4, 5, 11, 12

D.C. Code § 36-621.05 ....... 4

D.C. Code § 36-621.06 ....... 13

D.C. Code § 36-621.07 ....... 5

D.C. Code § 36-621.15 ....... 4, 10, 13

Mass. Gen. Laws ch. 137, § 1 ....... 20

Wash. Rev. Code § 4.24.070 ....... 17

**REGULATIONS**

30 D.C.M.R. § 2023.4 ....... 4

30 D.C.M.R. §§ 2100 *et seq.* ....... 5

30 D.C.M.R. § 2118.2 ....... 4, 11, 12

30 D.C.M.R. § 2126.10 ....... 4, 11

**RULES**

Fed. R. Civ. P. 12 ....... 6

L. Civ. R. 7 ....... 6

**OTHER AUTHORITIES**

Council of the District of Columbia, *B22-0944: Sports Wagering Lottery Amendment Act of 2018* ....... 16

Council of the District of Columbia, *B24-0416: Revised Criminal Code Act of 2021* ....... 16

Council of the District of Columbia, Committee on Finance and Revenue, Report on Bill 22-944 (Nov. 28, 2018) ....... 3, 4

D.C. Act 22-594, 66 D.C. Reg. 13 (Feb. 1, 2019) ....... 3

D.C. Act 25-217, 71 D.C. Reg. 9990 (Sept. 18, 2024). ....... 3

D.C. Office of Lottery and Gaming, *Approved Licenses* ....... 4

D.C. Office of Lottery and Gaming, *March 2025 Financials* ....... 5

## INTRODUCTION

In the Sports Wagering Lottery Amendment Act of 2018, the District of Columbia legalized and regulated sports wagering. The District welcomed sports-betting operators, vetted them, licensed them, and taxed them—and continues to oversee their operations through a comprehensive regulatory framework. Despite the District's recent and decisive authorization of sports betting, Plaintiff DC Gambling Recovery LLC seeks to line its own pockets by invoking a centuries-old anti-gambling statute to extract treble damages for every losing sports wager above $25—with half the proceeds going to the District and half to Plaintiff. This Court should reject Plaintiff's attempt to impose severe punitive liability on Defendants for lawful activity the District affirmatively invited, regulated, and approved.

Plaintiff's suit is legally untenable for many independent reasons. The statute Plaintiff invokes, D.C. Code § 16-1702, cannot be applied to legal and heavily regulated sports betting in the District. That statute traces its origins to the 1710 British Statute of Anne and was designed to suppress gambling in an era when all gambling was presumptively illicit and the government had limited resources for enforcing anti-gambling laws. Deputizing individuals to sue gambling winners and recover treble damages created a powerful disincentive to engage in unlawful gambling. The Sports Wagering Lottery Amendment Act of 2018 creates exactly the opposite incentive—it legalized sports betting, invited operators to offer sports betting in the District, and directed millions in tax revenue from licensed operators to fund District programs. That regulatory scheme is fundamentally incompatible with imposing severe punitive liability on licensed operators who accepted the District's invitation and comply with the District's laws and regulations.

Moreover, Section 16-1702 does not apply to Defendants on its own terms. The plain text of the statute provides a cause of action against the "winner" who actually played "cards, dice, or any other game" or who "bet[] on the sides or hands of persons who play," D.C. Code § 16-1702, not against duly authorized licensed companies that operate sportsbooks. Defendants do not play, or bet, or win within the meaning of the statute—they operate licensed platforms on which other individuals can bet. And sports betting is not the same as cards or dice, so it is not the sort of "game" encompassed by the statute.

Even if Section 16-1702 could apply to sports betting, Plaintiff has not plausibly alleged basic elements of the claims. The Complaint names no bettor, alleges no qualifying loss, and pleads none of the statute's threshold requirements. And Plaintiff's requested relief—massive, retroactive penalties for conduct the District affirmatively authorized—would raise serious constitutional concerns under both the Due Process and Excessive Fines Clauses.

This is not a close case. The Complaint attempts to revive an antiquated regime to prohibit conduct that is not only lawful but invited by (and publicly welcomed in) this District. But the District cannot, and does not purport to, collect millions in tax revenue from highly regulated, lawful businesses and at the same time deputize private plaintiffs to collect punitive treble damages from those same businesses. Plaintiff's effort to do so should be rejected, and the Complaint dismissed with prejudice.

## BACKGROUND

### A. The District Legalizes and Regulates Sports Betting.

Before 2018, the Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. §§ 3701–3704, prohibited certain state governments from authorizing or licensing sports betting. If a state attempted to do so in violation of PASPA, PASPA permitted the Attorney General of the United States or certain sports organizations to sue for injunctive relief in federal district court. *Id.*

§ 3703. In 2018, the Supreme Court eliminated the federal prohibition on state authorization of sports betting by striking down PASPA in its entirety. *See Murphy v. NCAA*, 584 U.S. 453 (2018). The Court held that PASPA's restrictions on authorizing and licensing sports betting "violate[d] the anticommandeering doctrine," and "that no provision of PASPA [wa]s severable from the provision directly at issue" in *Murphy*. *Id.* at 480, 486.

In response, jurisdictions across the country, including the District of Columbia, began enacting legislation to legalize and regulate sports betting. The D.C. Council did so through the Sports Wagering Lottery Amendment Act of 2018 ("Sports Wagering Act"), which became effective in May 2019. *See* D.C. Act 22-594, 66 D.C. Reg. 13 (Feb. 1, 2019) (as amended on September 18, 2024 by D.C. Act 25-217, § 7172(b), 71 D.C. Reg. 9990). The Sports Wagering Act declared that "sports wagering and related activities shall be lawful in the District of Columbia," and it established a comprehensive regulatory framework to govern sports betting operators in the District. D.C. Code § 36-621.01.

In enacting the Sports Wagering Act, the Council's goals included providing entertainment for residents, capturing revenues that were, at the time, flowing to neighboring jurisdictions, and generating new tax revenues for critical local programs. *See* Council of the District of Columbia, Committee on Finance and Revenue, Report on Bill 22-944, at 2–4 (Nov. 28, 2018) ("2018 Council Report"). As the Chairman of the Council recognized in supporting the legislation, "[s]ports betting revenue can be used to fund important programs, create jobs, and encourage visitors to spend more money in the District." *Id.* at 6; *see also id.* at 5 (asserting that the Sports Wagering Act was designed to generate "the maximum amount of revenue possible to the District while also ensuring strong consumer protections" (quoting statement of Chairman Evans)). Consistent with those purposes, revenues from sports betting were initially directed to fund early childhood and

violence prevention programs, *id.* at 3–4, and, as of September 2024, are allocated almost entirely to the District's Child Trust Fund, D.C. Code § 36-621.15(d).

The Sports Wagering Act instructed the Chief Financial Officer of the District to adopt "rules and regulations governing the conduct of sports wagering" to "ensure fair and honest play in sports wagering and to protect the economic welfare and interests of the District and participants of sports wagering." D.C. Code § 36-621.02(a). Among other things, the Sports Wagering Act expressly delegated authority to the Chief Financial Officer to regulate "[m]aximum wagers that may be accepted by an operator from any one individual or on a sports event." *Id.* § 36-621.02(a)(2). The District's implementing regulations generally authorize operators to "establish the minimum and maximum sports wagers that [they] accept[]," impose recordkeeping and identification requirements for individual wagers exceeding $10,000, and provide that the "maximum wager amount for a single wager" placed at a sports-wagering kiosk "shall be one thousand dollars." *See* 30 D.C.M.R. §§ 2023.4, 2118.2, 2126.10.

**B. Defendants' Lawful Operations and Regulatory Compliance.**

Defendants BetMGM, LLC ("BetMGM") and Crown DC Gaming LLC ("DraftKings") are licensed sports-betting operators under the Sports Wagering Act. *See* Compl. ¶¶ 11–12. Each underwent an extensive vetting process by the D.C. Office of Lottery and Gaming and has been approved as a Class A or Class C Operator under District law. *See* D.C. Code §§ 36-621.05-.06; D.C. Office of Lottery and Gaming, *Approved Licenses*, https://dclottery.com/olg/approved-licenses (listing BetMGM and DraftKings as approved operators).[1] BetMGM, a Class A operator,

[1] Documents from governmental websites are "public records" that are "subject to judicial notice on a motion to dismiss." *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *see Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies.").

runs a licensed sports-wagering facility at Nationals Park and provides mobile betting services to District residents through a licensed online platform. Compl. ¶ 11. DraftKings likewise offers licensed online and mobile sports betting under an authorized Class C license. *Id.* ¶ 12.

Licensed sports-betting operators must comply with the District's detailed regulatory requirements, which govern all aspects of their operations—from licensing fees and bet limits to recordkeeping, consumer protections, and mandatory disclosure. *See, e.g.*, D.C. Code §§ 36-621.02, 36-621.07; 30 D.C.M.R. §§ 2100 *et seq.* These requirements also include extensive regulations to promote responsible gaming in the District, such as by requiring operators to maintain and enforce self-exclusion lists and other measures to help players game responsibly. D.C. Code § 36-621.07(11)(A), (16). Operators must also regularly submit financial and operational reports to the D.C. Office of Lottery and Gaming. Publicly available reports confirm that Defendants have paid substantial taxes to the District. *See, e.g.*, D.C. Office of Lottery and Gaming, *March 2025 Financials*, https://dclottery.com/olg/financials/march-2025-unaudited. Their operations are thus licensed, taxed, and publicly overseen through a comprehensive regulatory framework designed to ensure a safe and thriving sports betting industry in the District.

**C. This Litigation.**

Plaintiff DC Gambling Recovery is a Delaware limited liability company. Compl. ¶ 8. Plaintiff alleges no connection to any defendant and concedes that it has "no relationship to any gambler who has suffered gambling losses." *Id.* On February 28, 2025, Plaintiff brought this lawsuit in D.C. Superior Court, alleging a single count under D.C. Code § 16-1702, a statutory descendant of the 1710 British Statute of Anne. *See* Compl. ¶¶ 4, 39.

Section 16-1702 allows a person who loses $25 or more in a single gambling session to sue the "winner" to recover any losses. D.C. Code § 16-1702. If no such suit is filed within three months, the statute permits "any person" to bring an action "against the winner" to recover treble

the amount lost, with half of the recovery going to the plaintiff and the remainder to the District. *Id.* Plaintiff purports to invoke this right on behalf of "thousands of individuals" who allegedly lost money betting on defendants' platforms. Compl. ¶ 40. Plaintiff does not identify any specific individual, date of loss, or facts regarding whether any such person has previously filed suit. *See id.*

On April 4, 2025, all defendants removed the case to this Court on grounds of both federal question jurisdiction and diversity jurisdiction. *See* ECF No. 1 at 2, 4. Defendants BetMGM and DraftKings (collectively, "Defendants"), along with the other named defendants in a separate motion, now move to dismiss.

**REQUEST FOR ORAL HEARING**

This motion presents important issues of federal and District law arising from Plaintiff's attempt to recover treble damages for Defendants' lawful, licensed sports wagering operations. Defendants respectfully submit that oral argument would help the Court decide this motion. *See* Local Civil Rule 7(f).

**LEGAL STANDARD**

To survive dismissal under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Plaintiffs "may not use discovery to obtain the facts necessary to establish a claim that is plausible on its face[,] even when those facts are only within the head or hands of the

defendant." *Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 406 F. Supp. 3d 72, 83 (D.D.C. 2019) (cleaned up).

## ARGUMENT

Plaintiff's claim under Section 16-1702 against Defendants—duly licensed, taxpaying, and law-abiding sports-betting operators regulated by the Sports Wagering Act—should be dismissed with prejudice on multiple independent grounds. *First*, as applied to legalized sports betting, Section 16-1702 is fundamentally incompatible with the Sports Wagering Act's regulatory scheme and was therefore repealed upon the Sports Wagering Act's enactment in 2019. *Second*, even on its own terms, Section 16-1702 does not apply to Defendants, who are not "winners" under the plain text of the statute. *Third*, Plaintiff has also failed to plead multiple essential elements of a Section 16-1702 claim. *Fourth*, applying Section 16-1702's treble-damages provision to Defendants would violate bedrock constitutional protections against arbitrary and excessive penalties under the Fifth and Eighth Amendments—at minimum, the statute should be narrowly construed to avoid these constitutional concerns. And *finally*, in any event, any surviving claim must be limited to losses incurred within the one-year statute of limitations.

### I. Applying Section 16-1702 To Sports Betting Is Irreconcilable With The Sports Wagering Act.

Plaintiff's Complaint should be dismissed because Section 16-1702 cannot apply to sports betting in the District. Applying Section 16-1702 to sports betting would be irreconcilable with the Sports Wagering Act, a comprehensive statute that legalized and regulates sports betting in the District. Because the two statutes are fundamentally incompatible, the Sports Wagering Act's enactment necessarily repealed Section 16-1702 as applied to legalized sports betting. Plaintiff's attempt to reconcile the two statutes collapses under even minimal scrutiny. And its fallback argument—that the Sports Wagering Act is void under PASPA—is meritless.

### A. Section 16-1702 Cannot Be Reconciled With The Sports Wagering Act As Applied To Legalized Sports Betting.

Under D.C. law, when a new statute conflicts with an existing statute, the earlier statute is impliedly repealed "if there is a clear legislative intention to repeal, or if the statutes themselves are irreconcilable, that is, so inconsistent that the two cannot have concurrent operation." *Mazanderan v. D.C. Dep't of Pub. Works*, 94 A.3d 770, 774 (D.C. 2014) (cleaned up). Put another way, a prior statute is repealed when it is "implicitly contradict[ed]" by "the effect" of a new statute. *Leonard v. District of Columbia*, 794 A.2d 618, 626 (D.C. 2002). The D.C. Court of Appeals has already held in another context that an earlier version of Section 16-1702 was impliedly repealed "to the extent . . . inconsistent or repugnant" with a later statute regarding negotiable instruments. *Wirt v. Stubblefield*, 17 App. D.C. 283, 291 (1900). This case is no different: because Section 16-1702 and the Sports Wagering Act cannot be reconciled, Section 16-1702 cannot be applied to legalized sports betting.

Section 16-1702 traces its origins to the Statute of Anne, a 300-year-old statute from Great Britain intended to "prevent[] . . . excessive and deceitful Gaming." 9 Anne, ch. 14 (1710) (Eng.). The Statute of Anne entered American colonial law during "a vanished era where the absence of an organized police authority to enforce criminal statutes made necessary the use of . . . rewards" to entice civilians to help suppress illegal gambling through private litigation. *Salamon v. Taft Broad. Co.*, 475 N.E.2d 1292, 1298 (Ohio Ct. App. 1984). Those rewards were significant: Citizens who successfully sued illegal gamblers under third-party causes of action were entitled to treble damages, which served as a "powerful enforcement mechanism" to "deter illegal gambling." *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997); *see also Cole v. Applebury*, 136 Mass. 525, 531 (1884). Maryland adopted its own version of the Statute of Anne, which was later incorporated into the D.C. Code as Section 16-1702. Like its counterparts, Section 16-1702

penalized unlawful gambling and has never undergone any real changes—it still purports to authorize private parties to sue gambling "winners" and recover treble penalties. D.C. Code § 16-1702.

The Sports Wagering Act marked a categorical break. Enacted in 2019, and reflecting modern regulatory priorities, the Sports Wagering Act's stated purpose—embedded in the statutory text—was to "legalize lotteries, daily numbers games, bingo, raffles, Monte Carlo night parties, *and sports wagering*." D.C. Code § 22-1716 (emphasis added); *see also id.* § 36-621.01 ("The operation of sports wagering and related activities shall be lawful in the District of Columbia."). The Sports Wagering Act thus reflects a deliberate policy choice to legalize and regulate sports betting in part to generate revenue for the District. The Sports Wagering Act set forth a detailed and exclusive regulatory framework, *see* D.C. Code §§ 36-621.01-.17, and charged the D.C. Office of Lottery and Gaming with responsibility for implementing and enforcing that regime, *see id.* § 22-1717.

These two statutes are categorically irreconcilable. The Statute of Anne assumes gambling is inherently unlawful and subjects all winning bets over $25 to treble penalties; the Sports Wagering Act legalizes, regulates, and taxes several popular forms of betting, including sports betting. The Sports Wagering Act cannot function if every licensed sports-betting operator that follows the statutory scheme to the letter remains subject to ruinous, strict-liability treble penalties under Section 16-1702. A statutory regime cannot simultaneously render conduct lawful and impose severe penalties for it.

But that is exactly what Section 16-1702 would do, under Plaintiff's theory. For example, under the Sports Wagering Act's implementing regulations, an operator must file a return every month "indicating the amount of its gross sports wagering revenue" and pay a designated percent

of "the gross sports wagering revenue" in taxes. D.C. Code § 36-621.15(a)(1)–(2). If the Statute of Anne applied to sports-betting operators, however, an operator could avoid punitive liability only by "discover[ing] and repay[ing]" the money received from betting, in which case the operator would "be acquitted, indemnified, and discharged from any further or other punishment, forfeiture, or penalty." D.C. Code § 16-1703. The two schemes are irreconcilable: An operator cannot simultaneously pay a percentage of sports betting revenues to the District as taxes and at the same time repay its sports betting revenues to avoid punishment under the Statute of Anne.

The D.C. Court of Appeals recognized that the Statute of Anne could not be reconciled with legalized gambling when the D.C. Council authorized the lottery in 1990. In *Pearsall v. Alexander*, the Court of Appeals considered whether Section 16-1701 of the D.C. Code—a provision of the Statute of Anne invalidating contracts arising from gambling transactions—remained good law as to lotteries following their legalization. 572 A.2d 113, 115 (D.C. 1990). The court answered that question in the negative, holding that a statute whose purpose is to "discourage illegal gambling" simply does not work where "the gambling involved . . . is not illegal," particularly where the District actually "encourage[s] people" to participate. *Id*. at 116; *see also Peterson v. Dist. of Columbia Lottery & Charitable Games Control Bd.*, 1994 WL 413357, at *3–4 (D.D.C. July 28, 1994) (applying *Pearsall* and holding that Section 16-1701 does not apply to the D.C. Lottery, which was lawfully created after Section 16-1701's enactment).

Similarly, in *Wirt v. Stubblefield*, the Court of Appeals concluded that D.C. Code provisions derived from the Statute of Anne purporting to invalidate certain betting-based negotiable instruments were "inconsistent with" and "repugnant to" a later-enacted law that rendered such instruments valid. 17 App. D.C. at 291. Accordingly, the court held that those

Statute of Anne-derived provisions were "repealed" and "no longer . . . in force in th[e] District." *Id.*

These same principles apply here: Section 16-1702 and the Sports Wagering Act are "clearly repugnant as to vital matters to which they relate," namely the lawfulness of sports betting in the District. *Speyer v. Barry*, 588 A.2d 1147, 1165 (D.C. 1991) (quotation marks omitted).

**B. Section 16-1702 Cannot Be Reconciled With The Sports Wagering Act As Applied To Bets Under $25.**

Plaintiff proposes a desperate fallback theory to avoid the clear conflict between Section 16-1702 and the Sports Wagering Act: The Complaint suggests the Sports Wagering Act legalized only small-stakes wagers—those under $25—leaving all larger wagers subject to treble-damages liability under Section 16-1702. *See* Compl. ¶ 34. That theory is incorrect. The purported $25 threshold appears nowhere in the text of the Sports Wagering Act and conflicts with the structure of the Sports Wagering Act, its legislative history, and basic rules of statutory interpretation. Such a *de minimis* threshold would also be fundamentally inconsistent with the entire regulatory apparatus the Sports Wagering Act created, including a regulation explicitly permitting sports-betting operators to accept bets of *$10,000 or more*. *See supra*, at 4 (citing D.C. Code § 36-621.02(a); 30 D.C.M.R. §§ 2118.2, 2126.10). Plaintiff's theory has no merit and should be rejected.

Beginning with the statutory text, the Sports Wagering Act contains no language limiting lawful sports wagering to bets under $25. Courts consistently decline to invent limitations that the legislature did not enact. *See Carter v. State Farm Mut. Auto. Ins. Co.*, 808 A.2d 466, 472 (D.C. 2002) ("This court will not read into an unambiguous statute language that is clearly not there."). If the Council had intended the Sports Wagering Act to impose a hard cap on the size of legal wagers, which would dramatically limit the size and scope of the sports-betting industry in the

District, "one would expect" that limitation to "have been made explicit," especially in a "comprehensive" regulatory statute of this complexity. *United States v. Hohri*, 482 U.S. 64, 73 (1987); *see also Norinsberg v. U.S. Dep't of Agric.*, 162 F.3d 1194, 1199–200 (D.C. Cir. 1998) (observing that "[h]ad the Congress intended to" incorporate another statutory requirement, "it could have done so expressly"). It imposed no such limitation.

To the contrary, multiple provisions of the Sports Wagering Act and its implementing regulations explicitly contemplate—and authorize—bets of all sizes. For example, the statute instructs the District's Chief Financial Officer to adopt rules governing "[m]aximum wagers that may be accepted by an operator," D.C. Code § 36-621.02(a)(2)—presupposing that wagers above $25 are lawful absent further regulation. Similarly, the statute requires operators to "[a]llow individuals to set . . . limits on the time spent betting *and the amounts to be wagered*," *id.*§ 36-621.07(c)(11)(A) (emphasis added)—a directive that would be unnecessary if there were already a fixed $25 ceiling. Reading a $25 cap into the Sports Wagering Act would render these provisions "insignificant" at best and surplusage at worst, violating a cardinal principle of statutory interpretation. *Tuten v. United States*, 440 A.2d 1008, 1010 (D.C. 1982); *see Matter of T.L.J.*, 413 A.2d 154, 158 (D.C. 1980) ("[O]ne part of a statute must not be construed so as to render another part meaningless."). In addition, the Sports Wagering Act's implementing regulations expressly authorize sports-betting operators to accept bets in "excess of ten thousand dollars ($10,000)," so long as certain player information is obtained. 30 D.C.M.R. § 2118.2. The regulations also provide that the "maximum wager amount for a single wager" placed at a sports-wagering kiosk "shall be one thousand dollars." *Id.* § 2023.4. There is no possible way to reconcile these provisions with Plaintiff's proposed $25 cap on sports bets.

The Sports Wagering Act's licensing and tax provisions likewise take for granted high-volume, high-dollar bets. The Sports Wagering Act imposes non-refundable licensing fees ranging from $100,000 to $1 million. *See* D.C. Code § 36-621.06(b)(3)(A), (4)(A). The statute also assumes that taxing sports betting will generate significant tax revenue, dedicating "all revenues" after the first $2.583 *million* to the District's Child Trust Fund. D.C. Code § 36-621.15(a)(2), (d)(1)-(2). That assumption is consistent with one of the express purposes of the D.C. Council in enacting the Sports Wagering Act—to "capitalize on th[e] new stream of revenue" made possible by *Murphy*, which struck down PASPA and cleared the way for legalized sports betting. *See* 2018 Council Report at 2. The Council projected nearly $92 million in tax revenue from sports betting in just three years. *Id.* at 10. That hefty projection would be odd if the Sports Wagering Act authorized only sub-$25 wagers. Plaintiff offers no explanation for why the Council would anticipate tens of millions in revenue from legal betting, while supposedly legalizing only wagers smaller than the cost of a ballpark beer and pretzel.

* * *

Plaintiff's suit would turn the Sports Wagering Act into a legislative bait-and-switch. On Plaintiff's telling, the Council invited sports-betting operators into the District, exacted massive fees, committed the new tax revenue to child-welfare programs—and then subjected any meaningful wager to treble penalties under Section 16-1702, with half the award diverted to the District itself. *See* D.C. Code § 16-1702 (providing for 50% share to the District). That interpretation would render the Council's commitments to the Child Trust Fund a fiction and suggest that the Council intended instead to enrich the government and entrepreneurial plaintiffs at the expense of regulated entities following the law. Courts routinely reject such "illogical" statutory constructions that "make[] little sense." *Wall v. Babers*, 82 A.3d 794, 800 (D.C. 2014);

*see also Hargrove v. D.C.*, 5 A.3d 632, 635 (D.C. 2010) ("What possible reason would have led the Council to [create such an incongruous scheme]?"); *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 754 (D.C. 1983) (noting that courts should reject constructions that produce "absurd results" (quotation marks omitted)).

At bottom, Plaintiff's reading would render the Sports Wagering Act a nullity. Its theory would impose strict, retroactive liability on any licensed operator accepting bets above $25—even though the Sports Wagering Act nowhere forbids such wagers. That construction cannot be reconciled with either the text or purpose of the Sports Wagering Act, and only further confirms that Section 16-1702 cannot coexist with the Sports Wagering Act, which governs "the entire matter" of legalized and regulated sports betting. *Wirt*, 17 App. D.C. at 290. The statutes are antithetical when it comes to sports betting. And where two laws are "irreconcilable and incapable of coexistence," the earlier one is repealed by implication. *Dist. Council 20 v. District of Columbia*, 1997 WL 446254, at *6 (D.D.C. July 29, 1997); *see also, e.g.*, *Leonard*, 794 A.2d at 626.

### C. The Sports Wagering Act Is Not Void Under PASPA.

Plaintiff also attempts to bypass the conflict between Section 16-1702 and the Sports Wagering Act by attacking the statute itself—asserting that the Sports Wagering Act is "without any legal force or effect." Compl. ¶ 5. Plaintiff's theory appears to be as follows: (1) *Murphy* held PASPA unconstitutional as a violation of the Tenth Amendment's anticommandeering rule; (2) the Tenth Amendment does not apply to the District, *see id.* ¶ 32; and, therefore, (3) PASPA "remains in full force" in the District, rendering the Sports Wagering Act—enacted after *Murphy*—void, *id.*

¶ 5. This misguided theory misunderstands *Murphy*, which did not merely invalidate PASPA's anticommandeering provisions but held the statute unconstitutional in its entirety.

*Murphy* left no room for doubt on that score. After concluding that PASPA's bar on state authorization of sports gambling violated the Tenth Amendment, the Court expressly held that "*no provision* of PASPA is severable from the provision directly at issue." 584 U.S. at 486 (emphasis added). For that reason, the Court held that its decision as to the "anti-authorization provision *dooms the remainder of PASPA*." *Id.* at 480 (emphasis added). The result was the invalidation of PASPA in full, whether it applied to states, to private parties, or to the District. *See id.* at 486 ("Our job is to interpret the law Congress has enacted and decide whether it is consistent with the Constitution. PASPA is not."); *see also id.* at 493–94 (Ginsburg, J., dissenting) (protesting the majority's "demolition" of PASPA "in its entirety").[2]

Plaintiff's assertion that PASPA somehow remains operative in the District is inconsistent with binding precedent. When a federal statute is held unconstitutional in full, with no provision severable, the statute is void everywhere—not just as to the party that brought the case. *See Collins v. Yellen*, 594 U.S 220, 259 (2021) ("[A]n unconstitutional provision is never really part of the body of governing law."); *Fay v. Noia*, 372 U.S. 391, 408 (1963) ("An unconstitutional law is void, and is as no law." (quotation marks omitted)); *see also Bartlett v. Bowen*, 816 F.2d 695, 707 (D.C. Cir. 1987) ("[A] law contrary to the Constitution may not be enforced."). Indeed, the

[2] Justice Thomas wrote separately to question whether the Supreme Court's "modern severability precedents" are consistent "with longstanding limits on the judicial power." *Murphy*, 584 U.S. at 491 (Thomas, J., concurring). In his view, "severability doctrine" is best understood as "an exercise in statutory interpretation" which asks courts to "decide how a statute operates once they conclude that part of it cannot be constitutionally enforced." *Id.* at 489. Although he found even that exercise "dubious," Justice Thomas "join[ed] the Court's opinion in its entirety" because "it gives the best answer it can to this question"—*i.e.*, no portion of PASPA could continue to operate if the portions that violated the Tenth Amendment were unenforceable. *Id.* at 486–87, 489.

Supreme Court has concluded on several occasions, just as it did in *Murphy*, that a statute's constitutional and unconstitutional provisions were "so interblended in the statute that they are incapable of separation," and thus that the entire "statute [was] repugnant to the Constitution"—rendering it a legal dead letter in its entirety. *Howard v. Ill. Cent. R.R. Co.*, 207 U.S. 463, 504 (1908); *see also, e.g.*, *Sloan v. Lemon*, 413 U.S. 825, 834 (1973) (holding entire Pennsylvania tuition reimbursement statute unconstitutional). The courts have recognized that PASPA is a nullity: Defendants have not located a single case applying PASPA since *Murphy*.

*Murphy* thus ends the matter. Plaintiff's erroneous theory would require this Court to revive a statute that the Supreme Court decisively invalidated. With PASPA gone, the Sports Wagering Act was validly enacted[3] and, as shown above, cannot be reconciled with Section 16-1702.

## II. Section 16-1702 Does Not Apply To Sports-Betting Operators Like Defendants.

Plaintiff's claim also fails under the plain text of Section 16-1702. Even if were still good law after the Sports Wagering Act, Section 16-1702 would not apply to Defendants, who are not "winners" within the meaning of the statute. Section 16-1702 permits civil actions against "a winner"—meaning those who, "by playing at cards, dice or any other game, or by betting on the sides or hands of persons who play," win a sum of $25 or more. D.C. Code § 16-1702. That

[3] Moreover, under the Home Rule Act, D.C. Code § 1-206.02, Congress has a "layover period of thirty statutory days to review legislation submitted by the D.C. Council," during which it may "veto" the bill through a "joint resolution of disapproval." *Bliley v. Kelly*, 23 F.3d 507, 508 (D.C. Cir. 1994) (citing D.C. Code § 1-233(c)(1)). The Sports Wagering Act was transmitted to Congress on February 7, 2019. *See* Council of the District of Columbia, *B22-0944: Sports Wagering Lottery Amendment Act of 2018*, https://lims.dccouncil.gov/Legislation/B22-0944. If Congress viewed PASPA as still controlling in the District, one would expect it to have exercised its veto right, but Congress declined to do so. *See id.* Congress's failure to do so here, while doing so in other contexts, confirms that PASPA is no longer controlling in the District post-*Murphy*. *See, e.g.*, Council of the District of Columbia, *B24-0416: Revised Criminal Code Act of 2021*, https://lims.dccouncil.gov/Legislation/B24-0416 (reflecting congressional veto through joint resolution of disapproval).

language requires two conditions be met for a party to be considered a "winner": (1) a qualifying relationship between the parties, namely that the defendant won against a loser by playing or betting; and (2) a qualifying game. Plaintiff's theory fails both requirements. Defendants are not the kind of persons the statute targets, and neither sports nor sports betting is the kind of "game" the statute covers. For these reasons, Defendants cannot be "winners" under Section 16-1702, and Plaintiff's claim should be dismissed.

As an initial matter, under "[t]he well-established strict construction principle," penal statutes must "be strictly construed." *Chemalali v. District of Columbia*, 655 A.2d 1226, 1230 (D.C. 1995); *see also Washington v. Dist. of Columbia Dep't of Public Works*, 954 A.2d 945, 948 (D.C. 2008). Applying this venerable principle, numerous courts "have long held that [statutes derived from the Statute of Anne] must be narrowly construed because they are penal in nature." *Humphrey v. Viacom, Inc.*, 2007 WL 1797648, at *4 (D. N.J. June 20, 2007); *Justice v. The Pantry*, 335 S.C. 572, 576 (1999) (same).

*First*, Plaintiff's claim fails because Defendants are not alleged to have "played" or "bet" at all and therefore cannot be considered a "winner" against whom a civil action may be brought under Section 16-1702. The statute contemplates a game with two (or more) "play[ers]" and an outcome in which a "winner" prevailed. Unlike other gambling recovery statutes, Section 16-1702 does not permit plaintiffs to recover "from the platform used" or "from the operator." *See, e.g.*, Wash. Rev. Code § 4.24.070 (parallel statute in Washington State explicitly allowing claims against the "dealer" or "proprietor"). The Complaint alleges only that Defendants operate licensed sports-wagering facilities and online platforms that allow others to place bets. *See* Compl. ¶¶ 11–12. But it does not—and cannot—allege that Defendants placed bets themselves or played a game

in which they defeated anyone, and the statute "makes clear that a 'winner' is one who actually 'wagers, bets or stakes'" upon a qualifying game. *Humphrey* , 2007 WL 1797648, at *4 .

Courts construing similar statutes have repeatedly held that facilitators of betting like Defendants here are not themselves "winners" as that term is used under Section 16-1702. For instance, in *Sonnenberg v. Amaya Group Holdings (IOM) Ltd.*, the Seventh Circuit held that a "gambling site" was not a "winner," because the "winner would be a person whom a player had played with and lost to" in a game, rather than the site that "hosted" the game. 810 F.3d 509, 510 (7th Cir. 2016). "Charging a fee for engaging in gambling," the court explained, "is not the same as winning a gamble." *Id.* at 511. Another court likewise held that "merely arranging the gambling transaction does not suffice," drawing a bright line between "a winner and an entity serving as the middleman or 'house' for a gambling transaction." *Anderson v. Naperville Rotary Charities Inc.*, 2019 WL 1368551, at *4–5 (Ill. App. Ct. Mar. 22, 2019).

*Second*, Section 16-1702 does not reach wagers on *sports* in any event, because neither the underlying athletic event nor sports betting are "cards, dice or any other game" within the meaning of the statute. The statute's reference to "cards" and "dice" covers traditional, table-based games of chance involving immediate play. Under the *ejusdem generis* interpretive canon, the catch-all phrase "any other game" must be read to include only items "of the same general class as those enumerated." *Am. Min. Cong. v. EPA*, 824 F.2d 1177, 1189–90 (D.C. Cir. 1987); *cf. Bolz v. District of Columbia*, 149 A.3d 1130, 1139 (D.C. 2016) (reading residual term "other occasions" to mean "nonroutine incidents with elements of unpredictability" in light of specific examples like "'fires, accidents, [and] wrecks'"); *United States v. Brown*, 309 A.2d 256, 258 (D.C. 1973) (applying *ejusdem generis* canon to hold that the phrase "the confidence game or swindle known as three-card monte, or of any such game, play, or practice, or any other confidence game, play,

or practice . . . must be limited in application to gambling activity similar to 'three-card monte'"). "Any other game" could thus include things of the same general class as cards and dice, such as roulette or dominoes.

Sports and sports betting are not encompassed within Section 16-1702's reference to "any other game." Football, for instance, involves a large field of professional athletes rotating in and out, and governed by formal league rules, not casual participants in a bounded, table-based contest. Sports betting is even further afield—it involves no interpersonal gameplay, no shared mechanics, and no fixed set of players. Bettors instead speculate independently on the outcome of external athletic contests, not games akin to cards or dice. In fact, the D.C. Code elsewhere defines "athletic contest" to be entirely distinct from "cards" or "dice." *See* D.C. Code § 22-1708 ("athletic contest" means "a football, baseball, softball, basketball, hockey, or polo game, or a tennis, golf, or wrestling match, or a tennis or golf tournament, or a prize fight or boxing match, or a trotting or running race of horses, or a running race of dogs").

The distinction between table games like "cards" and "dice" and traditional sports or sports betting matters in the context of Section 16-1702, because a "catch-all phrase should not be construed to open up a whole new area of transactions." *United States v. Niarchos*, 125 F. Supp. 214, 228–29 (D.D.C. 1954). That rule has particular force here, where Section 16-1702 is a penal statute and therefore must be "strictly construed." *Washington*, 954 A.2d at 948. Section 16-1702 offers a clear list of activities that must be interpreted together, narrowly; inclusion of the phrase "any other game" does not silently authorize third parties to recover from lawful sportsbooks for bets on football, basketball, or the like. *Cf. Dew-Becker v. Wu*, 178 N.E.3d 1034, 1040–41 (Ill. 2020) (concluding that daily fantasy sports does not involve a "game of chance").

In sum, Defendants are thus not "winners" under Section 16-1702. They do not "play," they do not "bet," and they do not fall within the narrow penal reach of the statute. Defendants are not aware of any court anywhere that has applied a statute like Section 16-1702 to impose liability on licensed sports-betting operators. This Court should not be the first. Plaintiff's claim should be dismissed.

## III. Plaintiff Has Not Alleged Multiple Essential Elements of Its Section 16-1702 Claim.

Plaintiff's claim should be dismissed for yet another independent reason: to the extent Section 16-1702 could apply to Defendants, Plaintiff has "failed to allege each of the material elements" of its claim. *Razolli v. Fed. Bureau of Prisons*, 230 F.3d 371, 374 (D.C. Cir. 2000).

Like other statutes derived from the British Statute of Anne, Section 16-1702 authorizes third-party recovery under only specific, narrowly defined circumstances. The plaintiff must allege (1) the identity of a "lose[r]"; (2) the date of a "loss" occurring more than "three months" before commencement of the suit, and the absence of a prior suit; and (3) the absence of "collusion" with the "lose[r]." D.C. Code § 16-1702. A Massachusetts court, in granting a motion to dismiss a similar complaint under Massachusetts's largely identical statute, *see* Mass. Gen. Laws ch. 137, § 1, identified these same three elements as "necessar[y]" to state a claim, *Patriots for Legal Equality, LLC v. DraftKings, Inc.*, 2016 WL 11972483, at *5 (Mass. Super. Ct. Feb. 23, 2016). As that court observed, the statute "does not contemplate the kind of wholesale recovery" that the plaintiff sought; instead, it "requires allegations at the retail level." *Id.* Plaintiff has not adequately alleged *any* of these elements.

As to the identity of the bettor, Plaintiff has not identified a single person who suffered a qualifying loss. Rather, Plaintiff refers vaguely to "thousands of individuals" who supposedly placed losing bets of more than $25 on Defendants' licensed platforms. Compl. ¶ 40. That kind of speculative aggregation is exactly what courts reject. *See Patriots*, 2016 WL 11972483, at *5

(rejecting plaintiff's "broad references" to "thousands of other[]" unnamed bettors). As one court put it, third-party plaintiffs "must allege that a specific loser lost a certain amount of money on a certain date." *Sonnenberg v. Oldford Grp., Ltd.*, 2015 WL 1379505, at *6 (S.D. Ill. Mar. 24, 2015). Plaintiff has not done so.

Nor does the Complaint allege that any person incurred a *net* loss over $25 in a single sitting, which is the operative standard. For more than a century, courts interpreting these statutes have universally rejected attempts to recover isolated losing bets without accounting for winnings in the same session. *See, e.g.*, *Proctor v. Whitlark & Whitlark, Inc.*, 778 S.E.2d 888, 896 (S.C. 2015); *McCurry v. Keith*, 481 S.E.2d 166, 168 (S.C. Ct. App. 1997); *Hogle v. Connell*, 134 Mass. 150, 153 (1883). The purpose of the statutes, after all, is to "place[] the injured party in the position that existed prior to the loss." *McCurry*, 481 S.E.2d at 168. Allowing a gambler to recover purported "losses" while pocketing "wins" produces a windfall that would *reward*, rather than punish, unlawful gambling. *Id.*; *see Elias v. Gill*, 18 S.W. 454, 456 (Ky. Ct. App. 1892); *see also Ludwig & Robinson, PLLC v. BiotechPharma, LLC*, 186 A.3d 105, 117 (D.C. 2018) (stating that no plaintiff is "permitted a duplicative recovery"). Yet Plaintiff provides no allegations about whether any bettor experienced a *net* loss of money. That omission alone dooms the claim. *See Humphrey*, 2007 WL 1797648, at *5–6 (dismissing claim where plaintiff failed "to allege the purported amount of alleged 'losses,' or when those alleged losses were purportedly sustained"); *Bressler v. Averbuck*, 322 Mass. 139, 142–43 (1947) (affirming dismissal of complaint alleging gambling losses where allegations were "too indefinite" because they did not allege the "dates and amounts of the various losses").

The Complaint is equally silent as to timing. Under Section 16-1702, a third party may sue only if the original bettor failed to bring an action within three months of the loss. But Plaintiff

does not identify a single particular loss that occurred more than three months before the suit was filed. It simply asserts, without detail, that "thousands" of bettors "have not sued." Compl. ¶ 40. This sort of conclusory allegation is legally insufficient. *See Johns v. Newsmax Media, Inc.*, 887 F. Supp. 2d 90, 95 (D.D.C. 2012) ("Bare allegations and conclusory statements are insufficient.").

The same is true of Plaintiff's assertion that its suit is brought "without collusion." Compl. ¶¶ 8, 42. That language merely parrots the statutory requirement, but offers no facts. Without identifying even one bettor, Plaintiff cannot plausibly claim to lack coordination with that person. *See Iqbal*, 556 U.S. at 678 (rejecting "legal conclusions couched as factual allegations"); *cf. Patriots*, 2016 WL 11972483, at *5 (dismissing claim where there were no "allegation[s] of non-collusion" with any specific person). Plaintiffs must state "*facts* that support [its] claim as opposed to mere conclusory allegations." *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 239 (D.D.C. 2007) (emphasis added). Alleging a lack of collusion without saying who the bettor is—let alone describing the relevant circumstances—falls far short of Rule 8.

Plaintiff tries to paper over these pleading deficiencies by asserting, "[u]pon information and belief," that it lacks access to the necessary facts, which it claims are "within the unique possession of Defendants." Compl. ¶ 40. But a plaintiff may not invoke discovery as a substitute for plausibly alleging the *elements* of its claim. To overcome a motion to dismiss, plaintiffs "bear the burden of sufficiently stating a plausible claim for relief in their Complaint," and "cannot rely on facts that may be discovered in yet-to-be-conducted discovery to meet this burden." *Cheeks v. Fort Myer Constr. Corp.*, 216 F. Supp. 3d 146, 158 (D.D.C. 2016); *see Patzy v. Hochberg*, 266 F. Supp. 3d 221, 225 (D.D.C. 2017) ("At the point of a motion to dismiss, a court's 'role is not to speculate about which factual allegations are likely to be proved after discovery.'" (quoting *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015)). Plaintiff has not met that burden

here.

In the end, Plaintiff's failure to plead Section 16-1702's core requirements simply confirms the broader incoherence of this lawsuit. Section 16-1702 was never meant to be wielded as a weapon for mass recovery. It was designed for individual redress in an era of insufficient enforcement resources to stamp out illegal gambling, not for sweeping claims against licensed operators under a modern regulatory regime. Plaintiff's claim fails as a matter of law and should be dismissed.

## IV. Penalizing Defendants' Lawful Operations Under Section 16-1702 Would Be Unconstitutionally Arbitrary and Excessive.

Plaintiff asks this Court to impose treble penalties—potentially in the tens of millions—on licensed, regulated businesses for conduct that the District permitted and affirmatively encouraged. That request is both extraordinary and unconstitutional. Imposing retroactive, punitive liability on Defendants for law-abiding conduct would violate both the Due Process Clause and the Excessive Fines Clause of the Constitution. Thus, even assuming Plaintiff could establish that Section 16-1702 somehow survives the Sports Wagering Act and that Plaintiff has adequately alleged facts to satisfy the elements of it, Plaintiff's effort to extract severe penalties from Defendants under these circumstances should be rejected.

### A. Due Process Forbids Arbitrary and Disproportionate Punishments For Lawful Conduct.

The Due Process Clause "prohibits the imposition of grossly excessive or arbitrary punishments." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003); *see also Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276 (1989) ("[T]he Due Process Clause places outer limits on the size of a civil damages award made pursuant to a statutory

scheme.").[4] This safeguard is rooted in the principle that individuals may not be deprived of property through the "application . . . of arbitrary coercion." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 585–86 (1996) (Breyer, J., concurring); *Rochin v. California*, 342 U.S. 165, 169 (1952) (explaining that punishments cannot "offend th[e] canons of decency and fair play"). Any punishment must therefore be "reasonabl[e]" in relation to "a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *Gore*, 517 U.S. at 568, 575.

No such legitimate interest exists here. Defendants did not violate the law—they followed it. Their operations are authorized and regulated by the D.C. Office of Lottery and Gambling, consistent with the Sports Wagering Act's requirements. *See supra*, at 4–5. The D.C. Council hailed these businesses as a promising revenue source. *See* 2018 Council Report at 2. Defendants were thus entitled to "rely" on the District's clear and repeated "guidance" that their conduct was lawful. *Gore*, 517 U.S. at 579. Plaintiff does not allege any violation by Defendants of the District's regulatory rules and as explained, Defendants have taken good-faith efforts to comply with all regulations. *See supra*, at 4–5. That is dispositive of Plaintiff's request for treble damages. *See Gore*, 517 U.S. at 579 (suggesting that extraordinarily high damages are inappropriate where conduct at issue had not been adjudged unlawful on even one occasion").

Beyond lawfulness, the punishment Plaintiff seeks is wildly "disproportioned to the offense and obviously unreasonable." *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919); *see also State Farm*, 538 U.S. at 529 (holding that punishment must be "proportionate to the wrong committed"). A key measure of due process is the "ratio between harm, or potential harm, to the plaintiff" and the penalty imposed. *State Farm*, 538 U.S. at 424–25. Here, that ratio is infinite:

[4] Precedent interpreting the Fourteenth Amendment's Due Process Clause may be relied upon to interpret the Fifth Amendment's Due Process Clause, which applies to the District. *See Colbert v. Dist. of Columbia*, 5 F. Supp. 3d 44, 50 n.2 (D.D.C. 2013).

Plaintiff admits it has suffered no harm, has no connection to the District, and has "no relationship" whatsoever to "any gambler who has suffered gambling losses." Compl. ¶ 8. Plaintiff evidently has only one purpose, and that is to collect penalties for others' alleged losses, losses that the District itself *authorized* in the Sports Wagering Act. The disproportionate penalties sought here blow past the boundary of "constitutional impropriety." *State Farm*, 538 U.S. at 425 (4:1 ratio "close to the line"); *Gore*, 517 U.S. at 583 (500:1 ratio "breathtaking" and constitutionally suspect). Rewarding Plaintiff's litigation gambit with immense penalties on Defendants would constitute "constitutionally unacceptable" punishment without "culpability" and be flatly inconsistent with due process. *Gore*, 517 U.S. at 580, 583.

**B. The Excessive Fines Clause Independently Bars The Penalty Sought.**

Because the District itself would take half of any award under Section 16-1702, Plaintiff's claim also implicates the Excessive Fines Clause. That clause "limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Austin v. United States*, 509 U.S. 602, 609–10 (1993) (cleaned up). The Excessive Fines Clause covers civil sanctions that are at least in part punitive, that is, "serving either retributive or deterrent purposes" rather than a "remedial" purpose alone. *United States v. Halper*, 490 U.S. 435, 448 (1989). Treble damages, especially where the government claims a share, are quintessentially punitive. *See, e.g.*, *United States v. Aleff*, 772 F.3d 508, 512 (8th Cir. 2014) (holding that False Claims Act's treble damages "are punitive for the purposes of the Excessive Fines Clause"); *United States v. Mackby*, 261 F.3d 821, 831 (9th Cir. 2001) (same); *see also Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) ("The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct."). And the Excessive Fines Clause applies any time the government is entitled to recover from a claim, even where the government is not itself a party. *See, e.g.*, *Grant v. Zorn*, 107 F.4th 782, 798 (8th Cir. 2024) (holding that "the Excessive Fines

Clause applies in non-intervened *qui tam* actions"); *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1314 (11th Cir. 2021) (same).

Given that the Excessive Fines Clause applies here, Plaintiff's claim may not seek a sanction "grossly disproportional to the gravity of the offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). Here again, for the same reasons that the punishment sought is unlawful and disproportionate under due process, it is likewise an excessive and unconstitutional fine. Defendants' conduct was lawful, and the District invited them in, licensed them to operate, monitored their operations, and did not cap the facilitation of bets at or over $25. Even assuming that Section 16-1702 were valid and applicable here, imposing potentially tens of millions of dollars in penalties on businesses following the rules set out by the District—half of which the District would pocket—would be grossly excessive by any measure.

### C. At a Minimum, Section 16-1702 Should Be Narrowly Construed To Avoid Constitutional Infirmity.

Where a reading of a statute raises serious constitutional concerns, courts should avoid the conflict if another construction of the statute is '"fairly possible.'" *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1436 (D.C. Cir. 1996); *see also Humphrey*, 2007 WL 1797648, at *4 (noting that descendants of Statute of Anne are penal and should be strictly construed). This principle applies with full force here. Defendants have established that there plainly exists a narrower, plausible reading of Section 16-1702—construing it to exclude licensed sports-betting operators, who do not fall within the meaning of the term "winner"—that would avoid these constitutional problems altogether. *See supra*, at 16–20. The Court could also interpret Section 16-1702 to apply only to unlawful gambling, consistent with its original purpose—not to sports betting authorized under the Sports Wagering Act. *Cf. Peterson*, 1994 WL 413357, at *3–4 (interpreting Section 16-1701 in this way). To the extent the Court is not convinced that applying Section 16-1702 to Defendants

in the manner envisaged by Plaintiff's Complaint is unconstitutional, it should at least adopt an alternative reading that would steer clear of the serious constitutional issues present in this case.

## V. Plaintiff's Claim Should Be Limited To Losses Incurred Within The Last Year.

For the reasons discussed above, the Court should dismiss this lawsuit in its entirety. But even if Plaintiff overcame all of the foregoing grounds for dismissal—that is, if Section 16-1702 were still valid, applicable to licensed sports-betting operators like Defendants, constitutional, and if a claim were properly pleaded (and none of which is true)—then Plaintiff's claim would *still* largely fail because it purports to aggregate thousands of individual claims, many of which are time-barred. Courts regularly dismiss those "portions" of claims that are untimely. *Everson v. Cong. Black Caucus Found., Inc.*, 2020 WL 6118440, at *8 (D.D.C. Oct. 16, 2020); *see, e.g.*, *Mittleman v. United States*, 997 F. Supp. 1, 13 (D.D.C. 1998) (dismissing "the remainder of plaintiff's fourth claim" as "barred by the statute of limitations"); *FEC v. Christian Coal.*, 965 F. Supp. 66, 72 (D.D.C. 1997) (granting motion to dismiss time-barred aspects of claim). Here, any portion of Plaintiff's "claim" that relates to individual claims for losses incurred before February 28, 2024 (that is, within one year of the Complaint's filing), should be dismissed.

Section 16-1702 creates two causes of action: one for the actual gambling "loser," subject to an express three-month limitations period, and one for "any person" to sue in the loser's stead for treble damages if the loser does not file suit herself within the three-month window. *See* D.C. Code § 16-1702. The latter cause of action—invoked by Plaintiff—has no express limitations period. Plaintiff's claim is therefore governed by one of the District's residual one-year statute of limitations for any "action for a statutory penalty or forfeiture," *id.* § 12-301(a)(5).

The following section of the D.C. Statute of Anne, Section 16-1703, expressly provides relief from "any further or other punishment, forfeiture, or penalty" that might otherwise have been imposed if a winner repays money "as provided by [S]ection 16-1702." D.C. Code § 16-1703.

The D.C. Court of Appeals has already described at least some claims brought under Section 16-1702's private right of action as "private *forfeiture* action[s]." *Ward v. District of Columbia*, 494 A.2d 666, 670 (D.C. 1985) (emphasis added). That alone brings Plaintiff's claim within the ambit of Section 12-301(5) as a "forfeiture." In any case, an action under Section 16-1702 also qualifies as an action for statutory "penalt[ies]." As explained above, treble-damages provisions are unquestionably penal, not remedial. *See supra*, at 17. Indeed, courts applying similar statutes derived from the Statute of Anne all have agreed that the treble damages provision "is purely and distinctly penal." *Beals v. Thurlow*, 63 Me. 9, 11–12 (1874); *see Humphrey*, 2007 WL 1797648, at *4 (observing that similar statutes are "penal in nature"); *Cole v. Groves*, 134 Mass. 471, 472 (1883) ("We have no doubt that [the statutory provision that] authorizes a third person to recover three times the sum of money or value of goods lost by gaming[] is a penal statute."). Accordingly, courts consistently subject claims under those provisions to the state statutes of limitations applicable to actions to recover statutory penalties. *See, e.g., Ardis v. Ward*, 467 S.E.2d 742, 744 (S.C. 1996) (holding that the equivalent South Carolina provision was governed by the one-year statute of limitations applicable to "[a]n action upon a statute for a penalty or forfeiture" (cleaned up)); *see also Johnson v. Beatty*, 126 N.E.2d 816, 817 (Ohio Ct. App. 1954) (same).

Section 12-301(a)(5)'s one-year limitations period, moreover, applies to each individual claim that Plaintiff attempts to assert. Though it styles its suit as a single claim, Plaintiff in fact seeks to aggregate "thousands" of individual forfeiture claims arising "since the passage of the . . . [Sports Wagering Act]" in 2019. Compl. ¶ 40. That tactic does not work. As the Supreme Court has explained, "discrete claims" that are "based on independent . . . acts cannot be aggregated to extend the limitations period." *Green v. Brennan*, 578 U.S. 547, 562 n.7 (2016). Courts in this District and others have echoed this point, rejecting plaintiffs' efforts to sidestep

time bars by bundling otherwise untimely claims. *See Blue v. Fremont Inv. & Loan*, 562 F. Supp. 2d 33, 43 (D.D.C. 2008) (rejecting plaintiff's argument "that their damages claims are timely because the statute of limitations periods for [multiple] claims may be aggregated"); *McMillian v. Wetzel*, 2017 WL 887221, at *4 (W.D. Pa. Feb. 10, 2017) ("[D]iscrete acts cannot be cobbled together in order to allow [the] [p]laintiff to raise claims that would otherwise be untimely."), *vacated on other grounds by* 790 F. App'x 455 (3d Cir. 2019).

Permitting aggregation would be particularly inappropriate here. A third-party action under Section 16-1702 is purely derivative. It exists only where a specific bettor incurred a particularized loss and failed to sue within three months. Whether Plaintiff may sue for that loss at all depends on when the individual bettor placed the wager and whether it qualifies as a net loss. *See supra*, at 20–23. These are inherently individualized inquiries, subject to individualized limitations periods.

As a result, to the extent Plaintiff's claim survives in any form, it should be limited to net losses incurred within one year of the Complaint's filing—that is, net losses arising between February 28, 2024, and November 28, 2024. *See Hobson v. Wilson*, 737 F.2d 1, 45 (D.C. Cir. 1984) ("The filing of a complaint commences an action for statute of limitation purposes."); *see also* D.C. Code § 16-1702 (permitting suits by third parties only if the "person who loses the money" does not sue "within three months"). All earlier losses are time-barred—and all subsequent losses are premature—and any related portion of Plaintiff's claim should be dismissed.[5]

---

[5] Alternatively, if the Court were to conclude that third-party claims under Section 16-1702 are governed by the general three-year statute of limitations at D.C. Code § 12-301(a)(8), then Plaintiff could seek to recover only for those bettors who, on net, lost $25 or more between February 28, 2022, and November 28, 2024.

## CONCLUSION

This case is an attempt to dismantle the District's sports-betting industry by resurrecting an ancient statute meant to suppress illicit gambling and turning it against lawful, regulated operators. Plaintiff's theory contradicts the text, structure, and purpose of the Sports Wagering Act and the plain language of Section 16-1702 and runs into foundational constitutional and pleading limitations. The Complaint should be dismissed with prejudice.

Dated: May 5, 2025

Respectfully submitted,

*/s/ Jacob T. Spencer*

Christopher Chorba *(pro hac vice* pending*)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
(213) 229-7000
CChorba@gibsondunn.com

Wesley Sze *(pro hac vice* pending*)*
GIBSON, DUNN & CRUTCHER LLP
310 University Avenue
Palo Alto, California 94301-1744
(650) 849-5300
WSze@gibsondunn.com

*Attorneys for Defendant BetMGM, LLC*

Orin S. Snyder *(pro hac vice* pending*)*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
(212) 351-4000
OSnyder@gibsondunn.com

Jacob T. Spencer (D.C. Bar No. 1023550)
Zachary B. Copeland (D.C. Bar No. 1724592)
Brandon Wolf (D.C. Bar No. 90024604)
GIBSON, DUNN & CRUTCHER LLP
1700 M St., N.W.
Washington, DC 20036
(202) 887-3792
JSpencer@gibsondunn.com
ZCopeland@gibsondunn.com
BWolf@gibsondunn.com

*Attorneys for Defendant Crown DC Gaming LLC*