**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DC GAMBLING RECOVERY LLC,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN WAGERING, INC.<br>dba CAESARS SPORTSBOOK,<br>BETFAIR INTERACTIVE US LLC<br>dba FANDUEL, BETMGM, LLC,<br>CROWN DC GAMING LLC<br>dba DRAFTKINGS,<br>FBG ENTERPRISES OPCO, LLC<br>dba FANATICS,<br><br>Defendants. | Case No. 1:25-cv-01023 (CJN) |

# PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ... iii

INTRODUCTION ... 1

REQUEST FOR ORAL HEARING ... 3

LEGAL STANDARD ... 3

ARGUMENT ... 3

I. The Statute of Anne Applies Here ... 3

A. Plaintiff and Defendants Are "Person[s]" ... 4

B. Sports Betting is Betting On "Any Other Game" ... 7

C. Defendants Are "Winners" Under the Statute of Anne ... 14

II. The Statute of Anne Is Still Good Law ... 16

A. There Is No Irreconcilable Conflict Between the SWLAA and the Statute of Anne ... 16

B. Defendants' Supposed Conflicts Are Illusory ... 20

C. Applying Longstanding District Law Does Not Violate the Constitution ... 21

1. The Statute of Anne Does Not Violate Due Process ... 22

2. The Statute of Anne Does Not Violate the Excessive Fines Clause ... 25

III. PASPA's Prohibition Remains Valid in the District ... 27

A. PASPA Prohibited the Passage of the SWLAA ... 28

B. *Murphy*'s Holding Does Not Extend to the District ... 29

C. Defendants' Remaining Arguments Fail ... 34

IV. Plaintiff Has Pleaded All Necessary Facts ... 35

A. The Identity of a Loser and Qualifying Loss ... 36

B. The Time of the Loss ... 42

C. Absence of Collusion ... 43

V. The Default Three-Year Statute of Limitations Applies....................................................44

CONCLUSION..............................................................................................................................45

# TABLE OF AUTHORITIES

Page

## CASES

*Abbas v. Foreign Pol'y Grp., LLC*,
783 F.3d 1328 (D.C. Cir. 2015)....3

*Ali v. Federal Bureau of Prisons*,
552 U.S. 214 (2008)....12

*Anderson v. Naperville Rotary Charities Inc.*,
2019 WL 1368551 (Ill. App. Ct. Mar. 22, 2019)....15

*Association of Am. Physicians & Surgeons, Inc. v. Sebelius*,
901 F. Supp. 2d 19 (D.D.C. 2012), *aff'd sub nom.*
*Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468 (D.C. Cir. 2014)....37, 42

*Bagley v. State*,
20 Tenn. 486 (1840)....10

*Bank of Columbia v. Okely*,
17 U.S. (4 Wheat.) 235 (1819)....9

*Bank of U.S. v. Deveaux*, 9 U.S. 61 (1809), *overruled on other grounds by*,
*Louisville, Cin. & Charleston R.R. v. Letson*, 43 U.S. 497 (1844)....6

*Barlow v. United States*,
32 U.S. (7 Pet.) 404 (1833)....24

*Bartenwerfer v. Buckley*,
598 U.S. 69 (2023)....21

*Bartlett v. Bowen*,
816 F.2d 695 (D.C. Cir. 1987)....33

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....3

*Berkebile v. Outen*,
426 S.E.2d 760 (S.C. 1993)....17

*Blaxton v. Pye*,
2 Wils. R. 309 [1766] (Gr. Brit.)....9

*BMW of North America, Inc. v. Gore*,
517 U.S. 559 (1996)........................................................................................ 22-23

*Boos v. Barry*,
485 U.S. 312 (1988)..............................................................................................40

*Brockett v. Spokane Arcades, Inc.*,
472 U.S. 491 (1985)..............................................................................................34

*Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*,
492 U.S. 257 (1989)..............................................................................................26

*Building & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*,
448 F.3d 138 (2d Cir. 2006)..................................................................................38

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014)................................................................................................4

*Carragher v. District of Columbia*,
240 A.3d 321 (D.C. 2020) ....................................................................................35

*Cent. Amusement Co. v. District of Columbia*,
121 A.2d 865 (D.C. 1956) .................................................................................. 4-5

*Cheesum v. State*,
8 Blackf. 332 (Ind. 1846).......................................................................................10

*Chickel v. Massachusetts Bay Transp. Auth.*,
2001 Mass. App. Div. 241 (Dist. Ct. 2001)...........................................................40

*Ciralsky v. C.I.A.*,
355 F.3d 661 (D.C. Cir. 2004)...............................................................................43

*Collette v. St. Luke's Roosevelt Hosp.*,
132 F. Supp. 2d 256 (S.D.N.Y. 2001)....................................................................40

*Collins v. Yellen*,
594 U.S. 220 (2021)..............................................................................................33

* *Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*,
617 S.W.3d 792 (Ky. 2020)...................................................................................38

*Conley v. United States*,
79 A.3d 270 (D.C. 2013) .......................................................................................24

*Council of Parent Att'ys & Advocs., Inc. v. DeVos*,
365 F. Supp. 3d 28 (D.D.C. 2019) ........................................................................37

*D.C. Common Cause v. District of Columbia.*,
858 F.2d 1 (D.C. Cir. 1988) ..............................................................................30

*Daintree v. Hutchinson*,
10 M. & W. 85, 152 E.R. 392 [1842] (UK) ..............................................................9

*Dew-Becker v. Wu*,
123 N.E.3d 86 (Ill. Ct. App. 2018), *aff'd*, 178 N.E.3d 1034 (2020) ................................40

*District Cablevision Ltd. P'ship v. Bassin*,
828 A.2d 714 (D.C. 2003) ..................................................................................25

*District of Columbia v. American Univ.*,
2 A.3d 175 (D.C. 2010) ................................................................................. 6-7

*District of Columbia v. Beretta U.S.A. Corp.*,
No. 0428-00, 2002 WL 34103516 (D.C. Super. Ct. Dec. 16, 2002) ................................18

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ..........................................................................................7

*Duckworth v. United States*,
418 F. App'x 2 (D.C. Cir. 2011) ..........................................................................23

*Ellis v. Beale*,
18 Me. 337 (1841) ...........................................................................................10

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ..................................................................................16, 28

*Etienne v. Hunter Ingalls Indus.*,
2022 WL 16571201 (D.D.C. Oct. 28, 2022) ..........................................................35

*Evangelou v. District of Columbia*,
901 F. Supp. 2d 159 (D.D.C. 2012) ......................................................................41

*Evans v. Corinthian Colleges, Inc.*,
2014 WL 2866369 (S.D. Ind. June 23, 2014) ..........................................................42

*Executive Benefits Ins. Agency v. Arkison*,
573 U.S. 25 (2014) ...........................................................................................34

*Fay v. Noia*,
372 U.S. 391 (1963)....................................................................................................33

*Flood v. Kuhn*,
407 U.S. 258 (1972)....................................................................................................35

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010)....................................................................................................34

*George v. Dade*,
769 A.2d 760 (D.C. 2001) ....................................................................................16, 28

*Gonzalez v. Thaler*,
565 U.S. 134 (2012)....................................................................................................39

*Goodburn v. Marley*,
2 Star. 1159 (Gr. Brit.)...................................................................................................9

*Gothberg v. Town of Plainville*,
148 F. Supp. 3d 168 (D. Conn. 2015).........................................................................14

*Grace v. M'Elroy*,
83 Mass. 563 (1861) ....................................................................................................10

*Hall v. DIRECTV, LLC*,
846 F.3d 757 (4th Cir. 2017) ......................................................................................43

*Harrison v. PPG Indus., Inc.*,
446 U.S. 578 (1980)....................................................................................................11

*Hedgeye Risk Mgmt., LLC v. Heldman*,
271 F. Supp. 3d 181 (D.D.C. 2017)............................................................................41

*Hibbs-Rines v. Seagate Techs., LLC.*,
2009 WL 513496 (N.D. Cal. Mar. 2, 2009)................................................................37

*Hodson v. Terrill*,
3 Tyr. 929, 1 C. & M. 797 [1833] (UK) .......................................................................9

*Howard Univ. Hosp./Prop. & Cas. Guar. Fund v. D.C. Dep't of Emp. Servs.*,
952 A.2d 168 (D.C. 2008) ..........................................................................................18

*Howard v. Ill. Cent. R.R. Co.*,
207 U.S. 463 (1908)....................................................................................................34

*Humphrey v. Viacom, Inc.*,
2007 WL 1797648 (D.N.J. June 20, 2007)....................6, 23, 38, 39

*In re Parker*,
2007 WL 1521068 (Bankr. D.D.C. May 21, 2007)....................44

*James Parreco & Son v. D.C. Rental Hous. Comm'n*,
567 A.2d 43 (D.C. 1989)....................7

*Justice v. The Pantry*,
518 S.E.2d 40 (S.C. 1999)....................13, 17, 38

*Kelleher v. Dream Catcher, L.L.C.*,
263 F. Supp. 3d 322 (D.D.C. 2017)....................41

*Kendall v. United States ex rel. Stokes*,
37 U.S. (12 Pet.) 524 (1838)....................30

*Kruse v. Kennett*,
181 Ill. 199 (1899)....................16

*Langone v. Kaiser*,
2013 WL 5567587 (N.D. Ill. Oct. 9, 2013)....................39

*Lee v. Flintkote Co.*,
593 F.2d 1275 (D.C. Cir. 1979)....................30

*Liverpool, N.Y. & Phil. S. S. Co. v. Commissioners of Emigration*,
113 U.S. 33 (1885)....................32

*Los Angeles Turf Club v. Horse Racing Labs, LLC*,
2017 WL 11634526 (C.D. Cal. May 15, 2017)....................39

*Lucas v. United States*,
602 A.2d 1107 (D.C. 1992)....................16

*Lynall v. Longbotham*,
2 Wils. 36 [1756] (Gr. Brit.)....................9

*Mandeville v. Union Bank of Georgetown*,
13 U.S. (9 Cranch) 9 (1815)....................9

*Marsh v. Chambers*,
463 U.S. 783 (1983)....................22

*Martinez v. Kaiser Found. Hosps.*,
2012 WL 2598165 (N.D. Cal. July 5, 2012)....................37

*Mazanderan v. D.C. Dep't of Pub. Works*,
94 A.3d 770 (D.C. 2014)....................16

*Marziano v. Cnty. of Marin*,
2010 WL 3895528 (N.D. Cal. Oct. 4, 2010)....................37

*McCurry v. Keith*,
481 S.E.2d 166 (S.C. Ct. App. 1997)....................40

*McLain v. Huffman*,
30 Ark. 428 (1875)....................10

*Medlock v. Host Int'l, Inc.*,
2013 WL 2278095 (E.D. Cal. May 22, 2013)....................37

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
583 U.S. 366 (2018).................... 5-6

* *Miller v. United States*,
6 App. D.C. 6 (1895)....................10, 12

*Mohamad v. Palestinian Auth.*,
566 U.S. 449 (2012)....................5

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....................33

*Moua v. Int'l Bus. Machs. Corp.*,
2012 WL 5373401 (N.D. Cal. Oct. 30, 2012)....................37

*Mullinax v. J.M. Brown Amusement Co.*,
508 S.E.2d 848 (S.C. 1998)....................17

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (4th Cir. 2019)....................2, 28, 29, 30, 31

*National Labor Relations Bd. v. SW Gen., Inc.*,
580 U.S. 288 (2017)....................9

*National Pork Producers Council v. Ross*,
598 U.S. 356 (2023)....................32, 45

*New York v. United States*,
505 U.S. 144 (1992)....................30, 34

*O'Donnell v. Barry*,
148 F.3d 1126 (D.C. Cir. 1998)....................43

*Palmore v. United States*,
411 U.S. 389 (1973)....................28

*Patriots for Legal Equality, LLC v. Draft Kings, Inc.*,
2016 WL 11972483 (Mass. Super. Ct. Feb. 23, 2016)....................40

*Patterson v. McLean Credit Union*,
491 U.S. 164 (1989)....................35

*Pearce v. Foote*,
113 Ill. 228 (1885)....................16

*Pearsall v. Alexander*,
572 A.2d 133 (D.C. 1990)....................18-19

*People v. Weithoff*,
16 N.W. 442 (Mich. 1883)....................10

*Pharaon v. Board of Governors of Fed. Rsrv. Sys.*,
135 F.3d 148 (D.C. Cir. 1998)....................24-25

*Powe v. Chicago Hous. Auth. Police Officers Richling*,
1991 WL 83758 (N.D. Ill. May 9, 1991)....................43

*Printz v. United States*,
521 U.S. 898 (1997)....................34

*Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. United States Dep't of Agric.*, 573 F. Supp. 3d 324 (D.D.C. 2021)....................38

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)....................32

*Ristic v. Machine Zone, Inc.*,
2016 WL 4987943 (N.D. Ill. Sept. 19, 2016)....................14

*Ruffin v. United States*,
76 A.3d 845 (D.C. 2013)....................4

*Sabri v. United States*,
541 U.S. 600 (2004)....................33

*Salamon v. Taft Broad. Co.*,
475 N.E.2d 1292 (Ohio Ct. App. 1984)....................38, 39

*Scollans v. Flynn*,
120 Mass. 271 (1876)....................10

* *Shenk v. Cohen*,
51 A.2d 298 (D.C. 1947)....................7, 25, 44

*Sims v. Rives*,
84 F.2d 871 (D.C. Cir. 1936)....................30

*Sloan v. Lemon*,
413 U.S. 825 (1973)....................34

*Sonnenberg v. Amaya Grp. Holdings (IOM) Ltd.*,
810 F.3d 509 (7th Cir. 2016)....................15

*Southwest Airlines Co. v. Saxon*,
596 U.S. 450 (2022)....................12

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
538 U.S. 408 (2003).................... 22-23

*Stockwell v. United States*,
80 U.S. 531 (1871)....................25

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009).................... 32-33

*Tatham v. Freeman*,
180 S.E. 871 (Ga. Ct. App. 1935).................... 10-11

*Tatman v. Strader*,
23 Ill. 493 (1860)....................10

*Tilley v. United States*,
238 A.3d 961 (D.C. 2020)....................6

*Tollett v. Thomas*,
6 Q.B. 514 [1871] (UK)....................10

*Town of Greece, N.Y. v. Galloway*,
572 U.S. 565 (2014)....................................................................................22

*Trustees of Dartmouth College v. Woodward*,
17 U.S. (4 Wheat.) 518 (1819)....................................................................6

*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*,
836 F.3d 770 (7th Cir. 2016) ........................................................... 35-36

*United States ex rel. Stearns v. Lane*,
2010 WL 3702538 (D. Vt. Sept. 15, 2010)..............................................26

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*,
389 F.3d 1251 (D.C. Cir. 2004)..................................................................40

*United States ex rel. Wood v. Allergan, Inc.*,
899 F.3d 163 (2d Cir. 2018)........................................................................23

*United States v. Aleff*,
772 F.3d 508 (8th Cir. 2014) ......................................................................26

*United States v. Bajakajian*,
524 U.S. 321 (1998)..............................................................................25, 26

*United States v. Booker*,
543 U.S. 220 (2005)....................................................................................34

*United States v. Brown*,
309 A.2d 256 (D.C. 1973) ................................................................ 12-13

*United States v. Brown*,
422 A.2d 1281 (D.C. 1980) ........................................................................18

*United States v. Dotterweich*,
320 U.S. 277 (1943)....................................................................................24

*United States v. Mackby*,
261 F.3d 821 (9th Cir. 2001) ......................................................................26

*United States v. Powell*,
423 U.S. 87 (1975)......................................................................................12

*United States v. Raines*,
362 U.S. 17 (1960)......................................................................................33

* *United States v. Salerno*,
481 U.S. 739 (1987) .......... 33-34

*Ward v. District of Columbia*,
494 A.2d 666 (D.C. 1985) .......... 44

*Washington State Dep't of Licensing v. Cougar Den, Inc.*,
586 U.S. 347 (2019) .......... 39

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008) .......... 33

*West Flagler Assocs. v. Haaland*, 573 F. Supp. 3d 260 (D.D.C. 2021), *aff'd in part, vacated in part, remanded sub nom. W. Flagler Assocs., Ltd. v. Haaland*,
71 F.4th 1059 (D.C. Cir. 2023) .......... 11

*Wilkinson v. Tousley*,
16 Minn. 299 (1871) .......... 10

*Willoughby v. Potomac Elec. Power Co.*,
100 F.3d 999 (D.C. Cir. 1996) .......... 43

*Wirt v. Stubblefield*,
17 App. D.C. 283 (1900) .......... 18-19

*Yates v. Pinellas Hematology & Oncology, P.A.*,
21 F.4th 1288 (11th Cir. 2021) .......... 27

**STATUTES**

D.C. Code § 12-301(a)(5) .......... 44

D.C. Code § 12-301(a)(8) .......... 44

D.C. Code § 22-1506 (1967) .......... 13

D.C. Code § 22-1708 .......... 13-14

D.C. Code § 28-3905(k)(1)(A) .......... 23

D.C. Code § 28-3905(k)(2)(A)(i) .......... 23

D.C. Code § 45-604 .......... 4, 5

* D.C. Statute of Anne,
D.C. Code § 16-702 (1961) .......... 5

D.C. Code § 16-1702 ....................1, 3, 5, 7, 22, 42

D.C. Code § 16-1702 (1963)....................5

D.C. Code § 16-1703 ....................14

Ga. Code Ann. § 13-8-3 ....................22

Gaming Act 1710 (Statute of Anne),

9 Anne c. 19 § I (Gr. Brit.)....................8

9 Anne c. 19 § II (Gr. Brit.) ....................8

Ky. Rev. Stat. Ann. § 372.005 ....................18

Ky. Rev. Stat. Ann. § 372.040 ....................22

Mass. Gen. Laws ch. 137 § 1 ....................18, 22

N.J. Stat. Ann. § 2A:40-6 ....................22

Ohio Rev. Code Ann. § 3763.04....................22

* Professional and Amateur Sports Protection Act,
28 U.S.C. § 3701 *et seq.*

28 U.S.C. § 3701(2) ....................28

28 U.S.C. § 3701(5) ....................28

28 U.S.C. § 3702(1) ....................28, 31

28 U.S.C. § 3702(2) ....................31

28 U.S.C. § 3704(a)(2)....................32

Sports Wagering Lottery Amendment Act of 2018,
D.C. Act 22-594, 66 D.C. Reg. 1402 (Feb 1, 2019),
D.C. Code § 22-1716 *et seq.* ....................28

D.C. Code § 22-1717 ....................18, 27

D.C. Code § 36-621.01 ....................28

D.C. Code § 36-621.02(a)(2) ....................20

D.C. Code § 36-621.02(b)....................41

Va. Code Ann. § 11-16.1 ....................18

1 U.S.C. § 1....................4, 5

15 U.S.C. § 15(a) ....................23

18 U.S.C. § 1964(c) ....................23

18 U.S.C. § 2333(a) ....................23

31 U.S.C. § 3729(a)(1)....................23

35 U.S.C. § 284....................23

77 Stat. 582, Pub. L. 88-241 (Dec. 23, 1963) ....................5

720 Ill. Comp. Stat. 5/28-8....................22

**CONSTITUTION**

U.S. Const. amend. X....................30

**RULES**

Fed. R. Civ. P. 8(a) ....................35

Fed. R. Civ. P. 9(b) ....................35

Local Civil Rule 7(f)....................3

**OTHER MATERIALS**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .................... 31-32

David G. Owen, *A Punitive Damages Overview: Functions, Problems and Reform*, 39 Vill. L. Rev. 363, 368 (1994)....................22

*Gaming*, Black's Law Dictionary (4th rev ed. 1968)....................8

*Gaming*, Black's Law Dictionary (5th ed. 1979)....................8

*Gaming*, Black's Law Dictionary (7th ed. 1999)....................8

Giles Jacob, *A New Law-Dictionary* (1739)....................8

* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018)....................2, 33

*PASPA: Awaiting the Supreme Court Decision on Sports Betting*, Colum. J. of L. & the Arts (Aug. 2, 2019)....................32

Synopsis of Statute of Westminster I, 3 Edw., ch. 1. (Eng.)....................22

Timothy Cunningham, *A New and Complete Law-Dictionary, or General Abridgment of the Law* (1771)....................8

Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1357 (1990)....................43

61A Am. Jur. 2d Pleading § 113....................40

## INTRODUCTION

For over a century, the District of Columbia has maintained a law that allows gamblers and relators to recover significant gambling losses. Its language is clear: "A person who, at any time or sitting," bets on any "game," "loses to a person so playing or betting, a sum of money . . . amounting to $25 or more" may "within three months . . . sue for and recover the money, . . . by a civil action, from the winner thereof, with costs." D.C. Code § 16-1702. If they do not, after three months, "any person may sue for, and recover treble the value of the money, . . . with costs of suit, by a civil action against the winner, one-half to the use of the plaintiff, the remainder to the use of the District of Columbia." *Id.*

Perhaps hoping to profit from the recent resurgence of problem gambling nationwide, Defendant corporations chose to ignore this law and open sportsbooks that take large bets in the District. Now, faced with the consequences of that choice, Defendants offer three far-fetched explanations for why the law should not apply to them. First, Defendants insist that they do not offer "games" (despite "gambling" and "gaming" being interchangeable in both common usage and legal parlance), and – still more brazenly – that they do not offer *betting on* "games" (despite centuries of precedent – uncited in their briefs – establishing that horse races, dog races, foot races, and cricket qualify as "games"). *See infra* pp. 7-14. Second, Defendants argue that they cannot be sued by DC Gambling Recovery LLC because corporations are not "person[s]" – contrary to both governing law and the doctrine of corporate personhood long-established by the time the District codified its modern Statute of Anne. *See infra* pp. 4-7. Third, Defendants stand on the baffling claim that, even though they risk their own money every time a gambler places a bet, and even though they profit every time a gambler loses, they are somehow not "winners" under the Statute. *See infra* pp. 14-16.

Defendants muster several additional arguments, all of which fail. They insist that a sports-betting law from 2018 that explicitly amended or repealed *other* gambling-related provisions somehow *impliedly* repeated the Statute of Anne, even though both laws can be harmonized and the District requires courts to reconcile statutes if at all possible. *See infra* pp. 16-21. And they claim that holding Defendants liable for treble damages for violating District law would violate due process or the constitution's Excessive Fines Clause, even though the imposition of treble damages is a common tool in civil statutes – seen in the Clayton Act, the Anti-Terrorism Act, the False Claims Act, the civil Racketeer Influenced and Corrupt Organizations Act, and the District's own Consumer Protection and Procedures Act. *See infra* pp. 21-27

Because even a finding of implied repeal will not save Defendants from liability under the Statute of Anne, Defendants must also evade the federal prohibition on gambling that is still in force in the District of Columbia. To that end, Defendants contort *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 480 (2018), which held only that the federal Professional and Amateur Sports Protection Act ("PASPA") violated the Tenth Amendment's anti-commandeering doctrine and cannot be applied *to the States*. Defendants interpret that holding as having wiped PASPA from the Statutes at Large altogether. But this evidences a fundamental misunderstanding of judicial review: Not even the Supreme Court can erase a duly enacted law from the statute books, or veto or suspend a statute. It may only decline to enforce the law in particular cases. *See generally* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 935-36 (2018). The only circumstance in which the Supreme Court has thus far suspended PASPA is when it is applied in a *State* – which the District of Columbia is not.

In short, to resist the straightforward conclusion that massive sports gambling companies are "winners" at "gaming," Defendants make a jumble of arguments across a combined 68 pages of briefing. They boil down to the position that it is somehow absurd or unfair to apply, as written, the words of a statute that has been on the books in the District of Columbia for over a century. But it is not unfair to require that multi-billion-dollar corporations – like natural persons in the District – follow the law. This Court should deny Defendants' motions to dismiss.

## REQUEST FOR ORAL HEARING

Plaintiff does not oppose an oral hearing if the Court would find it useful. *See* Local Civil Rule 7(f).

## LEGAL STANDARD

"[U]nder Federal Rule 12(b)(6), a plaintiff can overcome a motion to dismiss by simply alleging facts sufficient to state a claim that is plausible on its face." *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1334 (D.C. Cir. 2015) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

### I. The Statute of Anne Applies Here

Under D.C.'s Statute of Anne any "person who, at any time or sitting, by playing at cards, dice or any other game, or by betting on the sides or hands of persons who play, loses to a person so playing or betting, . . . $25 or more," may "within three months . . . sue for and recover the money . . . from the winner thereof, with costs." D.C. Code § 16-1702. If the loser does not sue, after three months, "any person may sue for, and recover treble the value of the money, . . . with costs of suit, by a civil action against the winner, one-half to the use of the plaintiff, the remainder to the use of the District of Columbia." *Id.* For all the reasons the Complaint identifies, the present litigation fits squarely within that statute's purview. DC Gambling

recovery is a "person," suing Defendants (themselves "person[s]") for "winn[ing]" at sports betting contests against bettors in the District, which qualifies as "any other game" (and also as "betting on the sides . . . of persons who play").

Defendants insist that Plaintiff cannot invoke the Statute of Anne for three reasons: Plaintiff and Defendants are not "persons," sports and sports betting are not "game[s]," and Defendants are not "winner[s]." *See* DraftKings Br. 16-20, Dkt No. 32-1; FanDuel Br. 19-24, Dkt. No. 30-1. These arguments are atextual and ahistorical, and many are self-refuting. None justifies dismissal.

**A. Plaintiff and Defendants Are "Person[s]"**

Plaintiff and Defendants may sue and be sued under D.C.'s Statute of Anne because they qualify as "person[s]." When determining the meaning of a word in a statute, courts first look to the applicable Dictionary Act. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 707 (2014) (noting that, to determine the meaning of the word "person" in a statute like RFRA, "[w]e therefore look to the Dictionary Act, *which we must consult* '[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise' ") (quoting 1 U.S.C. § 1) (emphasis added); *Ruffin v. United States*, 76 A.3d 845, 852-53 (D.C. 2013) (looking to 1 U.S.C. § 1 "to discern the scope of 'person' " in a statute enacted by Congress and recodified by the D.C. Council). Both the federal and the District's Dictionary Acts define "person" to include artificial persons like corporations and companies. *See* 1 U.S.C. § 1 ("person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies"); D.C. Code § 45-604 ("The word 'person' shall . . . apply to partnerships and corporations, unless such construction would be unreasonable."). Indeed, "[s]tatutory use of the word persons to include corporations is so general that to hold corporations are not included requires *clear proof* of

legislative intent to exclude them." *Central Amusement Co. v. District of Columbia*, 121 A.2d 865, 866 (D.C. 1956) (emphasis added).

FanDuel offers no affirmative proof, much less clear affirmative proof, that only "natural persons" may sue and be sued under the Statute of Anne, or that would it be unreasonable or acontextual to conclude otherwise. *See* FanDuel Br. 23-24. They note only that corporate personhood did not exist in its modern form when the Statute of Anne first appeared or when it became District law in the early 1800s. FanDuel Br. 23. This argument is both legally irrelevant and factually wrong.

It is legally irrelevant for two reasons. *First,* as already noted, *current* D.C. and federal law specifies that the word "person" includes artificial persons. *See* D.C. Code § 45-604; 1 U.S.C. § 1. Defendants offer no explanation as to why this Court should ignore that statutory text and instead look to history.

*Second*, whatever the law during the reign of Queen Anne, the modern view of corporate personhood was firmly established for over a century when Congress recodified the District's version of the Statute. *See* 77 Stat. 582, Pub. L. 88-241, § 1 (Dec. 23, 1963). During that recodification, Congress almost entirely rewrote the predecessor statute, translating it into modern English and adopting the modern $25 threshold. *Compare.* D.C. Code § 16-702 (1961) (the pre-recodification Statute of Anne), *available at* bit.ly/3SVQyPb, *with* D.C. Code § 16-1702 (1963) (the modern Statute of Anne). But despite this thorough reworking of the text, Congress nevertheless retained the "person" language. By using this verbiage – rather than a term like "individual," which more commonly denotes natural persons, *see Mohamad v. Palestinian Auth.*, 566 U.S. 449, 455 (2012) (citing statutes) – Congress chose, "against the backdrop" of modern corporate personhood doctrine, *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 372

(2018), to extend the Statute to corporate plaintiffs and defendants. *See also Tilley v. United States*, 238 A.3d 961, 964, 970 (D.C. 2020) (in discussing a term in a statute passed by Congress for the District, looking to the Dictionary Act's definition that existed "[a]t the time of the [statute's] enactment").

The argument is also factually wrong. While corporations were not (until the mid-1800s) considered persons for *all* purposes, they could still "sue [and be sued] in the courts of the union" because they were "composed of citizens." *See Bank of U.S. v. Deveaux*, 9 U.S. 61, 89-92 (1809), *overruled on other grounds by Louisville, Cin. & Charleston R.R. v. Letson*, 43 U.S. 497 (1844). As Chief Justice Marshall summarized, "corporations have been included within terms of description appropriated to real persons" since at least the time of Henry VIII. *Id.* at 88. Defendants have given no reason to suppose the Statute of Anne was an exception from this general rule. Indeed, while Defendants say they are "unaware of any cases involving the DC Statute of Anne where a corporate entity is the named plaintiff," FanDuel Br. 23, they cite a case applying D.C.'s Statute where the corporation was the named defendant, *see id.* (citing *Humphrey v. Viacom, Inc.*, 2007 WL 1797648, at *1-2 (D.N.J. June 20, 2007)). And other cases they cite suggest the opposite. *See* FanDuel Br. 23 (citing *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819)).[1]

Defendants' reading would also defy common sense. If the Statute of Anne excluded "suits . . . against corporate entities," FanDuel Br. 23, any gambling winner could evade liability under it simply by incorporating as a limited liability company. That would "render essentially toothless" the Statute's enforcement provision. *District of Columbia v. American Univ.*, 2 A.3d

[1] Despite what FanDuel argues in its brief (at 23), 1819 – the year *Dartmouth College* was decided – is not in the "mid- to late 1800s."

175, 187 (D.C. 2010). It would also produce the "absurd result," *James Parreco & Son v. D.C. Rental Hous. Comm'n*, 567 A.2d 43, 46 (D.C. 1989), of giving sophisticated gambling enterprises a get-out-of-jail-free card while punishing individual gambling purveyors running smaller-scale operations. D.C. has not understood the Statute in that way; it has long sought to combat *businesses* conducting illicit gambling. *See* Compl. ¶ 1 (describing the 1925 raid of a "Greek restaurant" and that was collectively operating "a furtive horse-racing operation.").

Here and elsewhere in support of their cramped reading, Defendants argue that this Court should strictly construe the Statute of Anne as a "penal statute." *See* DraftKings Br. 17, 19-20, 26-28; FanDuel Br. 19-20, 22-23. But D.C. itself characterizes the operative provision of that statute as compensatory, not penal. *See Shenk v. Cohen*, 51 A.2d 298, 300-01 & n.8 (D.C. 1947). And that is in keeping with the federal law governing the Excessive Fines Clause and other related provisions, *see infra* pp. 21-27.

**B. Sports Betting is Betting On "Any Other Game"**

D.C.'s Statute of Anne provides relief for persons who lose money by "playing at cards, dice *or any other game, or by betting on the sides or hands of persons who play*." D.C. Code § 16-1702 (emphasis added). Defendants' offerings fall under that umbrella for at least two reasons. First, sports are themselves "other game[s]," so the Statute of Anne permits recovery against those who "bet[] on the sides . . . of persons who play." *Id.* Second, sports *betting* is itself a game, meaning that D.C. gamblers "play[] . . . any other game" against Defendants each time they put a wager on one of the betting lines Defendants offers.

1. Sports are "games." At all relevant points, "*the public understanding*," *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (emphasis in original), of the word "game" has encompassed athletic contests. That was the true when the Statute of Anne first appeared in

Britain.[2] It was true in 1963, when the Statute of Anne was codified in the District.[3] And it remains true today.[4] Americans regularly ask each other – in barber shops, across water coolers, and around the dinner table – whether they saw the most recent football *game*, basketball *game,* baseball *game*, or hockey *game.* And Defendants' own websites include text noting that they facilitate betting on "games."[5]

History tells the same story as the text. The original, British Statute of Anne had two sections. The first declared unenforceable debts won by betting on "Cards, Dice, Tables, *Tennis, Bowls*, or other Game or Games whatsoever." Gaming Act 1710, 9 Anne c. 19 § I (emphasis added). It thus expressly defined "Tennis" and "Bowls" – both sports – as "Games." The second section (providing the private right of action), used a pithier shorthand: "Cards, Dice, Tables *or other Game or Games whatsoever*." Gaming Act 1710, 9 Anne c. 19 § II. Parliament

[2] *See*, *e.g.*, Giles Jacob, *A New Law-Dictionary* (1739) (providing as examples of "[g]aming" "Cock-Fighting, Horse-races, Foot-races or other Games or Pastimes," and citing the Statute of Anne for this definition); Timothy Cunningham, *A New and Complete Law-Dictionary, or General Abridgment of the Law* (1771) (including within "[g]aming" "tennis, bowls, kittles, shovelboard, or in or by cock-fighting, horse-races, dog-matches or foot-races, or other pastimes").

[3] *See*, *e.g.*, *Gaming*, Black's Law Dictionary (4th rev ed. 1968) (noting that "gaming" and "gambling" are similar in meaning, and either one comprehends the idea that, by a bet, by chance, by some exercise of skill, or by the transpiring of some event unknown until it occurs, something of value is, as the conclusion of premises agreed, to be transferred from a loser to a winner."); *Gaming*, Black's Law Dictionary (5th ed. 1979) (defining "gaming" as "[t]he practice or act of gambling").

[4] *See*, *e.g.*, *Gaming*, Black's Law Dictionary (7th ed. 1999) (defining "gaming" as "gambling").

[5] *See*, *e.g.*, DraftKings, *How to Bet 101: Sports Betting Explained*, https://sportsbook.draftkings.com/help/how-to-bet ("If a bet is on the winner of a game, that is called a moneyline bet.").

saw no reason to repeat the "Tennis" and "Bowls" language. It was well understood at the time that athletic contests qualified as "other . . . Games whatsoever."

Defendants miss this straightforward reading. Instead, they insist that the original Statute of Anne's first section *did* extend to athletic contests, but its second section *did not*. *See* FanDuel Br. 6. Defendants cite no authority for that strained interpretation. And for good reason: British courts serially recognized that the Statute of Anne permitted civil recovery for "excessive betting upon *all sports* as well as games" – even though it contained no express reference to "Tennis," "Bowls," or any other sort of athletic competition. *Blaxton v. Pye*, 2 Wils. R. 309 [1766] (emphasis added). So, for example, "although horse-racing [was] not mentioned in that statute," it still fell "within the general words other game or games." *Id.* (citing *Goodburn v. Marley*, 2 Star. 1159). The same went for gambling on foot races, *Lynall v. Longbotham*, 2 Wils. 36 [1756]; cricket games, *Hodson v. Terrill*, 3 Tyr. 929, 1 C. & M. 797 [1833]; and dog races, *Daintree v. Hutchinson*, 10 M. & W. 85, 152 E.R. 392 [1842]. Far from proving Defendants' thesis, this history confirms that an express reference to athletic competitions is *not* required for the Statute of Anne to reach them. This disproves Defendants' *expressio unius* argument. *See* FanDuel Br. 21 (citing *National Labor Relations Board v. SW General, Inc.*, 580 U.S. 288, 302 (2017)).

This jurisprudence followed the Statute of Anne across the Atlantic. When the District first inherited its own Statute of Anne from Britain (by way of Maryland), it inherited the common law interpreting its provisions, too. *See Mandeville v. Union Bank of Georgetown*, 13 U.S. (9 Cranch) 9, 10 (1815) (noting under "the laws of Maryland, in force in the county of Washington," parties are "subject to the same rules as in England under the statute of Anne."); *see also Bank of Columbia v. Okely*, 17 U.S. (4 Wheat.) 235, 242 (1819) (similar). It follows

that D.C.'s Statute of Anne similarly permitted private recovery for sports-gambling losses – even though (like Britain's equivalent provision) – it does not expressly reference athletic competitions.

The D.C. Court of Appeals has specifically held as much. In *Miller v. United States*, the court observed that "[i]t has from an early time been held that a horse race is a game of chance . . . within the meaning of the St[atute of] Anne." 6 App. D.C. 6, 14 (1895) (citing British authorities). Even though horse racing is "not specially mentioned" in the District's Statute of Anne, parties can nevertheless seek to recover for horse-betting losses because doing so is "embraced in the general words, other *game or games*." *Id.* (emphasis in original). It applied the same logic to a "game of base ball" and for "a foot race." *Id.* And in so holding, it joined numerous other State high courts faced with the question whether sports and athletic competitions count as games. *See*, *e.g.*¸ *People v. Weithoff*, 16 N.W. 442, 442 (Mich. 1883); *McLain v. Huffman*, 30 Ark. 428, 431 (1875); *Wilkinson v. Tousley*, 16 Minn. 299, 306 (1871); *Grace v. M'Elroy*, 83 Mass. 563, 564 (1861); *Tatman v. Strader*, 23 Ill. 493 (1860); *Cheesum v. State*, 8 Blackf. 332, 333 (Ind. 1846); *Ellis v. Beale*, 18 Me. 337, 339 (1841); *Bagley v. State*, 20 Tenn. 486, 491 (1840). The D.C. Court of Appeals has never displaced that holding.

2. In addition to sports *themselves* being "other games," sports *betting* – as a discrete activity – separately qualifies. The D.C. Court of Appeals has so held. *See Miller,* 6 App. D.C. at 14 (noting a "pooling scheme is to be considered a game"). So have numerous other courts on both sides of the ocean. *See*, *e.g.*, *Weithoff*, 16 N.W. at 447-48; *Scollans v. Flynn*, 120 Mass. 271, 272 (1876); *Tollett v. Thomas*, 6 Q.B. 514 [1871] (UK); *Tatham v. Freeman*, 180 S.E. 871, 872 (Ga. Ct. App. 1935) ("Betting upon a game of golf falls within the above principle. Also

betting that one competitor, among many others, in such a game will win is a side bet upon a game.”).

Moreover, as noted above, dictionary definitions and common usage treat the terms “gaming” and “gambling” as interchangeable. *See supra* pp. 7-8 & nn.3-4. And even Defendants do not try to contend that their offerings are not gambling. Nor could they: “Sportsbooks usually set their odds with help from professional statisticians and proprietary software,” and they “modify their offerings dynamically over time based on national and global betting trends,” allowing them “to derisk their operations.” Compl. ¶ 22. All the while, they keep a “statistical advantage” for themselves. *Id.* ¶ 23. In that way, sports betting is no different from spinning a roulette wheel or playing a game of blackjack at a casino. *See*, *e.g.*, *West Flagler Assocs. v. Haaland*, 573 F. Supp. 3d 260, 264 (D.D.C. 2021), *aff’d in part, vacated in part, remanded sub nom. W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059 (D.C. Cir. 2023) (noting that a federal compact “classifies ‘sports betting’ as a ‘covered game’ ”).

3. Relying on the *ejusdem generis* canon, Defendants say “cards, dice or any other game” should be read to cover only what they call “table games,” “such as roulette or dominoes.” *See* DraftKings Br. 18-20, FanDuel Br. 19-23. For the reasons given above, that argument clashes with the text, history, and structure of the Statute of Anne; it defies basic logic; and it contradicts an unbroken line of precedent spanning three centuries and two continents (including a binding decision of the D.C. Court of Appeals). And it is unpersuasive on its own terms.

Under the *ejusdem generis* canon, “where general words follow an enumeration of specific items,” the general words apply to all those “other items akin to those specifically enumerated.” *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980). Dice and cards are – as courts have repeatedly held – “akin” to other games of skill and chance on which people may

wish to wager money, to include all manner of sports and athletic competitions. *See Miller*, 6 App. D.C. at 14 (citing authorities). Moreover, the word "any" (as used here in "any other game") usually commands maximum breadth, meaning "of whatever kind." *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 220 (2008). The limited exceptions to that interpretive principle – such as when there is a "term of art that compel[s]" a narrow result; "when another term in the provision ma[kes] sense only under a narrow reading"; and "when a broad reading would . . . implicate[] sovereignty concerns" – do not apply here. *Id.* at 220 n.4. And courts may not rely on *ejusdem generis* to impose unduly exacting limiting principles unless that reading is "supported by evidence" that is "over and above the language of the statute." *United States v. Powell*, 423 U.S. 87, 90 (1975).

Additionally, defendants offer no compelling justification for why "table" should be the relevant criteria. After all, "table" is not even necessarily a " 'common attribute' " of cards and dice, as *ejusdem generis* requires. *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 460 (2022) (quoting *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 224 (2008)). Dice (and even cards) are not always played on tables. Nor does the "table" modifier effectively exclude athletic contests, as many popular sports (including ones on which gambling is common, such as pool, ping pong, and arm wrestling) are played on tables. By contrast, games involving "cards" and "dice" *do* share a variety of "common attributes" with tennis, bowls, and other types of non-table games as well. That is why the original Statute of Anne could sensibly put them all in a single list of "games." And that is why numerous courts have concluded, other the years, that all manner of sports and sports betting qualify as "other games."

Defendants' only D.C. authority, *United States v. Brown*, does not support their interpretation. It affirmed dismissal of an indictment under a statute criminalizing the playing of

"the confidence game or swindle known as three-card monte, or of any such game, play, or practice, or any other confidence game, play, or practice." 309 A.2d 256, 257 & n.2 (D.C. 1973) (quoting D.C. Code § 22-1506 (1967)). But it did so only because the alleged conduct by the defendant *did not even involve gambling*. *Id.* at 257 & n.3. The clear implication is that a clause like the one in the Statute of Anne would sweep in the full range of gambling-related activities. And indeed, other States have acknowledged their own Statutes of Anne extend well beyond what could be fairly characterized as a "table game." *See*, *e.g.*, *Justice v. The Pantry*, 518 S.E.2d 40, 43 (S.C. 1999) (video machine gambling).

Defendants' attempt to distinguish "table games" from sports betting is also unpersuasive. The best they can offer is that "[f]ootball . . . involves a large field of professional athletes rotating in and out and governed by formal league rules." DraftKings Br. 19. True enough. But some of the "table games" they describe also involve professionals and certainly have rules; that they don't have fields or involve athletes doesn't make them any less "games." And sports *betting* doesn't require any field or athleticism whatsoever. Successfully predicting the *outcome* of an athletic contest is a game of chance. Compl. ¶ 23. In that way, placing a sports bet is no different from spinning the roulette wheel. And Defendants acknowledge that the Statute of Anne covers that sort of activity. *See* DraftKings Br. 19.

Defendants also cite D.C. Code § 22-1708, which sets criminal penalties for sports betting, to distinguish "games" from "athletic contest[s]." But the fact that football, hockey, baseball, tennis, golf and other sporting events are defined as "athletic contest[s]" does not mean that those sports (and betting on them) are not also "games" for purposes of the Statute of Anne. For one, § 22-1708 specifies that the definition applies only "[f]or the purpose of th[at] section"; it thus cannot alter the meaning of the D.C. Statute of Anne. At any rate, sporting events can be

*both* "athletic contest[s]" under § 22-1708 *and* also games under the Statute of Anne. Indeed, § 22-1708 includes both tennis – which clearly is a "game" under the original Statute of Anne – and "polo game[s]." Defendants' interpretation would also lead to a bizarre result, where operating sports books is subject to criminal penalties but sports-betting is not subject to civil recovery under § 16-1702. There is no reason to think that is the statutory scheme D.C. enacted.

Defendants' reference to D.C. Code § 16-1703 is also of no help. That provision merely states that "[u]pon the discovery and repayment of the money . . . the person who so discovers and repays" does not stand to face "punishment, forfeiture, or penalty." *Id.* In other words, it clarifies that the Statute of Anne operates as a civil alternative to traditional punishment. Once the ill-gotten gains are surrendered, D.C. does not involve itself further. Confirming this view, § 16-1703 applies to all private actions under the Statute of Anne, even those where gamblers sue in their own name to recover their own losses. Defendants have never argued that this first portion of the Statute of Anne is penal in nature. Nor could they: It provides only for recovery of single damages (plus fees) that the plaintiff has personally sustained. And if the recovery of fees transmuted a civil statute into a penal one, § 1983 and countless other statutes with fee-shifting provisions in the U.S. Code would also be penal. Of course, they are not. *See Gothberg v. Town of Plainville*, 148 F. Supp. 3d 168, 196 (D. Conn. 2015).

### C. Defendants Are "Winners" Under the Statute of Anne

Defendants are gaming "winners" within the meaning of the Statute of Anne. In law as in common parlance, "[a] gambling winner is the person to whom a gambling loser has lost." *Ristic v. Machine Zone, Inc.*, 2016 WL 4987943, at *3 (N.D. Ill. Sept. 19, 2016). When Defendants set betting lines, they invite D.C. bettors to play a game (a sports gambling game) *against them*. *See* Compl. ¶¶ 20-23. When the D.C. bettors pick incorrectly, they lose money directly to Defendants. *Id.* ¶ 23. And because Defendants bake a statistical edge into their

betting lines, the game is rigged in their favor. *Id*. As a result, Defendants win more often than they lose. *Id.*

Both Defendants' cited cases support this view. Their lead authority (at DraftKings Br. 18) concerns an entirely different business model: companies that do not themselves offer wagers, but that provide gamblers a platform to bet *against each other*, profiting by taking a "rake off some of the money in the pot." *Sonnenberg v. Amaya Grp. Holdings (IOM) Ltd.*, 810 F.3d 509, 511 (7th Cir. 2016). In concluding that those websites were not gambling "winners," the court held only that "charging a fee for engaging in gambling is not the same as winning a gamble," citing (as an example) that "a croupier who supervises a casino's poker game is not a gambler, let alone a winner." *Id.* But the court expressly distinguished games such as "blackjack or slot machines," where the gambling operator *itself* had a financial "stake in the outcome of the games played." *Id.* Sports betting is of a kind with "blackjack or slot machines," as Defendants risk their own money each time they invite the public to play against them. Defendants do not merely collect a fee from games that members of the public play against one another.

The same goes for Defendants' other cited case (at DraftKings Br. 18), where the losers of raffles sought to sue the companies offering the raffles (and not the winners of the raffles) for the losses they sustained. *Anderson v. Naperville Rotary Charities Inc.*, 2019 WL 1368551 (Ill. App. Ct. Mar. 22, 2019). The court found those companies were not winners because "their own money [was] not at risk." *Id.* at *5. Rather, they operated as a "house," "with the raffle ticket serving as an entry fee for participants to compete *against each other* for a prize." *Id.* (emphasis added). Along the way, the court expressly distinguished cases involving brokerage firms, *id.*, in which "if there was a loss, the client would pay the brokerage firm, and if there was a gain, the

brokerage firm had to pay the client," *id.* at 4 (citing *Pearce v. Foote*, 113 Ill. 228, 232-33 (1885); *Kruse v. Kennett*, 181 Ill. 199, 204-05 (1899)). In each of those cases, the brokerage firm qualified as a "winner." Defendants provide much the same offering.

## II. The Statute of Anne Is Still Good Law

As Defendants concede, the Statute of Anne is "still on the books" in the District. FanDuel Br. 24; *see also* DraftKings Br. 9 (acknowledging the statute "has never undergone any real changes"). To prevail in their argument that the law should not apply to their conduct, Defendants are thus forced to argue that the Sports Wagering Lottery Amendment Act ("SWLAA") *impliedly* repealed the Statute of Anne. *See* FanDuel Br. 24-30; DraftKings Br. 7-14. But they cannot make the required showing. The standard for an implied repeal is high, for good reason – it is not the judiciary's role to review legislation and impose its preferred legislative scheme.

### A. There Is No Irreconcilable Conflict Between the SWLAA and the Statute of Anne

Defendants do not – and cannot – argue that the SWLAA expressly repealed the Statute of Anne. In the absence of an express repeal, "the court must, if possible, read the two statutes so each is effective." *Lucas v. United States*, 602 A.2d 1107, 1110-11 (D.C. 1992). Where there is "no irreconcilable conflict . . . [a court] can find no implied repeal." *Id.* Indeed, if there is any interpretation of the statutes that allows them to have "concurrent operation," that interpretation must be honored. *Mazanderan v. D.C. Dep't of Pub. Works*, 94 A.3d 770, 781 (D.C. 2014); *see also George v. Dade*, 769 A.2d 760, 764 (D.C. 2001) ("[O]ur task is to reconcile [statutes], if possible."); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears [a] heavy burden[.]").

Here, that judicial task is straightforward. Taken together, the Statute of Anne and the SWLAA work in harmony: Gambling losses below $25 are authorized, while losses above $25 remain subject to Statute of Anne. That's a perfect rational scheme – or least not an inherently contradictory one. Nothing prevents the District from fully authorizing the operation of small-stakes sports gambling while at the same time giving a right of action to its citizens (and to relators) allowing for the recovery of excessive gambling losses. Here, the District has determined that a $25 gambling loss is excessive – and provided just such a right of action against sports gambling operators.

Experience in other States reinforces that conclusion. When the South Carolina legislature comprehensively regulated video poker through its Video Game Machines Act ("VGMA"), the South Carolina Court of Appeals and Supreme Court both agreed that it did not repeal the "gaming statutes" (South Carolina's version of the Statute of Anne). *See Justice v. Pantry*, 496 S.E.2d 871, 875 (S.C. Ct. App. 1998) (reasoning that the "statutes are not repugnant to each other and are not incapable of a reasonable reconcilement"); *Mullinax v. J.M. Brown Amusement Co.*, 508 S.E.2d 848, 851 (S.C. 1998) (although the "VGMA sets forth a comprehensive set of rules and regulations concerning video poker machines[, it] did not impliedly repeal the gaming statutes"). Indeed, the South Carolina Supreme Court had previously found that "the gaming statute did not require playing of illegal games and was applicable to loss incurred by a gambler playing legalized video poker." *Id.* at 850 n.4 (citing *Berkebile v. Outen*, 426 S.E.2d 760 (S.C. 1993)). As the South Carolina cases confirm, the Statute of Anne and "legality" are separate concepts.

Furthermore, the District knows how to repeal laws when it wants to.[6] The SWLAA itself expressly repealed some provisions. It expressly amended the D.C. criminal code to clarify that Title 22, Chapter 17, Subchapter I (concerning criminal gambling offenses) did not extend to "sports wagering regulated, licensed, or operated by the Office of Lottery and Gaming." D.C. Act 22-594, 66 D.C. Reg. 1402 (Feb. 1, 2019), *codified at* § 22-1717. It made no similar statement as to the Statute of Anne, which is codified in Title 16. "When a legislature makes express mention of one thing, the exclusion of others is implied, because there is an inference that all omissions should be understood as exclusions." *Howard Univ. Hosp./Prop. & Cas. Guar. Fund v. D.C. Dep't of Emp. Servs.*, 952 A.2d 168, 174 n. 4 (D.C. 2008) (cleaned up). And the District is "presumed to have been aware of existing statutes" when it enacts laws. *United States v. Brown*, 422 A.2d 1281, 1284 (D.C. 1980); *see also District of Columbia v. Beretta U.S.A. Corp.*, No. 0428-00, at 72, 2002 WL 34103516 (D.C. Super. Ct. Dec. 16, 2002) ("the legislature is presumed to have been aware of existing statutes when laws are enacted on the same subject matter") (cleaned up). Taken together, these principles suggest that lack of an express repeal of the Statute of Anne in the SWLAA, if anything, evinces a legislative intent to *leave intact* the right of recovery against gambling operators.

Two cases repeatedly cited by Defendants – *Wirt v. Stubblefield*, 17 App. D.C. 283 (1900) and *Pearsall v. Alexander*, 572 A.2d 133, 115 (D.C. 1990) – are not to the contrary. *See*

---

[6] As do other States: When they *do* intend to modify, limit, or repeal their versions of the Statute of Anne, they do so explicitly. *See*, *e.g.*, Mass. Gen. Laws ch. 137 § 1 (Massachusetts' Statute of Anne applies "except for . . . sports wagering conducted pursuant to chapter 23N"); Va. Code Ann. § 11-16.1 ("[The Statute of Anne] chapter shall not apply to any bet, wager, or casino gaming permitted by Chapter 41 . . . of Title 58.1 or to any contract, conduct, or transaction arising from conduct lawful thereunder."); Ky. Rev. Stat. Ann. § 372.005 ("The terms and provisions of [the recovery of gambling debts] chapter do not apply to betting, gaming, or wagering that has been authorized, permitted, or legalized, including, but not limited to, all activities and transactions permitted under KRS Chapters 154A, 230, and 238.").

DraftKings Br. 10-11; FanDuel Br. 23-28. In *Wirt*, the D.C. Court of Appeals held that a Congressional act protecting *bona fide* noteholders repealed provisions in the District's Statute of Anne that rendered certain negotiable instruments (i.e., for gambling debts) void and unenforceable. 17 App. D.C. at 286-88. But there, Congress had explicitly specified that "all laws of force within the District of Columbia, inconsistent with the foregoing provisions of this act, be, and the same hereby are, repealed." *Id.* at 286. As the Court reasoned, it was therefore "within the contemplation of Congress, that there were laws or legislation in force proper to be repealed" and the Court's corresponding duty to determine "what laws were thus intended to be repealed[.]" *Id.* Here, there is no analogous language of repeal – in fact, there is far narrower language *specifically* indicating what other provisions SWLAA intended to modify and repeal. In any case, *Wirt*'s conflict was truly irreconcilable. A negotiable instrument cannot both be valid and invalid. If the relevant portion of the Statute of Anne remained in effect, it would directly "affect the validity of the negotiable instruments embraced by the act of Congress." *Id.* at 291.

Similarly, in *Pearsall*, the D.C. Court of Appeals considered whether the Statute of Anne invalidated an agreement to split winnings from the D.C. Lottery. 572 A.2d at 115. The Court concluded it did not; the plaintiff was not suing to "to recover a gambling debt" or "money loaned . . . for the purpose of gambling," and thus their agreement "[wa]s not a gaming contract as defined in [the Statute of Anne]." *Id.* at 115-16. "Because [the Court] conclude[d] that the trial court misapplied the statute in this case," the Court explicitly did "not reach the issue of whether the [S]tatute [of Anne] has been repealed or narrowed by the passage of D.C. Code § 2-2501 to 2537 (1988) creating the D.C. Lottery." *Id.* at 116 n.4. *Pearsall* therefore provides no support for the kind of implied repeal Defendants urge here.

### B. Defendants' Supposed Conflicts Are Illusory

To support their implied repeal argument, Defendants suggest that several features of the SWLAA are irreconcilable with the Statute of Anne. But none of these conflicts is real.

*First*, Defendants claim that the SWLAA "contemplates bets well over the Statute of Anne's $25 threshold," FanDuel Br. 25, or even "presuppos[es] that wagers above $25 are lawful absent further regulation," DraftKings Br. 12. But the only statutory text they cite is the SWLAA's general directive for the D.C. Office of Lottery and Gaming (OLG) to adopt rules and regulations governing the "[m]aximum wagers that may be accepted by an operator." D.C. Code § 36-621.02(a)(2). That language does not prescribe *what* the maximum wager should be, much less suggest an intent to immunize wagers over $25. As Defendants ultimately concede, the maximum limits are, in fact, set by OLG regulations, not the SWLAA. DraftKings Br. 12; FanDuel Br. 25. The fact that OLG *regulations* might permit *wagers* above $25 does not (and could not) alter or override the Statute of Anne, which allows recovery of *losses* (not wagers) greater than $25.

*Second*, DraftKings complains that "[t]he purported $25 threshold appears nowhere in the text of the [SWLAA]." DraftKings Br. 11. But they fail to explain why that matters. Even though the SWLAA does not reference the Statute of Anne's $25 threshold, enforcement of both results in a coherent legislative scheme. That precludes a finding of implied repeal.

*Third*, DraftKings suggests, without any evidence, that sports gambling would not be profitable or economical if limited to wagers under $25. *See* DraftKings Br. 13 (arguing the "Sports Wagering Act's licensing and tax provisions likewise take for granted high-volume, high-dollar bets" and "assumes that taxing sports betting will generate significant tax revenue"). At best, that's speculation about the expected popularity of sports gambling. It is not a reason to

ignore the text of a valid statute, and it is insufficient to satisfy the high standard for implied repeal.

Ultimately, Defendants fall back to the general argument that the SWLAA made sports wagering "lawful." FanDuel Br. 25; *see* DraftKings Br. 9 ("A statutory regime cannot simultaneously render conduct lawful and impose severe penalties for it."). But making something "lawful" does not exempt that activity from other existing (and valid laws) and regulatory regimes. Defendants surely have no right to ignore fraud, racketeering, usury, or other laws that govern their conduct with respect to sports wagering – even if those laws might limit the conduct they wish to engage in or expose them to penalties.

Finally, the Court should not speculate about the "policy and object" of the D.C. Council. *See* FanDuel Br. 26 (suggesting the D.C. Council wanted to "make the most money" possible). "No statute pursues a single policy at all costs," and this Court is "not free to rewrite [a] statute (or any other) as if it did." *Bartenwerfer v. Buckley*, 598 U.S. 69, 81 (2023). The best expression of the D.C. Council's intentions is captured by the statutory language contained in its validly-enacted laws. In any case, the District would enjoy significant revenue from the current statutory scheme, which fully permits small stakes betting. Defendants' arguments to the contrary reduce to a policy disagreement: multi-billion dollar sportsbooks cannot fathom a scheme in which they cannot encourage and take a huge amount of high-stakes wagers from the public. But this Court is not the forum for arguments about gambling policy. And the Court certainly is not required to defer to *Defendants'* own preferences for untrammeled profit-seeking.

### C. Applying Longstanding District Law Does Not Violate the Constitution

Defendants also claim that applying the Statute of Anne to their conduct would "raise serious constitutional concerns." FanDuel Br. 28; *see also* DraftKings Br. 23 (applying the law would be "extraordinary and unconstitutional"). But it is neither unfair nor unconstitutional to

hold companies accountable for violations of longstanding, preexisting law, and Defendants cite no case suggesting so.

As an initial matter, any argument that the Statute of Anne is unconstitutional should trigger immediate skepticism. It is difficult to find a modern statute with an equivalent historical pedigree. Statutes of Anne have existed in at least seven U.S. jurisdictions for centuries. *See*, *e.g.*, D.C. Code § 16-1702; Ga. Code Ann. § 13-8-3; Ky. Rev. Stat. Ann. § 372.040; N.J. Stat. Ann. § 2A:40-6; Ohio Rev. Code Ann. § 3763.04; 720 Ill. Comp. Stat. 5/28-8; Mass. Gen. Laws ch. 137, § 1. "In light of th[is] unambiguous and unbroken history of more than 200 years," the suggestion these statutes violate the Constitution strains credulity. *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 576 (2014) (quoting *Marsh v. Chambers*, 463 U.S. 783, 792 (1983)). Closer inspection of Defendants' arguments confirms this intuition.

### 1. The Statute of Anne Does Not Violate Due Process

DraftKings (at 23-24) invokes *State Farm Mutual Automobile Insurance Co. v. Campbell*, and Justice Breyer's concurrence in *BMW of North America, Inc. v. Gore* to suggest that the Statute of Anne violates substantive due process by imposing grossly excessive and arbitrary punishment. 538 U.S. 408, 416 (2003); 517 U.S. 559, 585-86 (1996) (Breyer, J., concurring). But those cases specifically identified "a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish." *State Farm*, 538 U.S. at 425 (citing *Gore*, 517 U.S. at 581). The Statute of Anne's treble damages provision falls comfortably within that tradition. In fact, a source cited in *Gore* notes that "Parliament enacted at least 65 separate provisions for double, treble and quadruple damages between 1275 and 1753" – including, of course, the Statute of Anne. David G. Owen, *A Punitive Damages Overview: Functions, Problems and Reform*, 39 Vill. L. Rev. 363, 368 (1994) (citing Synopsis of Statute of Westminster I, 3 Edw., ch. 1. (Eng.)).

Indeed, not only are treble damages not "extraordinarily high," DraftKings Br. 24, they are common. *See*, *e.g.*, D.C. Code § 28-3905(k)(1)(A)-(2)(A)(i) (District's Consumer Protection Procedures Act (CPPA)); 15 U.S.C. § 15(a) (Clayton Act); 18 U.S.C. § 2333(a) (Anti-Terrorism Act); 31 U.S.C. § 3729(a)(1) (False Claims Act); 18 U.S.C. § 1964(c) (civil RICO); 35 U.S.C. § 284 (willful patent infringement); *see also Duckworth v. United States*, 418 F. App'x 2, 3 (D.C. Cir. 2011) (when a case "involves a civil penalty authorized by" a statute, "citation to other decisions setting forth punitive damages tests" (i.e., *State Farm* and *Gore*) is "unavailing").

DraftKings also suggests that *any* damages (presumable even single damages) would be unconstitutionally disproportionate, because Plaintiff "has suffered no harm" and thus the "ratio" of penalty to harm would be "infinite." DraftKings at 24-25. But a plaintiff's damages (as opposed to the harm caused by a defendant) has never been the most relevant metric for proportionality. Rather, the key question is whether the punishment (assuming damages here even has a punitive aspect) is disproportionate to the severity of the defendant's conduct. *See Gore*, 517 U.S. at 575 (noting that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct"). Indeed, DraftKings's theory, if taken seriously, would doom relator statutes like the False Claims Act, where relators need not suffer any personal harm (and where, on DraftKings's telling, any "ratio" would be similarly "infinite"). *See United States ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 166 (2d Cir. 2018) (noting that, under the FCA, "[r]elators need not allege personal injury"). Treble damages is wholly proportionate to and a reasonable measure to prevent the harm caused by Defendants' conduct and targeted by the Statute of Anne. *See Humphrey v. Viacom, Inc.*, 2007 WL 1797648, at *3 (D.N.J. June 20, 2007) (describing the "common origin and purpose"

of Queen Anne statutes as "intended to prevent gamblers and their families from becoming destitute due to gambling losses – and thus becoming wards of the State").

Defendants also insist that treble damages would be unfair because they "did not violate the law – they followed it." DraftKings Br. 24. But that just assumes that the Defendants did not violate the Statute of Anne. If the Court concludes Defendants did not violate the law, they will not be liable for any damages – trebled or otherwise. Similarly, Defendant's further suggestion – that the District cannot "authoriz[e] parties to engage in conduct and then penaliz[e] or impos[e] liability on them for that very conduct," FanDuel Br. 28 – also just assumes the predicate (that the SWLAA authorized their conduct).

Reduced down, Defendants claim they were *misled* by the District's apparent endorsement of sports gambling in the SWLAA. *See* FanDuel Br. 29. But "[it] is a common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally." *Conley v. United States*, 79 A.3d 270, 281 (D.C. 2013) (quoting *Barlow v. United States*, 32 U.S. (7 Pet.) 404, 411 (1833)). Claims of excusable ignorance and surprise ring particularly hollow when the defendants are multi-billion dollar corporations fully equipped to understand the governing statutory framework in their very specific industry with the assistance of some of the finest lawyers and law firms in the country. Their decision to ignore the law and rush to profit is not protected by due process. *See United States v. Dotterweich*, 320 U.S. 277, 280-81, 285 (1943) (noting that, even the criminal context, a "familiar type of legislation whereby penalties serve as effective means of regulation" often "puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger," even though "consciousness of wrongdoing be totally wanting"); *Pharaon v. Board of Governors of Fed. Rsrv. Sys.*, 135 F.3d 148, 157 (D.C. Cir. 1998) ("Because the assessed penalty

falls far below the statutory maximum, [petitioner] cannot claim that he lacked constitutionally adequate notice.").

**2. The Statute of Anne Does Not Violate the Excessive Fines Clause**

DraftKings (but not FanDuel) further argues (at 25-26) that (1) Plaintiff's claim "implicates" the Excessive Fines Clause and (2) under the Clause, Plaintiff's claim is grossly disproportionate. DraftKings is mistaken on both counts.

*First,* the Statute of Anne is not a "penal" statute that triggers the Excessive Fines Clause in the first instance. Although DraftKings claims that "[t]reble damages . . . are quintessentially punitive," DraftKings Br. 25, under District law, treble damages and punitive damages are "different." *District Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 726-27 (D.C. 2003). "[M]ultiple damages provisions may be enacted to serve remedial rather than punitive purposes, such as ensuring full compensation or encouraging private enforcement of the law." *Id.* That latter justification fully describes the Statute of Anne. Indeed, in *Shenk v. Cohen,* the D.C. Court of Appeals noted the distinction between "strictly criminal penalties authorized by the statute and the remedial provisions giving a consumer the right to sue for treble the amount." 51 A.2d 298 at 299. It then specifically identified actions "for the amount lost in a gaming transaction" (like those "for treble damages under the Federal Anti-Trust law") as "remedial and not penal." *Id.* at 300.

DraftKings next implies that treble damages are *per se* punitive. DraftKings Br. 25-26. But that is not the law. *See Stockwell v. United States*, 80 U.S. 531, 547 (1871) ("There are many cases in which a party injured is allowed to recover in a civil action double or treble damages . . . . It will hardly be claimed that these are penal actions[.]"); *United States v. Bajakajian*, 524 U.S. 321, 341-42 (1998) (noting that statutes' provision for "forfeiture" as "a multiple of the value of the goods" did not render them "punishment for an offense"). And

contrary to DraftKings's suggestion, *United States v. Aleff* did not "hol[d] that [the] False Claims Act's treble damages 'are punitive for the purposes of the Excessive Fines Clause.'" DraftKings Br. 25 (quoting 772 F.3d 508, 512 (8th Cir. 2014)). *Aleff* rather held that the "FCA's treble damages *in combination with the [FCA's] per-claim penalties*" were punitive. 772 F.3d at 512 (emphasis added). Likewise, *Mackby* held only that "that the FCA's treble damages provision, *at least in combination with the Act's statutory penalty provision*, is not solely remedial and therefore is subject to an Excessive Fines Clause analysis" and "express[ed] no opinion as to whether such an analysis would be appropriate in a case where only treble damages were awarded." *United States v. Mackby*, 261 F.3d 821, 831 (9th Cir. 2001).

DraftKings also suggests the Statute of Anne triggers the Excessive Fines Clause because part of the recovery will be awarded to the District. DraftKings Br. 25. But the Excessive Fines Clause applies only to "payment to a sovereign *as punishment for some offense*." *Bajakajian*, 524 U.S. at 327 (quoting *Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989)) (emphasis added). Here, the D.C. Court of Appeals has already found that the Statute of Anne is remedial, and DraftKings offers no argument for second-guessing that determination.

*Second,* even if the Excessive Fines Clause applied, it would not bar Plaintiff's recovery here. A penalty violates the Excessive Fines Clause only if it is "grossly disproportional" to the gravity of the offense. *Bajakajian*, 524 U.S. at 334. Statutorily-authorized treble recovery of actual losses does not come close to that demanding standard. *See id.* at 336 ("[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature."); *compare United States ex rel. Stearns v. Lane*, 2010 WL 3702538, at *4 (D. Vt. Sept. 15, 2010) (finding "[a] penalty that represents between 82 and 162 times the government's actual damages in this case is grossly disproportional"). In sum, as one of DraftKings's own cases explains,

"[t]he treble damages awarded here also compare favorably to other penalties authorized by Congress." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1315 (11th Cir. 2021). And for the same reasons it does not violate due process, it is not unlawful or unfair to apply longstanding District law to highly sophisticated Defendants.

*Finally*, any prospect of criminal penalties is a red herring. FanDuel suggests that "placing a $25.01 bet would not only trigger the Statute of Anne, but it would also trip § 22-1708's criminal prohibition and the threat of imprisonment." FanDuel Br. 30. But that ignores the SWLAA's explicit repeal of the District's criminal gambling provisions (including § 22-1708) to any "sports wagering regulated, licensed, or operated by the Office of Lottery and Gaming." D.C. Code § 22-1717. FanDuel's wagering is clearly "regulated" or "licensed" by the OLG.

Because Defendants' constitutional arguments plainly fail, there is no need to resort to the doctrine of constitutional avoidance and contort the plain meaning of the words of the Statute of Anne. Defendant's suggestions here – for example, that the Court could "interpret" Section 16-1702 to apply only to unlawful gambling – invite the Court to engage in legislative re-drafting for the sportsbooks' preferred policy outcome.

## III. PASPA's Prohibition Remains Valid in the District

Even if the Court were to read the SWLAA as effecting an implied repeal of the Statute of Anne, Defendants would still be liable. That's because the SWLAA's purported authorization of sports gambling was ineffective in the first instance: the federal Professional and Amateur Sports Protection Act ("PASPA") continues to prohibit the legalization of sports gambling in the District, including the authorization expressed in the SWLAA. Indeed, if the Court agrees, the Statute of Anne would remain in force even if the SWLAA could not be harmonized with it (though it readily can be, *see* Section II *supra*).

The *converse* suggestion – that "DC Gambling Recovery must show that PASPA survived in the District to go forward" – is wrong as a matter of law. FanDuel Br. 18. Plaintiff need not establish that PASPA remains in effect (and that the SWLAA is void) in order to prevail; it need only show that the Statute of Anne and the SWLAA are compatible. And even then, it is *Defendants'* burden to show that two presumptively valid statutes cannot be harmonized. *See George*, 769 A.2d at 764; *Epic Sys. Corp*, 584 U.S. at 510.

### A. PASPA Prohibited the Passage of the SWLAA

The plain text of PASPA makes clear that the SWLAA is invalid and without effect. "PASPA's most important provision," *Murphy*, 584 U.S. at 461, makes it "unlawful" for any "governmental entity," including the District of Columbia,[7] to "authorize by law or compact" a "betting, gambling, or wagering scheme" that is based on "competitive games in which amateur or professional athletes participate." 28 U.S.C. § 3702(1). The SWLAA, for its part, purports to do precisely what PASPA forbids: authorize sports wagering within the District. *See* D.C. Act 22-594, 66 D.C. Reg. 1402 (Feb. 1, 2019), *codified at* § 36-621.01 ("The operation of sports wagering and related activities shall be lawful in the District of Columbia[.]"). As a result, the SWLAA's authorization is forbidden by the "direct command" of superior federal law. *See Murphy*, 584 U.S. at 480 ("[T]here is simply no way to understand the provision prohibiting state authorization as anything other than a direct command to [the District]"). That is the end of the matter, as under Article I, Section 8, Clause 17, Congress's power to legislate for the District is "plenary." *Palmore v. United States*, 411 U.S. 389, 397 (1973).

[7] *See* 28 U.S.C. § 3701(2), (5) (defining "government entity" to include the District of Columbia).

**B. *Murphy*'s Holding Does Not Extend to the District**

No Defendant contends that the SWLAA is permissible under PASPA. They argue only that PASPA does not apply to the District in the first instance. *See* FanDuel Br. 31 (arguing only that "PASPA has no effect in the District"); DraftKings Br. 14-16 (similar). Defendants claim that *Murphy* "held the statute unconstitutional in its entirety." DraftKings Br. 15; *see also* FanDuel Br. 31 (claiming *Murphy* invalidated "all of PASPA"). But *Murphy* did not address – and *could not* address – the applicability of PASPA to the District.

In *Murphy*, New Jersey challenged PASPA's constitutionality in response to a suit to enforce PASPA brought by the NCAA and three major professional sports leagues. 584 U.S. at 462. In that posture, the Supreme Court agreed with New Jersey and held that PASPA's application to the States violates the Tenth Amendment's anti-commandeering doctrine. As the Court explained:

> The Constitution confers on Congress not plenary legislative power but only certain enumerated powers. Therefore, all other legislative power is reserved for the States, as the Tenth Amendment confirms. And conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States. The anticommandeering doctrine simply represents the recognition of this limit on congressional authority.

*Id.* at 471. Applying the doctrine to PASPA's prohibition on state authorization of sports gambling, the Court concluded that it "dictate[d] what a state legislature may and may not do," put "state legislatures . . . under the direct control of Congress," and therefore "violate[d] the anticommandeering doctrine." *Id.* at 474, 480. Under PASPA, "it is as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals." *Id.* at 474. "A more direct affront to state sovereignty is not easy to imagine." *Id.*

That reasoning has no application to the District. "[T]he District, unlike the states, has no reserved power to be guaranteed by the Tenth Amendment." *D.C. Common Cause v. District of Columbia.*, 858 F.2d 1, 6 (D.C. Cir. 1988) (quoting *Lee v. Flintkote Co.*, 593 F.2d 1275, 1278 n.14 (D.C. Cir. 1979)). Indeed, Congress enjoys an express power to legislate for the District; the District is *already* under "the direct control of Congress." *See Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 526 (1838) ("Congress has the entire control over the [D]istrict for every purpose of government"). In exercising its "plenary and exclusive power to legislate for the District of Columbia," *Sims v. Rives*, 84 F.2d 871, 877 (D.C. Cir. 1936), Congress is not bound or limited by the Tenth Amendment, which only speaks to "powers not delegated to the United States," U.S. Const. amend. X; *see also New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power[.]"). It makes no sense to suggest that, through PASPA, Congress somehow commandeered itself.

Unable to explain how *Murphy* could limit Congress's power to legislate for the District, Defendants suggest that the Court ruled PASPA facially invalid. The argument is based on the following language in *Murphy*: "[W]e hold that no provision of PASPA is severable from the provision directly at issue in these cases." 584 U.S. at 486; *see also id.* at 480 (analyzing whether "our decision regarding the anti-authorization provision dooms the remainder of PASPA"). But Defendants take that language out of context. The Court's comment was about whether any provision of PASPA – even provisions that do not, themselves, engage in "commandeering" – could remain applicable *to the states* under the severability doctrine. The answer was "no." But the language is not persuasively read to mean that the Court used the Tenth Amendment to invalidate a congressional enactment vis-à-vis the District of Columbia – a

result that would overrule longstanding precedent about the Tenth Amendment's scope and rewrite its text.

*First*, in its severability analysis, the Court was not addressing whether its Tenth Amendment holding invalidated PASPA in jurisdictions where the Tenth Amendment does not apply. It was addressing the separate question of whether other operational provisions of PASPA – specifically, the provisions (1) prohibiting States from themselves offering sports gambling, 28 U.S.C. § 3702(1), (2) prohibiting private actors from operating sports gambling "pursuant to state law," 28 U.S.C. § 3702(2), and (3) prohibiting the "advertis[ing]" of sports gambling, 28 U.S.C. §§ 3702(1)-(2) – could be severed from the provisions that ran afoul of the anti-commandeering principle. *Murphy*, 584 U.S. at 482-86. The Court ultimately determined that these three provisions could not be saved, because Congress would not have wanted to enact them if it had known that it could not prohibit state authorization in the first instance. *Murphy*, 584 U.S. at 482. As the Court reasoned, it would make no sense to (1) "[p]rohibit[] the States from engaging in commercial activities that are permitted for private parties," (2) make gambling *illegal* only if it were *authorized* pursuant to state law ("perverse" and "weird"), or (3) "forbid the advertising of an activity that is legal under both federal and state law." *Id.* at 483-85 (cleaned up).

Here, in contrast, there is no indication that Congress wouldn't want to ban sports gambling in the District or the U.S. territories if couldn't in the States. To the contrary, given PASPA's broad prohibition, Congress wanted to outlaw sports gambling wherever possible. Defendants' only answer is to comb the legislative record for helpful statements from individual legislators suggesting that "Congress's policy was to implement a uniform nationwide ban." FanDuel Br. 32-33. Of course, such legislative history is like "walking into a crowded cocktail

party and looking over the heads of the guests to pick out your friends." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 377 (2012). And the *text* of PASPA countenanced a great deal of non-uniformity by grandfathering gambling in certain States. *See* 28 U.S.C. § 3704(a)(2) (grandfather provision); *PASPA: Awaiting the Supreme Court Decision on Sports Betting*, Colum. J of L. & the Arts (Aug. 2, 2019) (noting "the Act includes exceptions for Nevada, Delaware, Montana and Oregon, which already had legal sports wagering at the time the Act was passed and are therefore grandfathered in"). In any case, Congress's supposed preference for uniformity doesn't establish the further, necessary predicate: that Congress would prefer no regulation at all if perfect, coast-to-coast uniformity was unachievable. On that question, Defendants invite this Court to speculate about Congress's intentions and assume that Congress would not want to foreclose "a small fraction" of the massive sports gambling industry. FanDuel Br. 33. But it would be reasonable for Congress to prohibit sports gambling where it constitutionally could – particularly at its front door.[8]

*Second,* Defendants' reading of *Murphy* implies that the Court erased PASPA from the Statutes at Large. But that misunderstands the nature of judicial review. "[The Court] has no jurisdiction to pronounce any statute . . . irreconcilable with the [C]onstitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies." *Liverpool, N.Y. & Phil. S. S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39 (1885). "Except when necessary" to resolve cases and controversies, "courts have no charter to review and revise

[8] The Court has often reminded us that "[t]he language of an opinion is not always to be parsed as though we were dealing with language of a statute." *National Pork Producers Council v. Ross*, 598 U.S. 356, 373 (2023) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)). "Instead, we emphasize, our opinions dispose of discrete cases and controversies and they must be read with a careful eye to context." *Id.* at 373-74 (citation omitted). Here, careful consideration of that context forecloses any suggestion that the Court was invalidating – or indeed could invalidate – PASPA as to the District.

legislative and executive action." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009); *see also* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 935-36 (2018) ("The federal courts have no authority to erase a duly enacted law from the statute books, and they have no power to veto or suspend a statute. The power of judicial review is more limited: It permits a court to decline to enforce a statute in a particular case or controversy."). Indeed, "[b]ecause deciding the constitutionality of a statute as applied to nonparties is not necessary to resolve a case or controversy, it is beyond a federal court's constitutional authority." *Moody v. NetChoice, LLC*, 603 U.S. 707, 756 (2024) (Thomas, J., concurring). This Court should not assume the Supreme Court overstepped its own authority here.

DraftKings's contrary suggestion – that "[w]hen a federal statute is held unconstitutional in full, with no provision severable, the statute is void everywhere – not just as to the party that brought the case" – both commits the writ-of-erasure fallacy and is not supported by the cases it cites. DraftKings Br. 15. Fairly read, *Collins v. Yellen*, 594 U.S. 220 (2021), *Fay v. Noia*, 372 U.S. 391 (1963), and *Bartlett v. Bowen*, 816 F.2d 695 (D.C. Cir. 1987) stand for the proposition that an unconstitutional provision is not enforceable – and that a statute is unenforceable *to the extent* it conflicts with the Constitution. *See*, *e.g.*, *Bartlett*, 816 F.2d at 707 ("a law contrary to the Constitution may not be enforced").

Defendants' reliance on *Murphy* also illustrates why "[f]acial challenges are disfavored." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008). In short, "[f]acial adjudication carries too much promise of 'premature interpretatio[n] of statutes' on the basis of factually barebones records." *Sabri v. United States*, 541 U.S. 600, 609 (2004) (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)). There is no indication in *Murphy* that New Jersey attempted to make the necessary showing "that no set of circumstances exists under

which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). And no wonder – it unquestionably could not make that showing as to the District or the U.S. territories. Notably, in another anti-commandeering case where the relevant severability question was actually "briefed and argued," the Court rightly "decline[d] to speculate regarding the rights and obligations of parties not before the Court." *Printz v. United States*, 521 U.S. 898, 935 (1997); *see also New York*, 505 U.S. at 186-87 (invalidating only the offending provision of the statute).

**C. Defendants' Remaining Arguments Fail**

*First*, a set of Defendants suggests the Court engage in its own severability analysis independent of *Murphy*. *See* FanDuel Br. 31-33. If the Court does so, it should simply "limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010); *see also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985) (explaining that the "normal rule" is that "partial, rather than facial, invalidation is the required course"). Here, the valid portion of a statute – the ban on authorization in the District and territories – "remains fully operative as a law," and it is "not 'evident' from the statutory text and context that Congress would have preferred no statute at all." *Executive Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 37 (2014) (citations omitted). For the reasons explained above, the Court should not indulge in unprovable hypotheses about Congress's "preferred" nationwide policy or unarticulated "goals." *See United States v. Booker*, 543 U.S. 220, 320 n.7 (2005) (Thomas, J., dissenting) (criticizing severability analysis insofar as it "require[s] a nebulous inquiry into hypothetical congressional intent").[9]

[9] DraftKings offers two cases where the Supreme Court found constitutionally offensive provisions to be inseverable. *See* DraftKings Br. 16 (citing *Howard v. Ill. Cent. R.R. Co.*, 207 U.S. 463, 504 (1908) and *Sloan v. Lemon*, 413 U.S. 825, 834 (1973)). But the fact that the Court has found provisions inseverable in the context of the particular statutory schemes at issue (and under then-prevailing tests for severability) does not control the analysis here.

*Second*, the Court should not read into the fact that Congress declined to veto the SWLAA. *See* FanDuel Br. 33; DraftKings Br. 16 n.3. It is dubious business to make inferences from "mere congressional silence and passivity." *Flood v. Kuhn*, 407 U.S. 258, 283 (1972). Congress may have expected courts to simply decline to enforce the SWLAA. Or Congress may have simply been unable to muster the votes post-*Murphy*. But that is not a reason to ignore PASPA. "Congressional inaction cannot amend a duly enacted statute." *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n.1 (1989). And it is not Congress's burden to affirmatively strike down every District law that violates a prior Act of Congress.

Finally, FanDuel repeatedly cites *Carragher v. District of Columbia*, 240 A.3d 321 (D.C. 2020). FanDuel Br. 34; *see also id. passim*. But *Carragher*'s passing observations that *Murphy* "upended" PASPA and that "[w]ith *Murphy* in the books, many jurisdictions – including the District – raced to launch sports gambling platforms," *Carragher*, 240 A.3d at 322, are true but irrelevant. Relatedly, that "Defendants have not located a single case applying PASPA since *Murphy*" does not mean "[t]he courts have recognized that PASPA is a nullity." DraftKings Br. 16. The absence of evidence is not evidence of absence.

## IV. Plaintiff Has Pleaded All Necessary Facts

Plaintiff has pleaded all facts required to survive a motion to dismiss. At this juncture, it need only offer a "short and plain statement of the claim" sufficient "to give fair notice to the defendants of the claim being asserted" and "sufficient to prepare a responsive answer, [or] to prepare an adequate defense." *Etienne v. Hunter Ingalls Indus.*, 2022 WL 16571201, at *1 (D.D.C. Oct. 28, 2022) (citing Fed. R. Civ. P. 8(a)). And because Plaintiff's claims do not sound in "fraud or mistake," Plaintiff is not required to state "the circumstances" surrounding each "with particularity." Fed. R. Civ. P. 9(b). *See United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (citations omitted) ("Under Rule 8, a

plaintiff only needs to give enough details about the subject-matter of the case to present a story that holds together," while under Rule 9(b), "[a] plaintiff ordinarily must describe the 'who, what, when, where, and how' "). For all the reasons noted above, DC Gambling Recovery has more than cleared that bar. It has plausibly alleged a cognizable gambling injury (exceeding $25 at any single time or sitting) to a well-defined, and readily ascertainable group of victims in D.C.; it has explained why it can sue (and why Defendants can be sued) under D.C.'s Statute of Anne; and it has alleged that it did not collude with any gamblers in filing the Complaint.

None of Defendants' arguments to the contrary warrant dismissal of the Complaint.

### A. The Identity of a Loser and Qualifying Loss

Defendants fault Plaintiff for (they say) not "identif[ying] a single person who suffered a qualifying loss." DraftKings Br. 20. But this argument suffers from both procedural and substantive flaws.

1. Procedurally, Defendants ask this Court to transmute the requirements of Rule 8(a) notice pleading into the requirements of Rule 9(b) – even though they have not argued (and could not argue) that Rule 9(b) governs this cause of action. But Plaintiff has provided Defendants with all the notice they need for purposes of Rule 8(a): The Complaint plausibly alleges that "thousands of individuals within the District of Columbia have lost – and continue to lose – more than $25 at any single time or sitting by playing at games of chance (i.e., gambling) with Defendants, and have not sued to recover those losses within three months of payment to Defendants." Compl. ¶ 40. The Complaint further notes that "the identity and precise number of" those gambling victims "is within the unique possession of Defendants," because of D.C. laws requiring gambling operators to keep detailed records about its users. *Id.*

Defendants nevertheless insist that Plaintiff must "actually identif[y]" by name the victims who have suffered a specific loss, and quantify the amount. But Rule 8(a) requires no

such thing. "[A] plaintiff need not identify the [injured individuals] by name at the pleading stage." *Association of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 31 (D.D.C. 2012), *aff'd sub nom. Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468 (D.C. Cir. 2014);[s] *see also see Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 46 n.7 (D.D.C. 2019) (same); *Martinez v. Kaiser Found. Hosps.*, 2012 WL 2598165, at *11 (N.D. Cal. July 5, 2012) (quoting *Marziano v. Cnty. of Marin*, 2010 WL 3895528, at *9 (N.D. Cal. Oct. 4, 2010) ("[T]here is nothing about Federal Rule of Civil Procedure 8 which requires the naming of names."). Rather, when acting (as here) like a "private Attorney[] General," Compl. ¶ 24, a plaintiff need only provide at the pleading stage "an adequate definition of the types or categories of [persons] who were aggrieved." *Medlock v. Host Int'l, Inc.*, 2013 WL 2278095, at *7 (E.D. Cal. May 22, 2013); *see also id.* at *7 (noting that, for purposes of California's Private Attorneys General Act, Rule 8(a) pleading "*does not* require a plaintiff to identify the particular employees who are 'aggrieved' ") (emphasis in original); *Moua v. Int'l Bus. Machs. Corp.*, 2012 WL 5373401, at *4 (N.D. Cal. Oct. 30, 2012) (given "Rule 8's permissive pleading standard," it suffices for a relator plaintiff to "plead *some* definition of the represented employees," such as "by referring to categories of employees by job title or by job duties"); *Hibbs-Rines v. Seagate Techs., LLC.*, 2009 WL 513496, at *4 (N.D. Cal. Mar. 2, 2009) (noting that even a "broad categorization of 'Aggrieved Employees' " suffices at the pleading stage because "[i]f plaintiff can prove that defendant violated the [law] with respect to all the employees described in the [complaint] as 'Aggrieved Employees,' plaintiff will be able to argue that civil penalties are appropriate").

While Plaintiff may need to show more "if this litigation were at the summary judgment stage," "[D]efendants' argument that the persons allegedly injured must be identified . . . is

unpersuasive on a motion to dismiss." *Building & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144-45 (2d Cir. 2006). It is only at a "successive stage[]" of litigation – *after* discovery – that Plaintiff will be able to offer "affidavits and other evidence" in support of the elements of its claim. *Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. United States Dep't of Agric.*, 573 F. Supp. 3d 324, 335-36 (D.D.C. 2021).

2. Defendants are also wrong that "the identity of *a* 'lose[r]' " is an element of a claim under the Statute of Anne. DraftKings Br. 20 (emphasis added). Textually, the statute allows someone who "loses" more than $25 in a sitting to bring a claim within three months. But if the loser does not do so, "any person" may bring a claim – not on behalf of the loser but instead on behalf of itself and the District. Nothing in the latter provision's text refers to the need to prove the identity of any particular loser. Nor is the Complaint unusual in not naming the specific losers or the amount of their loss. *Cf.* DraftKings. Br. 20-21. Considerable appellate authority – including from multiple State high courts – finds general allegations sufficient to state a claim under their respective Statutes of Anne. *See*, *e.g.*, *Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*, 617 S.W.3d 792, 796 (Ky. 2020) (countenancing a "lawsuit to recover statutory treble damages for money lost by its citizens"); *The Pantry*, 518 S.E.2d at 42-44 (analyzing and rejecting Defendants' pleading arguments); *Salamon v. Taft Broad. Co.*, 475 N.E.2d 1292, 1295 (Ohio Ct. App. 1984) (rejecting a motion to dismiss because general allegations "afforded the defendant adequate notice.").

Defendants' cited cases do not change matters. For federal decisions, Defendants rely (at FanDuel Br. 35-36; DraftKings Br. 21) on "two, unpublished, out-of-Circuit cases: *Humphrey v. Viacom, Inc.*, No. 06-CV-2768, 2007 WL 1797648 (D.N.J. June 20, 2007)[,] and *Langone v.*

*Kaiser*, No. 12 C 2073, 2013 WL 5567587 (N.D. Ill. Oct. 9, 2013)." *Los Angeles Turf Club v. Horse Racing Labs, LLC*, 2017 WL 11634526, at *7 (C.D. Cal. May 15, 2017) (declining to rely on them). Notably, those cases fail to even identify – much less analyze – the difference between a plaintiff's burden at the pleading stage and at summary judgment. For example, *Humphrey* quotes from (and bases its pleading holding on) *Salamon*, 2007 WL 1797648, at *5 – overlooking the fact that *Salamon* rejected a motion to dismiss: "It was not until . . . summary judgment that it could fairly be argued by defendant that plaintiff could prove no set of facts under his complaint which would entitle him to relief." 475 N.E2d at 1295. And *Langone* similarly ignored the fact that a parallel case in Illinois State Court had made it to summary judgment. 2013 WL 5567587, at *7 n.7. Under federal pleading rules, that distinction is paramount, as courts in this district properly recognize. *See Ranchers-Cattlemen Action Legal Fund*, 573 F. Supp. 3d at 335-36 (citing cases).

Overlooking that nuance, *Humphrey* and *Langone* read atextual pleading requirements into state statutes, driven by their belief that those statutes serve an "anachronistic purpose," *Humphrey*, 2007 WL 1797648, at *4, and their own speculation about what the "legislature intended," *Langone*, 2013 WL 5567587, at *4. This court should not indulge in that sort of "freewheeling purposivism." *Gonzalez v. Thaler*, 565 U.S. 134, 166 n.7 (2012) (Scalia, J., dissenting). It should instead follow the course set by multiple State high courts interpreting the requirements to satisfy their own laws. *See Washington State Dep't of Licensing v. Cougar Den, Inc.*, 586 U.S. 347, 357 (2019) (noting federal courts, and even the U.S. Supreme Court, are "bound by the [State] Supreme Court[s'] interpretation[s] of [State] law"). Confirming this view, an Illinois state appellate court has subsequently considered – and rejected – *Langone*'s interpretation of the Illinois Statute of Anne, finding that "*Langone* is not instructive," and

emphasizing that because "this case involves the interpretation of an Illinois statute," "federal case law is not binding." *Dew-Becker v. Wu*, 123 N.E.3d 86, 91 (Ill. Ct. App. 2018), *aff'd*, 178 N.E.3d 1034 (2020).

Defendants' state court decisions do not support them either. *McCurry v. Keith* (at FanDuel Br. 35-36) involved a dismissal at summary judgment – *undermining* Defendants' arguments. 481 S.E.2d 166, 167 (S.C. Ct. App. 1997). And *Patriots for Legal Equality, LLC v. Draft Kings, Inc.* (FanDuel Br. 34-35; DraftKings Br. 20-21) involved a state trial court invoking legislative purpose (without citation or authority) to construe Massachusetts' Statute of Anne as "requir[ing] allegations at the retail level." 2016 WL 11972483, at *5 (Mass. Super. Ct. Feb. 23, 2016). That case is not precedential even in Massachusetts. *See Chickel v. Massachusetts Bay Transp. Auth.*, 2001 Mass. App. Div. 241, at *2 (Dist. Ct. 2001) (no horizontal stare decisis). And this Court could not follow that precedent anyways. Federal courts are "without power to adopt a narrowing construction of a state statute unless" the construction is "readily apparent" from the text. *Boos v. Barry*, 485 U.S. 312, 330 (1988). D.C. is due that same "judicial deference to . . . democratically-elected legislative branch[es]." *Collette v. St. Luke's Roosevelt Hosp.*, 132 F. Supp. 2d 256, 267 (S.D.N.Y. 2001). Defendants' proposed heightened pleading standard for D.C.'s Statute of Anne is not "readily apparent" from the text. And it calls for judicial innovation, not deference.

3. Regardless, Plaintiff has adequately pleaded allegations on information and belief. That is because, to quote Defendants' own source, "facts material to a cause of action" are "peculiarly within the knowledge of the adverse party." 61A Am. Jur. 2d Pleading § 113; *see also United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1258 (D.C. Cir. 2004) (noting an exception to general pleading requirements where "defendants control the

relevant documents"). By law, Defendants must maintain records about the bets placed at their facilities and on their websites and mobile apps. *See* D.C. Code § 36-621.02(b). Defendants can thus already identify the precise names of the individuals on behalf of whom Plaintiff has sued. Plaintiff has no comparable access to this information. Nor does the law require it. *See*, *e.g.*, *Kelleher v. Dream Catcher, L.L.C.*, 263 F. Supp. 3d 322, 326 (D.D.C. 2017) (information and belief sufficed because Plaintiffs needed Defendants "financial records" to confirm their "alleged improper diversion of corporate funds").

Even if Defendants did not uniquely possess information about the gambling victims for whom Plaintiff is suing, Plaintiff may still rely on information-and-belief allegations because "the belief is based on factual information that makes the inference of culpability plausible." *Hedgeye Risk Mgmt., LLC v. Heldman*, 271 F. Supp. 3d 181, 189 (D.D.C. 2017) (quoting *Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012)). Here, the inference of culpability – i.e., that at least one bettor in D.C. lost over $25 at a single time or in a single sitting to Defendants – is certain. The Complaint contains specific "factual information" showing as much. For example, it alleges that Defendants collectively reported millions in profits in D.C. last year, Compl. ¶17, that sportsbooks collectively profited $13.71 billion nationwide, *id.* ¶ 23; that only 3% of sports gamblers turn a profit each year (meaning 97% lose money), *id.*; that an estimated 15,000 "problem gamblers" live in D.C., *id.* ¶¶ 36-37; that D.C. received a "109% increase" in calls to its gambling help hotline after sports betting first appeared in the District, *id.* ¶ 37; and that the D.C. Department of Behavioral Health worries "the District may be significantly underserving this [gambling] population," *id.*

4. Defendants also insist that Plaintiff has failed to plead *net* losses of $25, arguing that "courts interpreting these statutes have universally rejected attempts to recover isolated losing

bets without accounting for winnings in the same session." DraftKings Br. 21; *see also* FanDuel Br. 35-36. But Plaintiff specifically pleaded all that the Statute of Anne requires – that bettors in the District have lost "more than $25 *at any single time or sitting*." Compl. ¶ 40 (emphasis added); *see* D.C. Code § 16-1702. To the extent Defendants suggest that gamblers' net losses should be calculated over the entire statute of limitations period, rather than at the end of each single time or sitting, *see* DraftKings Br. 29, they simply misread the statute.

**B. The Time of the Loss**

Plaintiff alleged that, "[u]pon information and belief, since the passage of the SWLAA and continuing through the present, thousands of individuals within the District of Columbia have lost – and continue to lose – more than $25 at any single time or sitting . . . and have not sued to recover those losses within three months of payment to Defendants." Compl. ¶ 40. That suffices. "Requiring Plaintiff to plead with more particularity to include the precise times and dates the [bets] were placed would impose an unnecessary burden on the plaintiff." *Evans v. Corinthian Colleges, Inc.*, 2014 WL 2866369, at *2 (S.D. Ind. June 23, 2014). That is especially so since information about the precise time and date wagers were placed – even more so than the names of the specific gamblers – is peculiarly within Defendants' possession. Few gamblers keep meticulous records of each bet, win, and loss. Defendants are therefore at least as well-positioned (and likely *better* positioned) to determine precisely when any qualifying bettors sustained losses of at least $25 at any time or in any sitting.

Defendants have no basis to fault the Complaint for not identifying a "single *particular* loss that occurred more than three months before the suit was filed." DraftKings Br. 21-22 (emphasis added). Just as pleading requirements do not, at this early stage, require Plaintiff to name specific individuals who sustained specific losses, *see Sebelius*, 901 F. Supp. 2d at 31, they also do not require Plaintiff to provide the precise time of those losses either. *See supra* pp. 36-

41; *see*, *e.g.*, *Hall v. DIRECTV, LLC*, 846 F.3d 757, 777-78 (4th Cir. 2017) (declining to "require plaintiffs to identify a *particular* week in which they worked uncompensated overtime hours," as long as they offer some allegations that "nudge[] [p]laintiffs' claims against [d]efendants from the merely conceivable to the plausible").

### C. Absence of Collusion

As required by the statute, Plaintiff has alleged that it "has no relationship to any gambler who has suffered gambling losses and [that it] has not colluded with any gamblers in bringing this action." Compl. ¶ 8. Remarkably, Defendants take issue with that attestation, claiming that "[w]ithout identifying even one bettor, Plaintiff cannot plausibly claim to lack coordination with that person." DraftKings Br. 22. But of course it can. "There is simply no requirement for plaintiffs either to plead or to prove a negative." *Powe v. Chicago Hous. Auth. Police Officers Richling*, 1991 WL 83758, at *1 (N.D. Ill. May 9, 1991). Plaintiff is entitled to stand on its well-pleaded allegation that no such conduct occurred.

* * *

For all these reasons, Plaintiff has adequately pleaded a claim under the Statute of Anne. If the Court disagrees and finds that certain elements should be pleaded with additional specificity, Plaintiff respectfully requests dismissal of the complaint without prejudice, with leave to file an amended complaint. *See Ciralsky v. C.I.A.*, 355 F.3d 661, 666 (D.C. Cir. 2004) (after "dismissal without prejudice of a *complaint* . . . the plaintiff is free to amend his pleading and continue the litigation") (citation omitted); *O'Donnell v. Barry*, 148 F.3d 1126, 1137 n.3 (D.C. Cir. 1998) ("a dismissal under Rule 12(b)(6) generally is not final or on the merits and the court normally will give plaintiff leave to file an amended complaint") (quoting Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1357 (1990)). Such amendment would not be futile. *See Willoughby v. Potomac Elec. Power Co.*, 100 F.3d 999, 1003 (D.C. Cir. 1996). There is no

credible argument that there are no timely bets, losers, or losses. Indeed, Defendants argue only that such elements were not technically pleaded – not that they don't exist.

## V. The Default Three-Year Statute of Limitations Applies

As DraftKings concede (at 27), the cause of action Plaintiff invokes for "treble damages if the loser does not file suit herself within the three-month window," has "no express limitations period." *Id.* And under D.C. law, the limitations period for a statute "for which a limitation is not otherwise specially prescribed" is "3 years." D.C. Code § 12-301(a)(8). And to be clear, Plaintiff does not contest that it can collect only on its timely claims. *Cf.* DraftKings Br. 27.

Defendants err in characterizing the statute of limitations as only one year. They attempt to shoehorn this case into the bucket for cases concerning "a statutory penalty or forfeiture." D.C. Code § 12-301(a)(5). That interpretation is flatly contrary to the settled law of the District. Its highest court found it "entirely clear," based on the "accepted meaning in England prior to the establishment of the American colonies" and the meaning applied "consistently by our Supreme Court and the various circuit courts of appeals," that the phrase "statutory penalty or forfeiture" does *not* apply in cases where a "private citizen [is] suing to redress a wrong." *Shenk*, 51 A.2d at 300-01. And it specifically noted that the phrase "statutory penalty or forfeiture" does *not* apply to actions "for the amount lost in a gaming transaction" under Statutes of Anne. *Id.* at 300 & n.8 (citing cases). Nor does it apply to other statutes awarding private citizens and relators double or treble damages. *Id.* at 300 & nn.3-10; *see also In re Parker*, 2007 WL 1521068, at *4 n.8 (Bankr. D.D.C. May 21, 2007) (confirming that *Shenk* remains the governing law); *supra* p. 25 (discussing why the Statute of Anne is not penal).

Defendants do not engage with this authority. Instead, they quote loose language from a subsequent opinion characterizing (in an unrelated context) a Statute of Anne claim as a "private forfeiture action." DraftKings Br. 28 (quoting *Ward v. District of Columbia*, 494 A.2d 666, 670

(D.C. 1985)). At most, this citation shows why it is a mistake to read judicial opinions like statutes. *National Pork Producers Council*, 598 U.S. at 373. That dicta does not supplant a reasoned opinion of the D.C. Court of Appeals. Nor does Defendants' invocation of D.C. Code § 16-1703, for the reasons discussed above. *See supra* p. 14. The default, three-year statute of limitations therefore applies.

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motions to dismiss.

Date: June 16, 2025

Respectfully submitted,

/s/ *Derek T. Ho*

Derek T. Ho (D.C. Bar No. 488609)
Eliana Margo Pfeffer (D.C. Bar No. 1723571)
Mark P. Hirschboeck (D.C. Bar No. 1618827)
Kyle B. Grigel (D.C. Bar No. 90031164)
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
dho@kellogghansen.com
epfeffer@kellogghansen.com
mhirschboeck@kellogghansen.com
kgrigel@kellogghansen.com

*Counsel for Plaintiff*