**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

DC GAMBLING RECOVERY LLC,

  *Plaintiff*,

  v.

AMERICAN WAGERING, INC. dba
CAESARS SPORTSBOOK, BETFAIR
INTERACTIVE US LLC dba FANDUEL,
BETMGM, LLC, CROWN DC GAMING
LLC dba DRAFTKINGS, FBG
ENTERPRISES OPCO, LLC dba
FANATICS BETTING & GAMING,

  *Defendants*.

</td><td>

Civil Action No. 25-cv-01023 (CJN)

</td></tr>
</table>

<u>**MEMORANDUM OPINION**</u>

The District of Columbia's version of the Statute of Anne allows a person who loses "$25 or more" playing "at cards, dice, or any other game" to sue the winner to recover the losses.  D.C. Code § 16-1702(a) (2026).  If the loser does not bring a claim within three months, "any person may sue" the winner for treble that amount, with "one-half" going to "the [non-bettor] plaintiff, [and] the remainder . . . to the District." *Id.*  Plaintiff DC Gambling Recovery LLC filed this action against several sportsbooks, seeking to recover treble the gambling losses that thousands of individuals have allegedly suffered by betting on sports in the District.  The sportsbooks move to dismiss.  For the reasons explained below, the Court grants those motions.

## I. Background

In 1710, Parliament enacted the Statute of Anne, which "permitted losers to recover their gambling losses[] and denied winners the use of judicial process to collect from recalcitrant losers." *Pearsall v. Alexander*, 572 A.2d 113, 115 n.1 (D.C. 1990).  The law had two main

components. Compl. ¶ 24; *see also* Gaming Act 1710, 9 Anne c. 14 § 1 (Gr. Brit.). The first relieved the losing party from any obligation to pay the winner by declaring void "all contracts growing out of gambling transactions." Compl. ¶ 24; *Pearsall*, 572 A.2d at 115 n.1. The second created a cause of action for the recovery of certain gambling losses. Compl. ¶ 24. In particular, those who lost "the Sum or Value of ten Pounds" or more could sue the winner to recover the amount lost (and the costs of the suit). *Id.* And, if the losing party failed to do so within three months without just cause, any other person could sue for treble that amount, with half going to the third-party plaintiff and the rest going to "the use of the Poor of the Parish." *Id.*

The District of Columbia has long maintained its own version of the Statute of Anne. *See, e.g.*, D.C. Code §§ 16-1701, 16-1702 (1963). Like the 1710 version, the District's law declares certain contracts involving winnings from "any game whatsoever" void. *Id.* § 16-1701. And, also like its British predecessor, the District's law allows a person who loses "$25 or more" "by playing at cards, dice or any other game, or by betting on the sides or hands of persons who play" to sue to recover those losses. *Id.* § 16-1702. If the loser fails to sue within three months, "any person may sue" the winner for treble that amount, with "one-half" going to "the plaintiff, [and] the remainder . . . to the District."[1] *Id.*

Similar laws were adopted in other American jurisdictions and were generally meant to "prevent a gambler 'from abusing the vice and exceeding limits which bring harm to the gambler and his or her family.'" *Burt v. Playtika, Ltd.*, 132 F.4th 398, 402 (6th Cir. 2025) (quoting

---

[1] The exact language of § 16-1702 reads: "A person who, at any time or sitting, by playing at cards, dice or any other game, or by betting on the sides or hands of persons who play, loses to a person so playing or betting, a sum of money, or other valuable thing, amounting to $25 or more, and pays or delivers the money or thing, or any part thereof, may within three months after the payment or delivery, sue for and recover the money, goods, or other valuable thing . . by a civil action, from the winner thereof, with costs."

*Berkebile v. Outen*, 426 S.E.2d 760, 763 (S.C. 1993)); *see also* Marc Edelman, *A Short Treatise on Fantasy Sports and the Law: How America Regulates Its New National Pastime*, 3 Harv. J. Sports & Ent. L. 1, 46 (2012) (explaining that the laws aimed to keep "gambling losers from becoming wards of the state due to their risky financial behavior").  In the District, the Statute of Anne functioned alongside a general criminal prohibition on gambling and lotteries, which made it "unlawful for any person . . . to purchase, posses, own, or acquire any chance, right, or interest . . . in any . . . lottery, or to make or place a bet or wager . . . on the result of any athletic contest." *See* An Act to Establish a Code of Law for the District of Columbia, ch. 854, § 869, 31 Stat. 1189, 1331 (1901) (codified as amended at D.C. Code § 22-1708).  D.C.'s Statute of Anne was thus "intended to supplement" the "general anti-gambling provisions during a time when local governments' enforcement powers were much weaker."  *Burt*, 132 F.4th at 402; *see also Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997) ("The [Illinois] Loss Recovery Act was intended to deter illegal gambling by using its recovery provisions as a powerful enforcement mechanism."); *Salamon v. Taft Broad. Co.*, 475 N.E.2d 1292, 1298 (Ohio Ct. App. 1984) ("[I]t is not possible to ignore the ancient and arguable anachronistic nature of *qui tam* actions of the instant sort, born in a vanished era where the absence of an organized police authority to enforce criminal statutes made necessary the use of such rewards for informers.").

By the late nineteenth century, gambling prohibitions like the District's were commonplace in the United States.  But in the 1920s and 1930s, legislatures began relaxing those restrictions. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 458 (2018).  The District, for example, authorized and regulated lotteries. *See Pearsall*, 572 A.3d at 116–17.  Even so, the Statute of Anne remained on the books. *See id.* at 115 n.1; Compl. ¶ 27.

This legalization trend eventually expanded to sports gambling.  *Murphy*, 584 U.S. at 460; *see* Compl. ¶ 28.  In 1992, Congress attempted to stem the tide by passing the Professional and Amateur Sports Protection Act ("PASPA").  Compl. ¶¶ 28–29 (citing 28 U.S.C. § 3701 *et seq*.).  PASPA makes it "unlawful for" any "governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact" any "lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games."[2]  28 U.S.C. § 3702(1).  It also makes it "unlawful for" a "person to sponsor, operate, advertise, or promote, pursuant to the law or compact of a governmental entity," such activities.  *Id.* § 3702(2).

In 2018, however, the Supreme Court held that PASPA violated the anticommandeering doctrine of the Tenth Amendment.  *See Murphy*, 584 U.S. at 480.  The Court also held that "no provision of PASPA is severable" from the provision the Court held was unconstitutional, because Congress would not have enacted PASPA's other provisions without the unconstitutional one.  *Id.* at 480–86.

Shortly thereafter, the District passed the Sports Wagering Lottery Amendment Act of 2018 ("Sports Wagering Act").[3]  The Sports Wagering Act amended the D.C. Code so that it could not be "construed to prohibit the operation of or participation in lotteries and/or daily numbers

---

[2] PASPA defines "government entity" as "a State, a political subdivision of a State, or an entity or organization," 28 U.S.C. § 3701(2), and a "State" as "any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, Palau, or any territory or possession of the United States," *id.* § 3701(5).

[3] D.C. Act 22-594, 66 D.C. Reg. 1402 (Feb. 1, 2019) (codified as amended at D.C. Code § 22-1717).

games . . . including bingo, raffles, and Monte Carlo night parties . . . [or participation in] sports wagering regulated, licensed, or operated by the Office of Lottery and Gaming." D.C. Code § 22-1717 (2026). With the enactment of this law, sportsbooks could be licensed and could operate lawfully in the District. Compl. ¶ 34.

In 2021, Caesars Sportsbook opened a physical location in Capital One Arena; the next year FanDuel and BetMGM followed at Audi Field and Nationals Park, respectively. *Id.* Online sports gambling is also available at various locations. *Id.* DC Gambling alleges that D.C. residents and visitors now use both in-person and online forums to gamble millions of dollars every month on sports, *id.*; that thousands of people have lost more than $25 at any single time by gambling against licensed sportsbooks, *id.*; and that those "losers" have not sued within three months to recover their losses, *id.*

In February 2025, DC Gambling[4] sued multiple licensed sportsbooks[5] in D.C. Superior Court, asserting claims under the District's Statute of Anne. *Id.* ¶¶ 37–42. Following removal here, the sportsbooks moved to dismiss. *See* ECF No. 1; ECF No. 30; ECF No. 32.

While those motions were pending, the Council of the District of Columbia proposed legislation in the D.C. Fiscal Year 2026 Budget Support Act of 2025 (hereafter "the Budget Support Act") to amend part of the Statute of Anne as it applies to sports wagering. ECF No. 40 at 4 (citing B26-0265 – Fiscal Year 2026 Budget Support Act of 2025, Council of the District of Columbia, https://lims.dccouncil.gov/Legislation/B26-0265). That Act went into effect on

---

[4] DC Gambling is a company located in Washington D.C. that was formed under Delaware law to enforce the District's gambling laws. Compl. ¶ 8. It alleges without contradiction that it does not have a relationship to any gambler who has suffered gambling losses and has not colluded with any gamblers in bringing this suit. *Id.*

[5] Caesars Sportsbook, FanDuel, and BetMGM are authorized by the Office of Lottery and Gaming as Class A operators. Compl. ¶¶ 9–12. Fanatics and DraftKings are authorized as Class C operators. *Id.* ¶¶ 11–13.

December 6, 2025.  ECF No. 62 ("Hr'g. Tr.") at 40; *see also § 16-1702. Recovery of losses at gaming.*, Council of the District of Columbia, https://code.dccouncil.gov/us/dc/council/code/sections/16-1702 (last visited Feb. 27, 2026).

## II.     Article III Jurisdiction

Although no party argues that the Court lacks jurisdiction, the Court must, of course, ensure that the case is properly before it.  *McCain v. District of Columbia*, 206 F. Supp. 3d 576, 581 (D.D.C. 2016) ("Although not raised by either party, the Court has 'an independent duty to satisfy [itself] of [its] Article III jurisdiction' before considering the pending motions." (alterations in original) (quoting *Elec. Privacy Info. Cent. v. FAA*, 821 F.3d 39, 41 n.2 (D.C. Cir. 2016))), *aff'd*, No. 16-7123, 2017 WL 2373061 (D.C. Cir. Apr. 11, 2017).  Accordingly, the Court *sua sponte* raised questions concerning its jurisdiction at the hearing on the motions to dismiss, and thereafter requested supplemental briefing regarding specific issues relevant to Article III jurisdiction.  *See* Hr'g. Tr. at 6; Min. Order on Jan. 16, 2026.  For the reasons discussed below, the Court concludes that it does have Article III jurisdiction.[6]

Article III, § 2, of the Constitution extends the "judicial Power" of the United States to "Cases" and "Controversies."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  Among other requirements, "[f]or a lawsuit to constitute a case within the meaning of Article III, the plaintiff must have standing to sue."  *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 110 (2025).  To establish standing, a plaintiff must show "(1) . . . an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

---

[6] The Court also confirmed at the hearing that it has subject-matter jurisdiction.  *See* Hr'g. Tr. at 6 ("Is it certain that there is complete diversity here?").  DC Gambling's members are domiciled in Florida, whereas the sportsbooks are incorporated and maintain their principal places of business in "Delaware, Massachusetts, New Jersey, and New York." *Id.*; *see also* 28 U.S.C. § 1332.

6

favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

This three-step analysis is a way for courts to assess whether a lawsuit amounts to "a justiciable case," that is, the "sort *traditionally* amenable to, and resolved by, the judicial process." *Steel Co.*, 523 U.S. at 102 (emphasis added) (citing *Muskrat v. United States,* 219 U.S. 346, 356–357 (1911)).   Indeed, the Supreme Court has "often said that history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008); *see GTE Sylvania, Inc. v. Consumers Union of United States, Inc.*, 445 U.S. 375, 382 (1980) ("The purpose of the case-or-controversy requirement is to limit the business of federal courts to questions presented in an adversary context and in a form *historically viewed* as capable of resolution through the judicial process." (emphasis added) (internal quotation marks omitted)); *Coleman v. Miller,* 307 U.S. 433, 460 (1939) (opinion of Frankfurter, J.) (noting that "[j]udicial power could come into play only in matters that were the traditional concern of the courts at Westminster and only if they arose in ways that to the expert feel of lawyers constituted 'Cases' or 'Controversies'").   Consequently, courts "carefully examine[] how" the type of suit before them has been "historically treated" in determining whether a plaintiff has Article III standing.   *Sprint*, 554 U.S. at 275; *see, e.g., Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 777–78 (2000) (looking at "the long tradition of *qui tam* actions in England and the American Colonies"); *cf. e.g., TransUnion LLC v. Ramirez*, 594 U.S. 413, 420 (2021) (explaining that "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts" (quoting *Spokeo*, 578 U.S. at 341)).

History strongly suggests that a non-bettor plaintiff, like DC Gambling, has standing to pursue a § 16-1702 claim in federal court, and that such lawsuits would have been considered "cases" or "controversies" at the Founding. Recall that § 16-1702 of the D.C. Code traces back to England's Statute of Anne, which was enacted well before ratification of the U.S. Constitution, and which authorized "any person" to sue to recover treble the losses of an unsuccessful gambler, with a portion of the recovery kept by the plaintiff and a portion to the "Poor of the Pari[s]h," if the unsuccessful gambler did not sue within three months of losing. 9 Anne c. 19 § 2. Moreover, English courts entertained non-bettor plaintiff suits under the Statute of Anne before and around the Founding. For example, just 22 years before ratification, the brother of a gambling loser brought "an action in the [Court of] Common Pleas in the name of his brother, as a common informer" against the gambling winner under the original Statute of Anne. *Frederick, Bart v. Lookup*, 98 Eng. Rep. 51, 52 (K.B. 1767). The King's Bench reached the merits in that case, *id.* at 53–54, and other English courts around the time of the Founding cited the case favorably. *See, e.g.*, *Avery v. Hoole*, 98 Eng. Rep. 1383, 1384 (K.B. 1778).

Similarly, in *Brandon v. Sands*, the High Court of Chancery held that assignees of a bankrupt gambling loser could bring an action under the Statute of Anne to recover the bankrupt gambler's losses from his opponent; in reaching that conclusion, the court noted that, under the Statute of Anne, "the action rests in the party injured" for a limited period so that "the common informer" can then bring "the penal action." 30 Eng. Rep. 751, 751–52 (Ch. 1794). And in *Brandon v. Pate*, the High Court of Chancery noted that, under the Statute of Anne, the gambling loser's right of action is "divested at the expiration of three months," at which point it passes to the common informer. 126 Eng. Rep. 566, 568 (Ch. 1794).

The New World experience was similar.  Many of the original thirteen colonies and early states adopted their own versions of the Statute of Anne.  *See Nichol v. Batton*, 11 Tenn. (3 Yer.) 469, 471 (1932) ("Our act of 1799, ch. 8, is almost a literal copy of 9 Ann, ch.14."); ECF No. 61, Ex. A–G (reproducing early gaming statutes from Connecticut, Georgia, Illinois, Massachusetts, New Jersey, New York, and Virginia).  Each of these laws expressly allowed non-bettor plaintiffs to sue to recover an unsuccessful bettor's gambling losses.  *See, e.g.*, An Act to Restrain Gaming, 1827 Ill. Laws 235, 235–36 ("In case the person or persons who shall lose such money . . . shall not, within six months . . . sue, and with effect prosecute, for such money, . . . it shall be lawful for any other person to sue for, and recover, treble the value of the money."); An Act to Prevent Gaming, 1797 N.J. Laws 224, 225 ("[I]f the person or persons, who shall lose and pay such money . . . shall not, within the time aforesaid . . . sue, . . . it shall be lawful for any other person or persons, by any such action as aforesaid, to sue for and recover the same.").  And the District of Columbia adopted its version in 1801.  *See Wirt v. Stubblefield*, 17 App. D.C. 283, 286 (D.C. Cir. 1900).

During this early period, courts adjudicated gambling-loss claims brought by non-bettor plaintiffs.  In *Cole v. Smith*, for example, a "stranger, or common informer" brought an action under New York's gaming statute "founded entirely upon the authority of the statute."  4 Johns. 193, 197 (N.Y Sup. Ct. 1809).  To be sure, the court held that "a judgment of nonsuit" had to be entered because the non-bettor plaintiff had failed to "follow the general rule of stating the special matter upon which his cause of action arises."  *Id.* at 198.  But the court did not question the plaintiff's ability to bring such a suit, and even noted that a "common informer" *could* so long as "he states the special matter, and does not declare simply upon the count for money had and received."  *Id.*  Other courts decided similar cases, or discussed the appropriateness of such suits in dicta, during this early period.  *See Davidson v. Blunt*, 16 Ky. (1 Litt. Sel. Cas.) 128, 128 (1811)

(holding that the action to recover money or property lost by gaming—via "[t]he act of 1799 to suppress gambling"—must be "qui tam, and not in the plaintiff's own right" with "one-half [of recovery] to the informer, and the other to the county"); *Kuder v. Cronice*, 7 Ohio 249, 250 (1836) (holding that a party to a wager was not required to testify in an action brought by an informer under the gambling statute); *Plummer v. Gray*, 8 Gray 243, 244 (Mass. 1857) (explaining that after three months, a gambling loser's "right of action . . . is by necessary implication devested" because "the right of action is vested in other persons").

In sum, "[s]tatutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our government." *Marvin v. Trout*, 199 U.S. 212, 222 (1905).  And English and American courts entertained suits brought pursuant to such statutes.  The Court therefore "find[s] this history and precedent 'well nigh conclusive' in respect to the issue before us":  Third-party Statute of Anne lawsuits "are 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *Sprint*, 554 U.S. at 285 (quoting *Vt. Agency*, 529 U.S. at 777–78).

To be sure, more recent Supreme Court cases have focused primarily on the three-part Article III standing test set forth above.  *See, e.g.*, *Vt. Agency*, 529 U.S. at 771–74 (analyzing plaintiff's injury in fact before turning to historical support for jurisdiction).  But even under that approach, the Court has Article III jurisdiction.  After all, in *Vermont Agency*, the Supreme Court held that a *qui tam* relator had standing to pursue a claim under the False Claims Act based on an assignment theory—as the Court put it, the relator, as the "assignee of a claim[,] ha[d] standing to assert the injury in fact suffered by the assignor." *Id.* at 773.  And the Supreme Court recognized in a recent decision that a plaintiff has Article III standing when its "right to sue has been *legally*

10

or contractually assigned to [it by] another party." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 543 (2020) (emphasis added). Here, all agree that the D.C. Code effects an assignment of either the loser's injury (her gambling losses) or the District's sovereign injury to the plaintiff who elects to pursue a claim.[7]

### III.   Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), of course, a plaintiff must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* If the complaint fails to establish a claim upon which relief can be granted, the Court must dismiss the case. Fed. R. Civ. P. 12(b)(6); *see Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.*, 922 F. Supp. 2d 56, 61 (D.D.C. 2013).

The sportsbooks contend that DC Gambling has failed to state a claim for a number of different reasons, including that: (1) the Budget Support Act applies retroactively to this suit and bars DC Gambling's claims; (2) the Statute of Anne doesn't apply to sports wagering or the parties here; (3) the Sports Wagering Act impliedly repealed § 16-1702; (4) a treble damages award would violate the Constitution's Due Process Clause and Excessive Fines Clause; and (5) DC Gambling has failed to meet its pleading requirements. *See* ECF No. 30; ECF No. 32. For the reasons below,

---

[7] BetMGM and Crown DC Gaming LLC contend that while "jurisdiction existed at removal," it no longer does because the Budget Support Act mooted the case by eliminating DC Gambling's asserted cause of action. ECF No. 60 at 4. The Court disagrees. Although "intervening legislation" can render claims moot, it can only do so if it "resolve[s] the issues before [the Court]." *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 593 (D.C. Cir. 2023). The Budget Support Act's enactment does not. The Court must interpret the Budget Support Act—a merits-stage inquiry—in order to conclude that it "eliminat[es] Plaintiff's asserted statutory cause of action." ECF No. 60 at 4.

11

the Court agrees that the Budget Support Act applies here, and it therefore need not address the sportsbooks' other arguments.

As noted above, while this suit was pending, D.C. decided to amend part of its version of the Statute of Anne through a provision in the Budget Support Act. *See* Fiscal Year 2026 Budget Support Act of 2025, 72 D.C. Reg. 9825, 9845 (Sept. 4, 2025). With that provision in effect, § 16-1702—the provision that authorizes actions to recover covered gambling losses—now reads:

### § 16-1702. Recovery of losses at gaming.

(a) A person who, at any time or sitting, by playing at cards, dice or any other game, or by betting on the sides or hands of persons who play, loses to a person so playing or betting, a sum of money, or other valuable thing, amounting to $25 or more, and pays or delivers the money or thing, or any part thereof, may, within three months after the payment or delivery, sue for and recover the money, goods or other valuable thing, so lost and paid or delivered, or any part thereof, or the full value thereof, by a civil action, from the winner thereof, with costs. If the person who loses the money or other thing, does not, within three months actually and bona fide, and without collusion, sue, and with effect prosecute, therefor, any person may sue for, and recover treble the value of the money, goods, chattels, and other things, with costs of suit, by a civil action against the winner, one-half to the use of the plaintiff, the remainder to the use of the District of Columbia.

(b) Subsection (a) of this section shall not apply to commercial bingo authorized by [subchapter I of Chapter 6 of Title 36].

(c) *As of May 3, 2019, subsection (a) of this section shall not apply to sports wagering authorized by [subchapter II of Chapter 6 of Title 36].*

(d) As of April 27, 2021, subsection (a) of this section shall not apply to games of skill authorized by [subchapter III of Chapter 6 of Title 36]

D.C. Code § 16-1702 (2026) (emphasis added).

12

As a result, if the Budget Support Act applies retroactively, it would preclude DC Gambling's claims here.[8]  ECF No. 55; ECF No. 56.  It does not, DC Gambling argues, because the Act is not sufficiently express about its retroactive application.

While "[c]ourts recognize a presumption against retroactivity," there is no such presumption when a law's text "makes clear that it is retroactive." *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 176 (D.C. 2008)[9]; *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) (explaining that a court need not "resort to judicial default rules" when there is clear legislative intent favoring retroactivity).  Courts will therefore apply newly enacted legislation to pending cases when the legislature "has expressly prescribed" a retroactive "reach." *Landgraf*, 511 U.S. at 280; *see, e.g.*, *Metro. Police Dept. v. Public Emp. Rels. Bd.*, 301 A.3d 714, 721 (D.C. 2023).

Here, the D.C. Council "expressly prescribed" the Budget Support Act's "reach" to be retroactive. *Metro. Police Dept.*, 301 A.3d at 721.  After all, the Act provides that "[a]s of May 3, 2019, subsection (a) of this section"—that is, the portion of the Statute of Anne on which DC Gambling bases its claims—"shall not apply to sports wagering." D.C. Code § 16-1702(c).  That language "expressly prescribe[s]" the Council's intent to prevent plaintiffs from recovering under the Statute of Anne for losses resulting from authorized sports bets placed on or after May 3, 2019. *Metro. Police Dept.*, 301 A.3d at 721 (quoting *Landgraf*, 511 U.S. at 280).  And DC Gambling

---

[8] BetMGM and Crown DC Gaming LLC argue that the Budget Support Act simply "clarifies" already existing law and therefore does not even implicate retroactivity concerns.  *See* ECF No. 55 at 2.  Because the Court concludes that the Act raises no constitutional concerns even if changing rather than clarifying existing law, it need not consider whether it is merely a clarification.

[9] "It is well-settled that on issues of D.C. law, this Court defers to the rulings of the D.C. Court of Appeals." *Foulger-Pratt Residential Contracting, LLC v. Madrigal Condos., LLC*, 779 F. Supp. 2d 100, 112 (D.D.C. 2011) (citing *Williams v. Martinez*, 586 F.3d 995, 1001 (D.C. Cir. 2009)).

seeks to do exactly that—recover losses over $25 that unidentified individuals have incurred through sports wagering since the Sports Wagering Act was passed on May 3, 2019. *See* Compl. ¶¶ 9–13, 40.

DC Gambling argues that, to apply retroactively to its claims, the Budget Support Act must expressly state that it applies to pending cases. *See* ECF No. 57 at 2 ("The D.C. Council knows how to apply a statute to a pending case when it wants to."). "But we do not scour . . . statute[s] or . . . legislative history for magic words; 'it will suffice if the legislature has made its intent clear.'" *Lane v. Dep't of Hous. & Cmty. Dev.*, 320 A.3d 1044, 1049–50 (D.C. 2024) (quoting *Apartment & Off. Bldg. Ass'n of Metro. Washington v. Pub. Serv. Comm'n of D.C.*, 129 A.3d 925, 932 (D.C. 2016)). By providing that plaintiffs cannot recover under § 16-1702(a) for losses resulting from sports bets placed since "May 3, 2019," the Act's temporal applicability, including to pending cases, is plain.[10]

DC Gambling does make one additional argument that the Court must address:  that the Budget Support Act is inconsistent with PASPA. ECF No. 57 at 2–3. As DC Gambling sees it, while *Murphy* held that PASPA is unconstitutional under the Tenth Amendment, and while *Murphy* further held that certain provisions of the Act couldn't be severed from the unconstitutional ones, none of those holdings applies to the applicability of PASPA to the District. And, they contend, the Budget Support Act's attempt to carve out sports wagering from part of the Statute of Anne is precisely the kind of selective removal of a prohibition on sports gambling that PASPA forecloses.

---

[10] To be sure, "under D.C. law[,] legislatively-mandated retroactivity will be limited where 'manifest injustice' would occur or 'substantial due process concerns' are raised." *Foulger-Pratt Residential*, 779 F. Supp. 2d at 112 (quoting *Menna v. Plymouth Rock Assur. Corp.*, 987 A.2d 458, 463 n.15 (D.C. 2010)). But DC Gambling does not argue that retroactive application of the Act would result in manifest injustice or a constitutional violation. *See generally* ECF No. 57.

The Court disagrees. Even assuming without deciding that PASPA still applies to D.C. legislation, the Budget Support Act would be enforceable. PASPA prevents covered sovereigns from enacting laws that "completely or partially repeal old laws banning sports gambling." *Murphy*, 584 U.S. at 468. But while the Budget Support Act could be considered a partial repeal of the District's 1963 version of the Statute of Anne (that is, the repeal of § 16-1702 as it relates to sports gambling), that part of D.C.'s Statute of Anne is not a "law[] banning sports gambling." *Id.* Rather, assuming that D.C.'s Statute of Anne applies at all to sports gambling,[11] § 16-1702 merely creates a private right of action (first for the gambler, then for a third-party) to recover gambling losses of more than $25. Put differently, that part of the Statute of Anne does not prohibit gambling whatsoever; instead, it provides a disincentive (a substantial one, to be sure) to engaging in the kinds of higher-wage gambling it covers. And the Budget Support Act does not amend in any way § 16-1701.

That is not to say that the District's legalization of sports gambling isn't covered by PASPA. After all, the Sports Wagering Act expressly amended D.C.'s criminal code to clarify that "[n]othing in subchapter I of [Title 22, Chapter 17]"—the subchapter governing criminal gambling offenses, including a provision prohibiting betting on athletic contests—"shall be construed to prohibit the operation of or participation in . . . sports wagering regulated, licensed, or operated by the Office of Lottery and Gaming." D.C. Code § 22-1717. But DC Gambling does not assert a claim here under PASPA that the Sports Wagering Act is unlawful (nor is it clear it would have Article III standing to do so).

---

[11] The Court also need not decide whether the Statute applies to sports gambling. *See* ECF No. 30 at 19–23; ECF No. 32 at 18–19; ECF No. 39 at 7–14.

DC Gambling also suggests that the D.C. Council's attempt to carve out "sports wagering" from part of the Statute of Anne has no force or effect, because the text of the Budget Support Act assumes—incorrectly—that the Council had the authority to legalize sports wagering, as it purported to do through the Sports Wagering Act.  *See* ECF No. 57 at 3.  The argument appears to be that because there can be no "sports wagering activities" authorized in the District, the Budget Support Act's language stating that "subsection (a)" of the Statute of Anne does "not apply to sports wagering authorized by [subchapter II of Chapter 6 of Title 36]" is meaningless.

This is a cramped reading of the Act.  What is now § 16-1702(c) states: "As of May 3, 2019, subsection (a) of this section shall not apply to sports wagering authorized by [subchapter II of Chapter 6 of Title 36]."  § 16-1702(c) (brackets in original).  That language simply means that "subsection (a)" of the Statute of Anne does not apply to one category of "gaming"—that is, it does not apply to the sports wagering activities laid out in the Sports Wagering Act.  *Id.*; *see also Barnhard v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002) (explaining that a statutory construction inquiry ceases "if the statutory language is unambiguous and the statutory scheme is coherent and consistent." (internal quotation marks omitted)).  Even if the District lacked authority to pass the Sports Wagering Act, the Budget Support Act's cross reference merely expresses the D.C. Council's intent regarding the kinds of sports wagering activities that would not trigger the Statute of Anne's private cause of action.

In sum, because the Budget Support Act (and its addition of § 16-1702(c) to the D.C. Code) expressly applies retroactively to this lawsuit and is not foreclosed by PASPA, DC Gambling lacks a cause of action under the Statute of Anne.

## IV.    Conclusion

For the foregoing reasons, Defendants' Motions to Dismiss are GRANTED.  A separate Order will accompany this Memorandum Opinion.


DATE:  March 26, 2026

CARL J. NICHOLS
United States District Judge

17